UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

T.G., a minor in the custody of the Baltimore    *
 County Department of Social Services,
 on behalf of himself and all other children   *
 similarly situated, by his next friend,
 Beverly Schulterbrandt,        *   Case No. 8:23-cv-01433-PJM

T.A., a minor in the custody of the Montgomery  *
 County Department of Health and Human
 Services, on behalf of himself and all other   *
 children similarly situated, by his next friend,
 Ethel Zelenske,          *

D.B., a minor in the custody of the Prince George's  *
 County Department of Social Services,
 on behalf of herself and all other children    *
 similarly situated, by her next friend,
 Selene Almazan,         *

M.G., a minor in the custody of the Montgomery  *
 County Department of Health and
 Human Services, on behalf of herself     *
 and all other children similarly situated,
 by her next friend, Selene Almazan,     *

R.R., a minor in the custody of the Queen Anne's  *
 County Department of Social Services,
 on behalf of herself and all other children    *
 similarly situated, by her next friend,
 Sharon Jennings,         *

B.B., a minor in the custody of the Wicomico   *
 County Department of Social Services,
 on behalf of herself and all other children    *
 similarly situated, by her next friend,
 Sharon Jennings,         *

 and              *

DISABILITY RIGHTS MARYLAND, INC.    *

 1500 Union Avenue         *
 Suite 2000

Baltimore, MD  21211,　　　　　　　*

Plaintiffs,　　　　　　　　　　　*

v.　　　　　　　　　　　　　　　*

MARYLAND DEPARTMENT OF HUMAN　*
 SERVICES,
　　　　　　　　　　　　　　　*

  SERVE ON:　　　　　　　　*
  Attorney General Anthony G. Brown
  Office of the Attorney General　　*
  Civil Division
  civil_service@oag.state.md.us,　　*

MARYLAND DEPARTMENT OF HEALTH,　*

  SERVE ON:　　　　　　　　*
  Attorney General Anthony G. Brown
  Office of the Attorney General　　*
  Civil Division
  civil_service@oag.state.md.us,　　*

RAFAEL LÓPEZ, in his official capacity as　*
 Secretary of the Maryland Department
 of Human Services,　　　　　　*

  SERVE ON:　　　　　　　　*
  Attorney General Anthony G. Brown
  Office of the Attorney General　　*
  Civil Division
  civil_service@oag.state.md.us,　　*

STEPHEN LIGGETT-CREEL, in his official　*
 capacity as Acting Executive Director of the
 Maryland Social Services Administration,　*

  SERVE ON:　　　　　　　　*
  Attorney General Anthony G. Brown
  Office of the Attorney General　　*
  Civil Division
  civil_service@oag.state.md.us　　*

LAURA HERRERA SCOTT, M.D., in her official　*
 capacity as Secretary of the
 Maryland Department of Health,　　*

       SERVE ON:                     \*
       Attorney General Anthony G. Brown
       Office of the Attorney General      \*
       Civil Division
       civil_service@oag.state.md.us,    \*

BERNARD SIMONS, in his official capacity as  \*
  MDH Deputy Secretary for Developmental
  Disabilities and Director of the Maryland   \*
  Developmental Disabilities Administration,
                                    \*

       SERVE ON:                     \*
       Attorney General Anthony G. Brown
       Office of the Attorney General
       Civil Division                \*
       civil_service@oag.state.md.us,
                                      \*

LISA BURGESS, M.D., in her official capacity as  \*
  Acting MDH Deputy Secretary for Behavioral
  Health and Director of the Maryland Behavioral  \*
  Health Administration,
                                    \*

       SERVE ON:                     \*
       Attorney General Anthony G. Brown
       Office of the Attorney General      \*
       Civil Division
       civil_service@oag.state.md.us,    \*

RYAN B. MORAN, DrPH, in his official    \*
  capacity as Deputy Secretary Health Care
  Financing & Maryland Medicaid Director,   \*

       SERVE ON:                     \*
       Attorney General Anthony G. Brown
       Office of the Attorney General      \*
       Civil Division
       civil_service@oag.state.md.us,    \*

GREGORY BRANCH, in his official capacity as  \*
  Director of the Baltimore County Department of
  Social Services,                   \*

       SERVE ON:                     \*
       Attorney General Anthony G. Brown
       Office of the Attorney General      \*
       Civil Division
       civil_service@oag.state.md.us,    \*

OSCAR MENSAH, in his official capacity as            *
  Acting Social Services Officer of the Montgomery
  County Department of Health and Human Services,*

       SERVE ON:                                    *
       Attorney General Anthony G. Brown
       Office of the Attorney General                *
       Civil Division
       civil_service@oag.state.md.us,               *

GLORIA L. BROWN BURNETT, in her official            *
  capacity as Director of the Prince George's
  County Department of Social Services,             *

       SERVE ON:                                    *
       Attorney General Anthony G. Brown
       Office of the Attorney General                *
       Civil Division
       civil_service@oag.state.md.us,               *

SUSAN COPPAGE, in her official capacity as          *
  Director of Queen Anne's County Department of
  Social Services,                                  *

       SERVE ON:                                    *
       Attorney General Anthony G. Brown
       Office of the Attorney General                *
       Civil Division
       civil_service@oag.state.md.us,               *

ROY BREWINGTON, in his official capacity as         *
  Director of Wicomico County Department
  of Social Services,                               *

       SERVE ON:                                    *
       Attorney General Anthony G. Brown
       Office of the Attorney General                *
       Civil Division
       civil_service@oag.state.md.us,               *

Defendants.                                         *

*     *     *     *     *     *     *     *     *     *     *     *     *     *

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs T.G., T.A., D.B., M.G., R.R., B.B., and Disability Rights Maryland ("DRM") bring this action for declaratory and injunctive relief and for damages against the Department of Human Services, the Department of Health, and various officials of the State of Maryland, in their official capacities, for violating Plaintiffs' rights by illegally and unconstitutionally housing them in hospitals and institutions without medical need. Moreover, Plaintiffs demand a jury trial of all issues triable by jury. In support of these claims and requested relief, Plaintiffs allege the following facts and violations of law.

## MARYLAND'S OVERSTAY CRISIS

### A.    Scope of the Problem.

1.     Plaintiffs T.G., T.A., D.B., M.G., R.R., B.B., and other similarly situated Maryland foster children and youth, are warehoused in psychiatric hospitals, psychiatric units of general hospitals, emergency rooms, other hospital wards, and other institutions, often for weeks and months, even though they do not need hospitalization or institutionalization and have been found ready for discharge, because Defendants, all of whom are state officials, and/or their predecessors have failed to plan for and ensure a sufficient number and range of placements and behavioral-health services and supports. Because Plaintiffs are residing in highly restrictive institutional settings without medical necessity while they await placements or services from Defendants that would enable them to leave, they are in "overstay" status.

2.     Plaintiffs are Maryland foster children with disabilities who are committed to the custody of a local department of social services ("DSS"), outside of the Baltimore City DSS, who currently are experiencing, or are at imminent risk of experiencing, medically unnecessary hospitalization. Other children are in limbo because their parents cannot care for them without additional services, which Defendants do not provide to them, or because their local DSS will

not accept custody of them under voluntary placement agreements ("VPAs") until a bed becomes available in a highly restrictive residential treatment center ("RTC") or other restrictive setting. The overstays typically have lasted for several weeks but also have lasted for months and, on occasion, for a year or longer.

3.      Many of these children would be better and more cost-effectively supported with community-based and family-based placements and services, including mental-health and habilitative services.

4.      Hospital overstays are a significant problem, affecting more than 100 foster children a year, and a chronic problem in Maryland for at least the past five years.  Defendant Maryland Department of Human Services ("DHS") has informed the General Assembly that, in the one-year period from October 1, 2021, to September 30, 2022, 123 Maryland foster children were hospitalized without medical necessity.  On information and belief, roughly half of these foster children were in the custody of non-Baltimore City DSS agencies.  Most were hospitalized for psychiatric or behavioral reasons, but some were hospitalized for somatic (physical health) reasons.  Among youth hospitalized for medical reasons, 14 youth experienced overstays totaling 510 days, and .109 youth hospitalized for psychiatric reasons had overstays totaling 3,627 days.

5.      The 2021-22 numbers showed no improvement from the previous year. According to Defendants' own data reported to the General Assembly, 86 foster children were in hospital overstay status for the first nine calendar months of 2021; 11 of those children spent New Year's Eve of 2021 in overstay status.  Indeed, the average length of stay worsened last year; during this prior 9-month period in 2021, the 86 children were in overstay status for a total of 1,421 days.

6.      A partial survey of Maryland hospitals by the Maryland Hospital Association ("MHA") in June and July 2022 found that at least 51 children were in overstay status, languishing in Maryland hospitals without medical necessity because the state's foster-care system lacked placements for them.  This number likely was an undercount, as some Maryland hospitals did not participate in the survey.  *See* Liz Bowie et al., *Maryland kids in distress are being kept in emergency rooms for weeks, months*, Balt. Banner (Aug. 9, 2022, https://www.thebaltimorebanner.com/community/public-health/hundreds-of-maryland-children-live-in-hospitals-FCLWTVRAZFARHKCP74RP5EFJNQ/ [hereinafter Bowie et al., *Maryland kids*].  Additional Maryland children not counted by the MHA survey have been kept by Defendants in overstay status in hospitals in Washington, D.C., and Delaware.  After the undersigned counsel sent a demand letter to Defendant Maryland Department of Health ("MDH") and DHS on June 27, 2022 warning them this lawsuit was imminent, MDH and DHS focused and intensified their efforts to find placements for foster children in hospital overstays.  Subsequently, the agencies and undersigned counsel pursued mediation about these issues with a retired federal judge.  The number and duration of overstays declined during the autumn of 2022 while the parties mediated.  The mediation was terminated in December 2022.  At that time, Defendants reported four foster children in overstay status. Since then, on information and belief, the number of overstays has begun to rebound.  On February 13, 2023, Defendant López, then serving as Acting Secretary of DHS, testified at a budget hearing in the General Assembly that 10 foster children in DHS custody were in hospital overstays at that time.  On information and belief, nearly all of these were Plaintiff foster children who did not reside in Baltimore City.[1]

---

[1] Baltimore City foster children are covered by a separate consent decree in a related case in this Court, *L.J. v. Massinga*, which concerns matters addressed in this lawsuit and are therefore excluded from this Complaint.

Thus, five years after the practice was first reported, hospital overstays remain a major unresolved problem.

7.    Many other Maryland children with disabilities not (yet) in foster care also languish in hospital overstays, waiting for placements or services from Defendants.  These children are in limbo because their parents cannot care for them without additional services, which Defendants do not provide to them, or because their local DSS will not accept custody of them under voluntary placement agreements ("VPAs") until a bed becomes available in a highly restrictive RTC or another restrictive setting.  Defendants have not published data regarding the number of overstays resulting from their refusal to process VPA requests and, on information and belief, do not collect data on the number of non-foster children in hospital overstays awaiting services or placements from Defendants.

**B.    The Harm Caused by Overstays.**

8.    Hospital overstays are devastating to the Plaintiff children, who are confined to hospital beds for weeks on end with little, if any, opportunity for education, recreation, socialization, fresh air, or the basic interactions so critical for healthy child development.  Often, their mental and physical conditions deteriorate, making appropriate placements even more difficult to find.  Professional literature is replete with studies demonstrating that long-term hospitalization harms children.

9.    Hospital staff have spoken publicly about the harm overstays cause.  For example, Laura Scott, the medical director of Greater Baltimore Medical Center's pediatric emergency room, told *The Baltimore Banner* that, "[i]n a lot of ways I think jail and juvenile detention are better."  Liz Bowie, *Inside the ER: Staffers overwhelmed as struggling youths languish with no end in sight*, Balt. Banner (Nov. 3, 2022, 6:00 AM),

https://www.thebaltimorebanner.com/community/local-news/children-hospitals-mental-health-emergency-rooms-QHKYZ2KPRRFGPGKWPKVJ2TFUUU/ [hereinafter Bowie, *Inside the ER*].  She said: "The emotional toll on the youth who stay for weeks, or months, is clear."  *Id.*  In the same article, Neil Roy, the chief of emergency medicine at Sinai Hospital, added: "I think all of the autistic children break our hearts.  These are the children who are truly harmed by being in this setting.  They are taken from family and loved ones, they have no concept of why they are here."  *Id.*

10.      The impact of hospital overstays on children is profound.  Unnecessary inpatient hospitalization, institutionalization, or prolonged emergency-room stays are traumatic and cause additional harm to foster children who already have suffered great trauma requiring removal from their families.  Housing children in hospitals or institutions when they do not need to be there can undo whatever therapeutic benefit they may have received from the initial hospitalization, making placement more difficult; they often deteriorate and end up in more restrictive placements as a result.  For example, D.R., a foster youth who is no longer hospitalized, was determined by medical professionals to be clinically ready for discharge within 13 days of his admission to a psychiatric hospital in Washington, D.C. but remained hospitalized *for more than one year* while waiting for placement in a therapeutic foster home, group home, or diagnostic group facility.  He did not attend school or receive any educational instruction while hospitalized.  During the brief times he was allowed outside, he had to remain in an enclosure that he characterized as a "cage."  As a result of his prolonged and wrongful hospital overstay, D.R. deteriorated, and, in July 2022, his clinicians changed their recommendation for him to residential treatment.  A treatment center in Kansas admitted him but had no openings.  He was

eventually placed in Florida, well over a year after he was ready for discharge and in worse condition psychiatrically due to the overstay.

11.     Similarly, T.T.M., a 17-year-old foster youth, lived in an *emergency room* for approximately *five months* although he was ready for discharge from the hospital seven days after admission.  He did not attend school or receive *any* educational instruction while in the emergency room.  His family resided more than an hour away from the hospital and could not visit often.  T.T.M. spent his birthday in his small hospital emergency room without a visit from his family.  His hospital overstay negatively affected his mental-health diagnoses.  T.T.M. was finally discharged and placed in an out-of-state RTC after 42 programs had rejected him.

12.     K.B. is a 20-year-old foster child who is committed to the Prince George's County Department of Social Services ("PGDSS").  Diagnosed with multiple developmental and mental-health disabilities, she had been placed in a DDA-licensed group home.  She recently spent more than half a year in overstay status at Autumn Lake Liberty Heights, a nursing home in Baltimore City, following a placement at Spring Grove state psychiatric hospital, where she contracted a severe respiratory infection that required her to be placed on a ventilator and a gastric tube for nutrition.  She recovered and was medically cleared for discharge in March 2022 but was not removed by PGDSS until November 2022, when she moved to a DDA-licensed group home.  She did not receive *any* educational services during her half-year of overstay status at Autumn Lake.

13.     For other children in overstay status, the lack of meaningful crisis intervention and home-based services forces them to go into foster care when their parents could and would maintain them at home if appropriate services were provided. In such cases, Defendants are engaging in a policy of family separation at odds with their obligation to engage in family

preservation and in violation of these children's constitutional right to family integrity and family association.  This is a deliberate choice by Defendants.  For example, J.B., a youth with autism and behavior challenges, was hospitalized for months in overstay status on two separate occasions during the past year.  Applications were sent to dozens of residential programs, including many outside Maryland, over the objection of J.B.'s mother, who did not want him placed far away because it would hinder visitation.  J.B. ultimately went home after his first hospitalization with the promise of in-home supports and services from DSS.  Unfortunately, the services were not put into place, and J.B. experienced another crisis when he wanted to go to school but could not because he did not have a new school placement.  He was hospitalized again after being transported by emergency personnel; his grandmother attempted to use the crisis intervention hotline number the family had been given but was asked a host of demographic questions while J.B. was in crisis, making the process impracticable and unhelpful.  After his second overstay period, J.B. was placed locally in a community program, not an RTC, with advocacy assistance from DRM.

14.    Foster children in hospital overstay status typically lack access to any education for weeks or months.  Local DSS workers rarely make prompt referrals for educational services for foster children while they are housed in hospitals.  Even when some educational services are eventually obtained, they are far from the full educational services to which the children and youth are entitled.

15.    Tragically, A.B. will never have the opportunity to be placed or to return to his family.  A.B. was a 17-year-old youth with autism and mental illness.  During the past year, he divided his time between living at home and various stints in three different emergency rooms and a hospital ward.  A.B.'s parents tried multiple times to access crisis services to maintain him

at home, but the crisis intervention hotline only gave generic referrals to autism support organizations and called 911 for the police to take A.B. to emergency rooms. After an extended stay at one of the emergency rooms for the second time, he was re-hospitalized on a specialized psychiatric unit intended for short-term stabilization. After more than six months on the unit awaiting a VPA with his local DSS, A.B. died very suddenly. DRM has conducted an investigation into the circumstances of A.B.'s death and expects to release a report shortly. A.B.'s death was the second on that unit within a year. The first death was also of a youth whose parents were seeking a VPA.

### C.    The State's Long History of Recourse to Overstays.

16.    Plaintiff DRM has addressed the overstay issue previously with MDH agencies. In 1987, DRM, then called Maryland Disability Law Center, filed *Lisa L. v. Wilzack*, No. 1:87-CV-00138, to address overstays of children in Maryland's public psychiatric hospitals. The case settled in 1993 with a settlement agreement and court order that required MDH to issue regulations requiring specified psychiatric hospitals to conduct prompt discharge planning and institute other protections. The regulations required by the settlement have been of limited utility because most of the hospitals covered by the regulations no longer exist or no longer serve children.

17.    Likewise, these issues have been discussed with Defendants in the context of *L.J. v. Massinga*, No. ELH-84-4409, a longstanding case pending in this Court addressing Baltimore City's foster-care system. Counsel for the *L.J.* plaintiffs have raised concerns about hospital overstays of Baltimore City foster children for the last 4½ years.

18.    In 2017, because of concern about the trend towards use of overly restrictive placements, including hospitals, to house children with dual mental-health and developmental

disabilities and a growing shortage of placements for such children, DRM hosted a symposium to educate members of the public and officials from all state agencies about a crisis prevention and intervention system called "Systemic, Therapeutic, Assessment, Resource and Treatment" ("START"). START is a research-based program of comprehensive in-home services successfully implemented by several states to minimize unnecessary hospitalization and institutionalization. DHS and MDH each declined to implement START in Maryland. Eventually, however, the Developmental Disabilities Administration ("DDA"), a component agency of Defendant MDH, agreed to pilot START. On information and belief, the scope of the pilot was limited by time and resources and served only a handful of individuals with limited case management services. MDH has not provided any specific information about if or how START will be expanded.

19.     Separate from START, Defendants also have failed to develop and implement comprehensive in-home crisis prevention and intensive in-home therapeutic services ("wraparound services") that other states have utilized to maintain children in their communities or to facilitate their prompt return. A demonstration project for intensive wraparound services was developed during the 2008-2012 period but was halted and dismantled. Programs instituted as replacements are scarce and insufficient. At most, MDH has developed a hotline for families in crisis to contact, with a promise of some in-home mobile-response clinical intervention. On information and belief, families often are provided only generic information and assistance for accessing emergency personnel to transport their family member to the emergency room or for identifying other agencies that they can contact. MDH promised a decade ago or more that wraparound intensive in-home therapeutic services would be available throughout the state, but,

outside of DSS-funded services in Baltimore City and surrounding areas, wraparound services have not been available to avert or remedy unnecessary hospitalization.

20.     Despite recent federal legislation promoting prevention and family-based community services for foster children, local DSS offices often seek to place children with significant challenging behavior in highly restrictive residential institutions such as RTCs, often out-of-state, instead of facilitating placement in the community by utilizing wraparound services, crisis prevention and intervention services, treatment foster care, or placement with willing relatives with support services. Plaintiff children thus frequently remain in hospital overstay status waiting for RTC placements to become available even though they could be served in less restrictive settings.

21.     Despite legal requirements intended to keep children in community settings, Defendants have created a system that is skewed towards institutional placement. For example, families who need services for their children must seek voluntary placement with Defendant DHS, and the only options DHS makes available for voluntary placement are an RTC, a short-term diagnostic facility, or a DDA-licensed therapeutic group home for children with developmental disabilities. Indeed, Gregory James, the former DHS Deputy Secretary for Operations, told National Public Radio that most children in hospital overstays "need the higher level of supervision they can get at a residential treatment center" but must remain in hospitals due to RTC waiting lists that have roughly 350 children ahead in line for placements. Rachel Baye, *Foster Kids in Maryland Are Being Left in Psych Hospitals Due to Space Constraints*, Nat'l Pub. Radio (Feb. 15, 2020), https://www.npr.org/2020/02/15/806282700/children-in-marylands-foster-care-system-are-being-left-in-psychiatric-hospitals [hereinafter Baye, *Foster Kids*].

22.     Contrary to Mr. James' statement, the Governor's Office of Crime Prevention, Youth, and Victim Services ("GOCPY"), which is responsible for setting interagency policy on placements and assessing unmet needs, reported to the General Assembly that "Residential Treatment Centers and other high-level residential programs do not currently offer the types of services to adequately address the ongoing needs of the youth identified as at risk for a hospital overstay." Gov. Off. of Crime Prevention, Youth, and Victim Servs., No. 6523, FY 2021 State of Maryland Out-of-Home Placement and Family Preservation Resource Plan 4 (2021) [hereinafter GOCPY FY 2021].

23.     Defendants' over-utilization of RTCs exacerbates the hospital-overstay crisis because of the limited number of RTC beds in Maryland and out-of-state, creating waiting lists that can last for many months. Three Maryland RTCs have closed since 2017, and those that remain open have faced significant staffing shortages over the past three years and, on information and belief, are accepting fewer children.

24.     To the extent that Defendants have considered this issue, they have focused on expanding the number of RTC and hospital beds, a response that runs counter to federal policy and the advice of many experts; good policy dictates an array of services designed to try to avoid RTCs entirely and instead try to maintain children in, and return them to, their communities.

25.     As recently as April 26, 2023, Defendant MDH issued a "Request for Expressions of Interest" ("RFOI") to providers to solicit interest in developing a "High Acuity Tertiary Care Inpatient Program" to "reduce and eliminate barriers affecting the placement of individuals in behavioral health crises experiencing extended hospital stays." (Available online at: https://health.maryland.gov/bha/Documents/04.26.2023%20Tertiary%20Care%20REOI.pdf. Last visited May 24, 2023). This RFOI expressly called for the creation of 15 adolescent and 10

long-term hospital beds to serve adults and adolescents who have been difficult to place in acute

care and specialty-care hospitals. *Id.*

26.    Each named Plaintiff and Plaintiff class member has been, and continues to be,

irreparably harmed by Defendants' failure to develop a range of alternatives to hospitalization

and RTC placement. Plaintiffs' efforts to resolve this matter have not been successful, and

Plaintiffs have no recourse but to file this lawsuit. Formal written notice of these claims was

provided to DHS and MDH on June 27, 2022.

**D.    Hospital Overstays Violate Federal and State Laws and Policies.**

27.    Hospital overstays are unconstitutional, illegal, and contrary to settled state and

federal policy. Local DSS offices are state agencies, operating at all times under the control of

DHS and its Social Services Administration ("SSA"). Foster children committed to the custody

of a local DSS are, therefore, entitled to federal and state constitutional guarantees of liberty and

due process. DHS and SSA's pattern and practice of using hospitals as foster-care placements

violates these fundamental rights. Similarly, for children who languish in hospitals because of

state policy restricting use of VPAs to families willing to accept placement of their children in

restrictive placements, the Defendants' policy—a choice on their part that is not required by any

state law—violates their rights to procedural and substantive due process. And, by forcing

parents to forego custody of their children in order to obtain services for their children, the policy

violates those children's substantive due-process rights to family integrity and association.

28.    Children with disabilities who are clinically ready for discharge from a

psychiatric hospital or unit or who are boarding in emergency rooms without treatment or

services while waiting for other placements, face illegal discrimination based on their disabilities

in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and

Section 504 of the Rehabilitation Act of 1973 ("Section 504" or the "Rehabilitation Act"),

29 U.S.C. § 794.  These children have the right to be placed in the most integrated setting

appropriate to their needs, including community placements, as the Supreme Court held in the

seminal *Olmstead* decision, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

29.     Additionally, the federal Early Periodic Screening, Diagnostic, and Treatment

("EPSDT") provisions of the Medicaid Act require MDH to provide all medically necessary

behavioral health services required by a Medicaid-eligible child.  Plaintiffs need these services to

remain in the community or to be placed in the community, but they rarely receive them.  For

example, MDH has structured its service-delivery system to be so segmented and diagnosis-

driven that children with autism or other developmental disabilities are unable to receive certain

mental-health services even if those children also have mental health diagnoses.  This is a choice

that state officials have made.

30.     Federal foster-care laws require states, as a condition of receiving federal funds,

to have mechanisms in place to ensure that foster children are placed in the least restrictive

placement and that they are placed near their homes.  Four years ago, Congress enacted the

Family First Prevention Services Act ("Family First," "FFPSA"), Pub. L. No. 115-123, § 50702

*et seq.*, 132 Stat. 232 (2018), which provides states with additional tools, funding, and incentives

to avoid or facilitate exits from foster care and residential care and disincentives to dissuade

states from using institutions and other restrictive placements.

31.     Longstanding state policy recognizes and follows these principles.  "Maryland

law very strongly favors home and community[-]based care over institutional care."  *Reese v.*

*Dep't of Health & Mental Hygiene*, 177 Md. App. 102, 124 (2007) (Hollander, J.) (discussing

Md. Code Ann. Health-Gen. ("HG") §§ 7-102(4)-(6), which, *inter alia*, require MDH "to

designate sufficient resources to strengthen a permanent comprehensive system of community programming for individuals with developmental disability as an alternative to institutional care" and to provide "resources to operate community services to sustain [such] individuals … in the community, rather than in institutions"). MDH and DHS regulations further require placement of individuals in their communities and not in institutions wherever possible.

32.     Since 2007, state policy known as "Place Matters" has called for the reduction of RTCs and other congregate-care placements for Maryland foster children and increased placement of those children with families. *See Place Matters*, Md. Dep't of Hum. Servs., https://dhs.maryland.gov/place-matters/. This policy is consistent with federal child-welfare policy implemented through the FFPSA, which also calls for extremely limited use of residential congregate-care placements and limits federal Title IV-E financial support accordingly. Despite improvements, University of Maryland School of Social Work ("UMSSW") researchers report that, "today, *more than 25% of Maryland children in out-of-home placements reside in nonfamily settings*." Deborah S. Harburger, et al., *Maryland's Children's Quality Services Reform Initiative: A strategic approach to improving the quality of services for children in residential interventions and increasing the number of children served in family settings*, Inst. for Innovation & Implementation, Univ. of Md. Sch. of Soc. Work, 2021, at 2 (emphasis in original) [hereinafter Harburger et al., *Maryland's Children's QSRI*].

33.     Despite their knowledge of the lack of sufficient community resources to serve Plaintiff class members and other children in overstay status, Defendants have failed to develop, fund, and provide sufficient community-based services to Maryland foster children and to children whose parents have sought voluntary placement to access services, demonstrating through their actions a preference for more restrictive congregate-care residential placements.

The Supreme Court ruled that such "[u]njustified isolation … is properly regarded as discrimination based on disability."  527 U.S.. at 597.

34.    Under Justice Ginsburg's plurality opinion in *Olmstead*, which is followed by the lower courts, states are required to provide community-based services to persons with disabilities who would otherwise be entitled to institutional services when (a) the State's treatment professionals reasonably determine that such community placement is appropriate; (b) the affected persons do not oppose such treatment; and (c) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others who are receiving State-supported disability services.  *Id.* at 607 (Ginsburg, J., plurality).  The plurality opinion does, however, allow a defense if the requested accommodation would "entail a 'fundamenta[l] alter[ation]' of the States' services and programs."  *Id.* at 603 (quoting 28 C.F.R. § 35.130(b)(7)) (brackets in original).  This "allow[s] the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities."  *Id.* at 604.

35.    In May 2022, UMSSW researchers issued an SSA-commissioned assessment of the placement status and needs of Baltimore City foster children, including children in hospital and RTC overstay status or on waiting lists for placement, and concluded that MDH should *not* develop additional highly restrictive congregate care settings such as RTCs and high-intensity therapeutic group homes because "[t]here are children in these settings who instead should be in family settings" in their communities.  *Baltimore City Placement Review*, Inst. For Innovation & Implementation, Univ. of Md. Sch. of Soc. Work, May 2022, at 20.  DHS has not accepted this recommendation, even though DHS procured it to comply with a requirement of the modified

consent decree in the related *L.J. v. Massinga* class action for Baltimore City foster children pending in this Court (which requires that DHS biennially assess what placements and supportive services are needed to serve its foster children).

36.    Despite this clear state policy against unnecessary institutionalization of children, DHS continues to keep both foster children and children awaiting VPAs in restrictive inpatient facilities while waiting for RTC beds to become available in-state or, often, in states as far away as Georgia, Arkansas, or Tennessee.  In its report to the General Assembly about VPAs, DHS confirmed that, to qualify for a VPA, the "[c]hild requires a restrictive Out-of-Home placement and the reason for the placement is appropriate."  Md. Dep't Hum. Servs., Report on Voluntary Placement Agreements – Children & Youn[g] Adults 2, Dec. 1, 2021, at 2.  The report confirms that except for a small number of children with intellectual and developmental disabilities who were placed in DDA-licensed therapeutic group homes, no children were placed in non-restrictive settings under VPAs.  Defendants are aware that their actions violate the rights of these Maryland children but have failed to develop and implement sufficient home and community-based services and placements.  Some local DSS agencies refuse entreaties to (i) utilize emergency measures such as hotels,[2] (ii) develop emergency foster homes that are kept available on standby, (iii) create and to develop comprehensive wraparound therapeutic services across the state, and (iv) institute other reforms that could provide short-term immediate relief.

37.    The Maryland General Assembly has expressed alarm at the situation and has required Defendants to submit annual reports explaining the scope of the problem and their plans to resolve it.  The House of Delegates passed legislation in 2020 and 2022 to compel DHS to address the hospital overstay issue, but the Senate failed to pass the bills following DHS

---

[2]  Plaintiffs recognize that hotel placements also are illegal and are generally unacceptable as ongoing placements, but, given the extreme harm that hospital overstays can cause, they are the lesser of two evils.

opposition. *See* H.B. 1382, 2020 Leg., 441st Sess. (Md. 2020); H.B. 0406, 2022 Leg., 444th Sess. (Md. 2022). Despite this legislative pressure, Defendants have not developed a comprehensive plan to resolve the current crisis of hospital overstays or to ensure that children will not languish in overstay status in the future.

38.    Some states faced with similar misuse of psychiatric programs and emergency rooms as *de facto* foster-care placements have been able to develop services, programs, and placements that eliminated or minimized hospital overstays. Defendants have not availed themselves of these models, continuing to focus on RTCs and restrictive congregate care. For example, to address overstays, one year ago MDH licensed a 12-bed group facility in Western Maryland for children with developmental disabilities; only six beds were actually used, and the program recently closed. MDH is working to license a new four-bed RTC unit on the grounds of a group-home facility in Baltimore County, and reportedly is utilizing vacant space to expand one of its locked "RICA" RTC facilities. It has been trying to expand the capacity of psychiatric hospitals—even though Plaintiffs need to *leave* hospitals. The most recent initiatives announced by the Children's Cabinet do not identify any systemic changes intended to address the overstay problem, and their requests for proposals or statements of interest from the private-provider community to create new beds have elicited very little, if any, response beyond the above small RTC and congregate-care programs.

39.    More than forty years—*four decades*—ago, this Court declared the practice of unjustified psychiatric hospitalization to be unconstitutional, despite the ostensible need identified by state officials. *See Johnson v. Solomon,* 484 F. Supp. 278, 287 (D. Md. 1979) (Young, J.) (finding that, "in the specific context of involuntary commitment to a mental hospital where the deprivation of liberty is great and the possibility of stigmatization is very real, the

mere *possibility* of benefit is not enough to justify such official paternalism") (emphasis in original).  Moreover, in that same litigation, this Court found that MDH (then named DHMH) had formally admitted that the practice where "juveniles are inappropriately admitted to mental hospitals" is wrong and unjust:

> "[A] child who could be treated in a community mental health center should not be placed in an institutional setting for treatment.  Too often because of lack of parental ability, *lack of juvenile court appreciation of mental health programs and lack of foster care placement facilities, children who do not need to be institutionalized in hospitals find their way into our regional hospital centers.* Inappropriate placements are costly to the individual, the mental health system and society."

484 F. Supp. at 588 (emphasis added) (quoting DHMH Plan for Fiscal Years 1979-1983 at V-561).

      40.     In failing to develop the services, programs, and placements needed to solve the systemic problem of hospital and institutional overstays, Defendants have failed to exercise professional judgment, have acted or have failed to act in ways that fall below professional standards of care, and have ignored known or likely risks of harm to the children and youth despite years of notice.  These systemic failures are compounded by failure to exercise reasonable professional judgment in individual cases:

      a.     In determining the placement needs of the children in overstays, Defendants tend to focus on the negative behavior or characteristics of the children and ignore the views and recommendations of the professional staff at the hospitals that are treating and evaluating them.  They favor RTC placement even though these types of placements should be a last recourse after ruling out all less restrictive options.  This lack of appropriate assessment results in children being much harder to place and having to spend months waiting for RTC placements to be become available, especially in out-of-state, for-profit facilities, some of which are owned by companies under federal investigation for running programs riddled with abuse

and neglect.  Hospital staff have been pressured into signing "certificates of need" for RTC placement because Defendants lead them to believe that that is the only way the children will be discharged from the hospital.

      b.      Some DSS agencies refuse to use hotels and other non-institutional emergency alternatives even though other DSS agencies have done so successfully.  In some cases, DSS agencies simply ignore hospital recommendations that a hotel would be preferable to continued hospital overstays.  Children and youth sometimes are placed successfully in less restrictive settings after waiting months for an RTC placement that does not materialize.

      c.      Defendants have not developed standards and methodologies to ensure consistent and proper assessment of placement needs of Plaintiffs.  Instead, placement decisions for foster children are inconsistent and idiosyncratic, as UMSSW researchers determined in a comprehensive assessment of decisions to place foster children in group facilities.  *See Maryland Children's QSRIError! Reference source not found.*, *supra* at 2 (describing assessment process as "highly variable" and focusing on "individual opinions and expertise of [local DSS staff] across 24 different jurisdictions, as well as the availability of placements and responsiveness of providers," without a template for "key characteristics and therapeutic needs of youth who require a non-family setting for the purpose of their own behavioral health treatment needs").

      d.      Defendants have failed to ensure the availability and provision of a continuum of supports and services to children and families before the situation becomes a crisis and an out-of-home placement becomes necessary.

      41.      Defendants are aware that their actions and omissions cause or risk substantial harm to foster children and children awaiting voluntary placement who will board in hospitals or other institutions without medical need.  Despite this knowledge, and despite their ability to cure

the violations of the children's rights, Defendants have been, and continue to be, deliberately indifferent to the harm and violations of the law described in this Complaint.

42.     Defendants have had ample financial wherewithal to afford any costs that might be needed to halt their violations.  Maryland had a *$2 billion* surplus at the end of FY 2022 (June 30, 2022).  *See Governor Hogan Statement on Comptroller's FY 2022 Closeout Report*, The Off. of Governor Larry Hogan (Sept. 14, 2022), https://governor.maryland.gov/2022/09/14/governor-hogan-statement-on-comptrollers-fy-2022-closeout-report/.  Rather than meet its obligations to children and families, MDH elected to return to the general treasury a *$100 million bounty* from a federal increase of its proportion of Medicaid funding.  *See* Hallie Miller & Liz Bowie, *How Maryland failed families and children with complex needs*, Balt. Banner (Dec. 12, 2022, 6:00 AM), https://www.thebaltimorebanner.com/community/family/children-mental-health-treatment-hogan-maryland-NSXT5FRBTJGFBNKTAOH2Y64XJQ/ [hereinafter Miller & Bowie, *How Maryland Failed*].

43.     Moreover, as discussed below, by failing to induce its residential providers to conform to the federal Family First legislation, and by failing to secure evidence-based supportive services to allow children to be placed with families, DHS is forfeiting an unknown amount of federal Title IV-E funding for the cost of care of foster children with complex needs that cannot be met in foster homes or by parents or other family members absent appropriate supports.  As the outgoing former Comptroller of Maryland, Peter Franchot, recently stated to the *Baltimore Banner*: "It is not a lack of money, it is a lack of political will to implement what is needed to take care of these severely disabled kids."  *Id.*

44.     Without judicial intervention, Defendants' illegal and wrongful practices will continue to harm the children for whom Defendants are responsible and will leave them without recourse.

## JURISDICTION AND VENUE

45.     This class action for declaratory and prospective injunctive relief and for compensatory damages is brought to address Defendants' ongoing deprivations of rights guaranteed by federal statutes, the U.S. Constitution, and the Maryland Declaration of Rights: Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the EPSDT provisions of the Medicaid Act, 42 U.S.C. 1396d, *et seq*. (through 42 U.S.C. § 1983); the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1 (through 42 U.S.C. § 1983); and Article 24 of the Maryland Declaration of Rights.

46.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

47.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 & 2202 as well as by Rules 57 and 65 of the Federal Rules of Civil Procedure.

48.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to these claims occurred in this District.  All Defendants maintain places of business in this District.

## PARTIES

### A.     Named Plaintiffs and Next Friends.

49.     Plaintiff T.G. is a 16-year-old foster child with multiple disabilities in the custody of the Baltimore County DSS who had been in overstay status in Sheppard Pratt Hospital in

Towson for nearly eight months when this Complaint was initially filed on May 30, 2023. T.G. was emergently admitted to Sheppard Pratt on August 23, 2022 due to suicidal ideation, which he denies, and was determined by an administrative law judge ("ALJ") not to require further hospitalization on September 7, 2022 and was ordered discharged.  He spent nearly a year in Sheppard Pratt *after* he was ordered discharged until August 17, 2023, when DSS moved him to a separate RTC facility operated by Sheppard Pratt, T.G. has spent more than half of his life in foster care.  He entered foster care at age seven after having been sexually abused and trafficked, and subsequently had fifteen different foster-care placements, including an RTC and several secure facilities.  T.G. was heavily medicated in the hospital, slept much of the day, and got no exercise.  He has learning disabilities and an Individualized Education Program ("IEP") requiring a 1-to-1 behavioral aide, a 1-to-1 instructional assistant, counseling, audiology, transition services, and extended school-year services, among other services.  T.G. did not receive any education services while hospitalized from his admission date of August 23, 2022 through September 30, 2022.  He began receiving home-and-hospital instruction on October 3, 2022, but this consisted of only  six hours of  tutoring per week.  He did not receive any transition services as required by his IEP.  His IEP team indicated that his hospital stay interrupted his education and that his education needs were not comprehensively met at Sheppard Pratt Hospital.  Since his hospitalization commenced, T.G. did not receive his annual audiology exam for hearing loss in his right ear. He also needed glasses, but the hospital restricted him from having glasses due to concerns that he might utilize the glasses inappropriately.  His DSS worker requested goggles for him but did not received approval. Sheppard Pratt Hospital is a short-term crisis intervention facility, so D.B. did not receive

individual therapy even though intensive therapy was recommended by his clinical team at the hospital.

50.     Pursuant to Rule 17(c)(2), T.G. appears through his next friend, Beverly Schulterbrandt.  Ms. Schulterbrandt is a senior attorney at the American Bar Association's Center on Children and the Law.  She previously worked at the Maryland Office of the Public Defender where she was a supervising attorney for attorneys representing parents in Maryland "Child in Need of Assistance" ("CINA") child-welfare cases in juvenile court.  Ms. Schulterbrandt has more than two decades of experience working on dependency and delinquency cases.  Because T.G. is a minor in state custody, has experienced frequent placement moves, and lacks consistent significant relationships with adults able to represent him, appointment of Ms. Schulterbrandt as his next friend is necessary to protect his interests.

51.     T.G.'s DSM-V diagnoses substantially limit one or more life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain. His diagnoses include disruptive mood dysregulation disorder ("DMDD"), attention-deficit hyperactivity disorder (ADHD), post-traumatic stress disorder ("PTSD"), and oppositional defiant disorder ("ODD").  He is a qualified person with disabilities.

52.     T.G. received group therapy and medication management in the hospital.  These services can be provided in the community.

53.     As a child in the custody of Baltimore County DSS, T.G. is categorically eligible for Medicaid-funded services in the community and might be eligible for additional state-funded services.

54.     T.G. wants to live in the community with appropriate services and support.  While in the hospital, he was restricted from attending school in the community or interacting with nondisabled peers.

55.     Without the availability of needed community services, T.G. is at risk of overstay again in the future.

56.     T.G. is a constituent of DRM.

57.     Plaintiff T.A. is a 13-year-old foster child with multiple disabilities in the custody of the Montgomery County Department of Health and Human Services ("DHHS") who until recently was in lengthy overstay status at Sheppard Pratt Baltimore-Washington Hospital.  T.A. was emergently admitted to Sheppard Pratt on or around November 18, 2022 following an altercation with a peer on his school bus.  On November 30, 2022, T.A. was medically cleared for discharge by Sheppard Pratt.  DHHS did not remove him from the hospital until June 12, 2023.  Throughout that time, T.A. was on abandonment status at Sheppard Pratt because a child-neglect report was made based on DHHS not picking him up from the hospital.  T.A. is diagnosed with multiple developmental and mental-health disabilities and has an IEP requiring special-education services.  For a period, T.A. did not receive any educational services and eventually received eight hours per week of home-and-hospital tutoring services at Sheppard Pratt.  T.A. did not receive any visitors while stuck in the hospital over the holidays. Given that Sheppard Pratt Baltimore-Washington Hospital is a short-term crisis-intervention facility, T.A. did not receive individual therapy, applied behavioral-analysis services, and 1:1 support, all of which were recommended by his clinical team. T.A. was placed in an RTC in Florida on June 12,l 2023.  six and one-half months after he was cleared for discharge by his clinicians at Sheppard Pratt.

58.     Pursuant to Rule 17(c)(2), T.A. appears through his next friend, Ethel Zelenske. Ms. Zelenske is a retired attorney who specialized in representing individuals with disabilities. She previously worked at the Maryland Legal Aid Bureau for fourteen years where, *inter alia*, she served as co-counsel in *L.J. v. Massinga*, a federal class-action lawsuit in this Court addressing deficiencies in Baltimore's foster care program, and *Johnson v. Solomon,* 484 F. Supp. 278 (D. Md. 1979), a class-action lawsuit in this Court addressing the unjustified psychiatric hospitalization of youth with disabilities.   After Legal Aid, she worked as Director of Governmental Affairs for the National Organization of Social Security Claimants' Representatives.  Because T.A. is a minor in state custody, has experienced frequent placement moves, and lacks consistent significant relationships with adults able to represent him, appointment of Ms. Zelenske as his next friend is necessary to protect his interests.

59.     T.A.'s DSM-V diagnoses substantially limit one or more life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain.  T.A. has been diagnosed with autism, ADHD, DMDD, and PTSD.  He is a qualified person with disabilities.

60.     T.A. received group therapy, recreational therapy, and occupational therapy in the hospital.  These services can be provided in the community.

61.     As a child in the custody of DHS, T.A. is categorically eligible for Medicaid-funded services in the community and might be eligible for additional state-funded services.

62.     T.A. wants to live in the community with appropriate services and support.  While he was in hospital overstay status, he was restricted from attending school in the community or interacting with nondisabled peers.

63.     Without the availability of needed community services, T.A. is at risk of overstay again in the future.

64.     T.A. is a constituent of DRM.

65.     Plaintiff D.B. is a 16-year-old foster child with multiple disabilities in the custody of the Prince George's County DSS who was in overstay status in Sheppard Pratt Hospital in Towson.  D.B. was emergently admitted to Sheppard Pratt on December 5, 2022 after making threats of harm.  On or about December 20, 2022, Sheppard Pratt medically cleared D.B. for discharge, but DSS did not remove her until June 23, 2023—seven months later.  D.B. has an IEP and requires special-education services.  She did not receive educational services when placed at Sheppard Pratt.  D.B. rarely went outside or felt fresh air since her admission to the hospital.  D.B. did not receive individual therapy at Sheppard Pratt even though she requested it.

66.     Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff D.B. appears through her next friend, Selene Almazan.  Ms. Almazan has worked in child advocacy for more than three decades. She is a former supervising attorney at the Legal Aid Bureau, where she worked in child welfare; she was the director of advocacy at a Maryland non-profit where she represented families and children in special-education matters at a project funded, in part, by the Maryland Legal Services Corporation. In addition to her private practice devoted to child advocacy, she is the legal director at the Council of Parent Attorneys and Advocates ("COPAA"), a national organization devoted to advocacy for students with disabilities. As legal director, she guides litigation for COPAA as an organizational plaintiff and directs amicus appellate work around the country in issues related to child welfare and advocacy. She is co-counsel in a class action lawsuit in Oregon challenging the use of exclusionary discipline. Because D.B. is in state custody, has experienced frequent placement moves, and lacks consistent significant

relationships with adults able to represent her, the appointment of Ms. Almazan as her next friend is necessary.

67.     D.B.'s DSM-V diagnoses substantially limit one or more life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain.  She has been diagnosed with DMDD, depression, and ADHD. She is a qualified person with disabilities.

68.     D.B. received group and recreation therapy services in the hospital. These services can be provided in a less restrictive environment than a hospital.

69.     As a child in the custody of DHS, D.B. is categorically eligible for Medicaid-funded services in the community and might be eligible for additional state-funded services.

70.     D.B. wants to live in the community with appropriate services and support.  While hospitalized, she was restricted from attending school in the community or interacting with nondisabled peers.

71.     Without the availability of needed community services, D.B. is at risk of overstay again in the future.

72.     D.B. is a constituent of DRM.

73.     Plaintiff M.G. is a 17-year-old foster child with multiple disabilities in the custody of the Montgomery County DSS who was in overstay status in the Psychiatric Institute of Washington ("PIW") in the District of Columbia.  M.G. was admitted to PIW on March 3, 2023. On or about March 27, 2023, PIW medically cleared M.G. for discharge, but DSS did not pick her up from the hospital or found another placement for her until July 12, 2023, three and one-half months ago.  M.G. has an IEP and requires special-education services.  She did not receive any educational services while she was placed in PIW.

74.     Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff M.G. appears through her next friend, Selene Almazan, whose background is discussed *supra* at ¶ 66.  Because M.G. is in state custody, has experienced frequent placement moves, and lacks consistent significant relationships with adults able to represent her, the appointment of Ms. Almazan as her next friend is necessary.

75.     M.G.'s DSM-V diagnoses substantially limit one or more life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain.  M.G. has been diagnosed with major depressive disorder, PTSD, ADHD, generalized anxiety, and asthma.  She is a qualified person with disabilities.

76.     M.G. received group therapy in the hospital. She also received individual therapy from an extern, but this service stopped when the extern's school year ended.  These services can be provided in a less restrictive environment than a hospital.

77.     As a child in the custody of Montgomery County DHHS, M.G. is categorically eligible for Medicaid-funded services in the community and might be eligible for additional state-funded services.

78.     M.G. wants to live in the community with appropriate services and support. When she was hospitalized in PIW, she was restricted from attending school in the community or interacting with nondisabled peers.

79.     Without the availability of needed community services, M.G. is at risk of overstay again in the future.

80.     M.G. is a constituent of DRM.

81.     Plaintiff R.R. is a 15-year-old foster child with multiple disabilities in the custody of the Queen Anne's County Department of Social Services ("QACDSS") who is stuck in

overstay status at University of Maryland Shore Medical Center at Easton ("UMSMC"), placed

in a three-bed locked pediatric psychiatry unit.  R.R. was emergently admitted to UMSMC on

March 17, 2023 following an incident at a licensed QACDSS foster home, where she was placed.

On March 27, 2023, R.R. was medically cleared for discharge from UMSMC.  In the five

ensuing months, QACDSS has not picked her up from the hospital.  QACDSS has indicated that

she is qualified for placement in a therapeutic foster home and, accordingly, has explored foster-

home placements for R.R. but it has claimed that it cannot find a therapeutic foster home for

R.R.  The hospital's current clinical recommendation for R.R. is placement in a therapeutic foster

home while awaiting RTC placement.

82.    R.R. has an IEP for emotional disability.  Since her admission on March 17, 2023,

R.R. has had only limited access to on-line tutoring.  Once on-line tutoring was initiated, the

charger did not initially work and then R.R. was too despondent to participate.  She has not

received any other educational services.

83.    R.R. received individual therapy in the community for several years prior to her

hospitalization.  She did not receive any individual therapy for the first four months of her

hospitalization due to conflicts with insurance and only resumed individual therapy at the

hospital with her long-time community therapist provider in July 2023.  R.R. now receives

weekly individual therapy, but her therapist affirms that weekly individual therapy is grossly

insufficient and strongly recommends intensive therapy and psychological rehabilitation services

to increase socialization, and these services are not available at UMSMC.  R.R. therefore is not

receiving medically necessary care while she is in overstay status at UMSMC.

84.    At UMSMC, R.R. is housed in a small room and is completely isolated from

peers, her family, school, recreation, and socialization.  Almost all of her interactions have been

with nursing staff, DSS staff, her lawyers, and, now, her therapist.  She lies in bed all day watching Cartoon Network or playing video games.

85.     Pursuant to Rule 17(c)(2), R.R. appears through her next friend, Sharon Jennings. Ms. Jennings is R.R.'s (CINA) attorney in the Circuit Court for Queen Anne's County, Maryland, Juvenile Division.  Ms. Jennings has served as R.R.'s CINA attorney since March 8, 2023 when R.R. came into care.  Ms. Jennings is an experienced CINA attorney and has represented children in CINA proceedings since 2000.  Ms. Jennings is a managing partner at Jennings Law Firm, LLC, where, in addition to CINA work, her practice includes domestic cases (divorce, adoption, custody, child support, termination of parental rights, private guardianships and representation of children, and general civil litigation), and representing adults in guardianship proceedings.  As R.R.'s CINA attorney and someone who has known and advocated for R.R. since R.R. came into foster care, Ms. Jennings is uniquely qualified to protect her interests as her next friend.

86.     R.R.'s DSM-V diagnoses substantially limit one or more life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain.  R.R. has been diagnosed with autism spectrum disorder (severity level 1), DMDD, and ADHD.  While hospitalized, she has suffered from significant depression. She is a qualified person with disabilities.

87.     R.R. receives individual therapy in the hospital. This service can be provided in the community.

88.     As a child in the custody of DSS, R.R. is categorically eligible for Medicaid-funded services in the community and might be eligible for additional state-funded services.

89.    R.R. wants to live in the community with appropriate services and support.  She is restricted from attending school in the community or interacting with peers.

90.    Without the availability of needed community services, R.R. is at risk of overstay again in the future.

91.    R.R. is a constituent of DRM.

92.    Plaintiff B.B. is a 16-year-old foster child with multiple disabilities in the custody of the Wicomico County Department of Social Services ("WCDSS") who is in overstay status at Sheppard Pratt Towson Hospital.  B.B. was admitted to the emergency department of UMSMC on May 16, 2023 after going into crisis while at her foster home.  She was transferred to Sheppard Pratt Towson Hospital on June 6, 2023.  On June 21, 2023, B.B. was medically cleared for discharge by Sheppard Pratt.  WCDSS has not picked her up from the hospital.

93.    B.B.'s clinical team recommends that she be placed in a therapeutic group home or a foster home while awaiting placement at a residential treatment center.

94.    B.B. has not received any educational services since her emergency-room admission on May 16, 2023.  She is a rising twelfth-grade student and is scared that she will still be stuck in the hospital when school starts for the upcoming year, will miss part of her senior year, and will not receive education services as compensation.  Prior to her hospitalization, when living in a foster home in the community, B.B. had regular visitation with her mother and her two younger sisters, with whom she is very close.  Since being hospitalized, B.B. has been isolated from her family and has not had any visitation with them, which has been devastating for BB.

95.    B.B. received individual therapy in the community prior to her hospitalization, but she has not received any individual therapy at Sheppard Pratt, which is unavailable there even

though it has been recommended by her clinical team. B.B. has orthodontic braces and requires orthodontic care and follow-up, but has not received any orthodontic care since being hospitalized. She lies in bed and sleeps much of the day as there is nothing else to do. Since being hospitalized, B.B. has not been able to attend church or youth choir, as she did prior to the hospitalization.

96.    Pursuant to Rule 17(c)(2), B.B. appears through her next friend, Sharon Jennings. Ms. Jennings is B.B.'s CINA attorney in the Circuit Court for Wicomico County, Maryland, Juvenile Division. Ms. Jennings has served as B.B.'s CINA attorney since March 14, 2023. Ms. Jennings' background is discussed *supra* at ¶ 85 . As B.B.'s CINA attorney and someone who has known and advocated for B.B., Ms. Jennings is uniquely qualified to protect B.B.'s interests as her next friend.

97.    B.B.'s DSM-V diagnoses substantially limit one or more life activity, including self-care, learning, concentrating, thinking, interacting with others, and the operation of the major bodily function of the brain. B.B. is diagnosed with bipolar disorder, psychosis, anxiety and PTSD. She is a qualified person with disabilities.

98.    B.B. receives group therapy, recreational therapy, and occupational therapy in the hospital. These services can be provided in the community.

99.    As a child in the custody of DSS, B.B. is categorically eligible for Medicaid-funded services in the community and might be eligible for additional state-funded services.

100.    B.B. wants to live in the community with appropriate services and support. She is restricted from attending school in the community or interacting with nondisabled peers.

101.    Without the availability of needed community services, B.B. is at risk of overstay again in the future.

102.   B.B. is a constituent of DRM.

**B.   Plaintiff Disability Rights Maryland, Inc.**

103.   This action also is brought by Disability Rights Maryland, Inc. ("DRM"), the designated federally-mandated "protection and advocacy" ("P&A") program for individuals with disabilities in Maryland.  DRM, among other activities, advocates for the rights of children with mental-health disabilities and those dually diagnosed with mental-health and developmental disabilities such as intellectual disability or autism.  The named individual Plaintiffs and members of the Plaintiff class are clients or constituents of DRM, which is authorized under federal law to file lawsuits in its own right on behalf of its constituents.  *See* Protection and Advocacy for Individuals with Mental Illness Act (the "PAIMI Act"), 42 U.S.C. §§ 10805(a)(1)(B)-(C), and the Developmental Disabilities Assistance  and Bill of Rights Act of 2000, 42 U.S.C. 15043(a)(2)(A)(i) (the "DD Act"), which amended, *inter alia*, Pub. Law No. 94-103, the Developmental Disabilities Assistance Bill of Rights Act of 1975 (the "1975 DD Rights Act"), and the Protection and Advocacy of Individual Rights Act, 29 U.S.C. § 794e *et seq.*

104.   The P&A system was established by Congress in 1975 to protect and advocate for the rights of persons with disabilities in each state and territory. *See* 42 U.S.C. §§ 10801, 15041; 29 U.S.C. § 794.  Under the DD Act, each state must "have in effect a system to protect and advocate the rights of individuals with developmental disabilities."  42 U.S.C. § 15043(a)(1). Each governor must appoint either a public agency or a private nonprofit entity to serve as the P&A system in each individual state or territory.  42 U.S.C. § 15044.  To comply, Maryland enacted Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-1001(a), which provides: "[t]here shall be provided protection and advocacy services to persons with developmental disabilities."

105.    On June 25, 1986, then-Governor Hughes designated the Maryland Advocacy Unit for the Developmentally Disabled, subsequently named Maryland Disability Law Center and now named Disability Rights Maryland, as the agency responsible for the implementation of the state system for the protection and advocacy of the rights of people with developmental disabilities.  That designation was promulgated in Md. Code Regs. ("COMAR") 01.01.1986.12. Congress has subsequently established additional P&A programs to advocate, respectively, for individuals with mental illness (per the PAIMI Act), physical disabilities, and traumatic brain injury were enacted and codified into statute; each subsequent program conferred its authority upon the "eligible system" created by the DD Act.  *See* 42 U.S.C. §§ 10802(2), 15043.  DRM's federally mandated responsibility to advocate on behalf and protect the rights of persons with disabilities includes children and youth with developmental and mental-health disabilities.  42 U.S.C. §§ 10802(3), 15043.

106.    DRM has associational standing in this action based on the following:

a.    All of the individuals whose rights DRM seeks to protect are individuals with disabilities, and this action is germane to DRM's purpose and mission.  DRM serves such constituents statewide.

b.    DRM is directed by a board of directors that represents the needs of DRM's clients.  As required by federal law, its board includes individuals with disabilities and individuals who have received, or who are receiving, services based on their disabilities.  DRM also has a "PAIMI Advisory Council" comprised of persons who are, or who are involved with, individuals with mental illness who have received, or who are currently receiving, behavioral or mental health services.  The PAIMI Advisory Council is specifically mandated to, and does,

include parents and guardians of minor children with mental illness who are receiving, or who are eligible to receive, services.

      c.    The PAIMI Advisory Council assists with establishing DRM's priorities, and its chair is a member of DRM's board of directors.  The PAIMI Advisory Council has recommended that DRM adopt as a priority the availability of sufficient voluntary and appropriate community supports through advocacy for systemic reform and increased housing opportunities in the community.

      d.    In setting its priorities and activities, DRM seeks input from its constituents, including individuals with disabilities, as well as guardians and family members of people with disabilities.

      e.    DRM has the right to pursue legal remedies on behalf of individuals with mental illness pursuant to 42 U.S.C. § 10805(a)(1)(B); *see also* S. Rep. No. 120, at 103 Cong., 1st sess. 39-40 (1993) (DD Act legislative history explicitly confirming that "the current statute is clear that P&A systems have standing to pursue legal remedies").  Using this authority, DRM has represented scores of foster children inappropriately placed in hospitals or RTCs in individual cases.  DRM also has engaged in systemic advocacy on multiple occasions over many years to protect the rights of foster children inappropriately placed in hospitals or RTCs, including litigation of *Lisa L.*, filed in 1987—*thirty five years ago*—in this Court, on behalf of children who remained in psychiatric hospitals beyond their clinically-determined discharge dates.  Significantly, the settlement agreement that resolved the litigation in 1993 required DHMH to adopt regulations to facilitate timely and successful discharge of these children to appropriate placements.  Regulations, including case-coordination requirements, were promulgated in COMAR 14.31.03.03-05.

f.      DRM meets regularly with advocacy groups who advocate for foster care reforms and with attorneys who represent foster children.

g.      DRM has a grievance process to ensure that it operates effectively for its clients.

h.      Based on the foregoing and other facts, DRM, as the nonprofit designated Protection and Advocacy organization for Maryland, has associational standing to proceed in this matter as a plaintiff.

107.    DRM and the individual named Plaintiffs with their next friends bring this class action on behalf of themselves and, with the exception of foster children in the custody of the Baltimore City DSS, a statewide class of foster children who are, or who will be, or who are at imminent risk of being required to stay in psychiatric hospitals, psychiatric units of hospitals, or hospital emergency rooms, despite having been determined by medical staff, an administrative law judge or a court to be ready for discharge because they never met, or no longer meet, the criteria for hospitalization or institutionalization.  The proposed class excludes foster children in the custody of Baltimore City DSS because those children already are class members in the related *L.J.* case pending in this Court, which has a modified consent decree prohibiting their placement in facilities that are not licensed foster-care placements, such as hospitals.  For convenience, the named individual Plaintiffs and the class members are referred to collectively as the "Plaintiff Children."

C.      **Defendants.**

108.    DHS is the executive agency responsible for the care of Maryland foster children in the custody of local DSS agencies, with overall direct and non-delegable custodial responsibility for placing foster children in the least restrictive placements that meet their needs

by ensuring their safety and well-being while providing appropriate behavioral-health assessment and treatment, along with other needed services.

109.    Defendant MDH is the Maryland executive agency responsible for Medicaid administration, public health-care financing and regulation, and administration of EPSDT, Developmental Disabilities, and Behavioral Health Services.  It also licenses all hospitals and RTCs in Maryland and is responsible for their oversight and regulation.

110.    Defendant Rafael López is the Secretary of DHS and is sued in his official capacity.  Secretary López has ultimate responsibility for ensuring DHS' adherence to the federal and state laws and professional standards that govern these responsibilities.  He has the power and duty to (i) determine the general policies relating to child-welfare services and placements provided to all foster children in Maryland, (ii) administer or supervise those services and placements, and (iii) adopt the policies and regulations to carry out these responsibilities.

111.    Defendant Stephen Liggett-Creel is the Acting Executive Director of SSA and is sued in his official capacity.  SSA is the agency of DHS that administers Maryland's foster-care system.  It develops and implements policies and programs for Maryland foster children and is responsible for oversight of all services provided by local departments of social services to Maryland children in out-of-home placements ("OHPs").  Mr. Liggett-Creel is the state official within DHS who has lead responsibility for addressing individual cases of Plaintiffs in hospital overstays.

112.    Defendant Laura Herrera Scott, M.D., is the Secretary of MDH and is sued in her official capacity.  She is responsible for MDH's compliance with federal and state laws and standards for providing health services to children in Maryland, including programs and services for children with developmental disabilities, programs and services for children with behavioral

health needs, and the Medicaid EPSDT program.  Dr. Herrera Scott enjoys broad statutory

authority over MDH, including the ability to create and eliminate subdivisions within her

department and to direct departmental responsibilities to any of her subordinates.

113.    Defendant Bernard Simons is a Deputy Secretary of MDH and heads the

Developmental Disabilities Administration ("DDA").  He is sued in his official capacity.  DDA

is the agency of MDH responsible for developing and administering programs serving children

and adults with developmental disabilities, including DDA's residential programs for children,

its crisis-response programs, and its Family Supports, Community Supports, and Community

Pathways Medicaid waiver programs.  Mr. Simons is responsible for DDA's compliance with

federal and state laws and standards for the provision of programs and services to children with

developmental disabilities, including DDA's residential programs for children.

114.    Defendant Lisa Burgess, M.D. is the Behavioral Health Administration

("BHA")'s Acting Deputy Secretary for Behavioral Health and is Acting Executive Director of

the BHA.  She is sued in her official capacity.  BHA is the agency of MDH responsible for

developing and overseeing the provision of behavioral health services to children.  Dr. Burgess is

responsible for BHA's compliance with federal and state laws and standards for the provision of

behavioral-health programs and services to children with behavioral health needs.

115.    Defendant Ryan B. Moran, DrPH is MDH's Deputy Secretary for Health Care

Financing and Medicaid Director in MHA's Maryland Medicaid Administration ("MMA"), and

is sued in his official capacity.  MMA is the agency of MDH responsible for developing and

administering Medicaid-funded services to children in Maryland, including the EPSDT program,

and is the single state Medicaid agency pursuant to 42 U.S.C. § 1396a(a)(5). Dr. Moran is

responsible for ensuring MMA's compliance with federal and state laws and standards for

providing EPSDT programs and services to Medicaid-eligible children.  In this capacity, he is responsible for ensuring Medicaid beneficiaries have critical acute and behavioral healthcare services available to them.  He also is responsible for ensuring that such services are appropriately and adequately reimbursed so as to ensure that they are available to children who need them.

116.    Defendant Gregory Branch is the Director of the Baltimore County Department of Social Services and is sued in his official capacity.  As Director of the Baltimore County DSS, Mr. Branch was responsible for named Plaintiff T.G.'s ongoing placement in a psychiatric hospital without medical necessity.  He has general responsibility for managing Baltimore County DSS's foster-care system, for exercising authority over placement decisions, and for meeting the needs and ensuring the proper care and welfare of all foster children in its care and custody, including T.G.

117.    Defendant Oscar Mensah, Ph.D. is the Acting Social Services Officer of the Montgomery County Department of Health and Human Services and is sued in his official capacity.  As Acting Social Services Officer, Dr. Mensah was responsible for named Plaintiff T.A. and M.G.'s ongoing placement in a psychiatric hospital without medical necessity.  He has general responsibility for managing Montgomery County DHHS's foster-care system, for exercising authority over placement decisions, and for meeting the needs and ensuring the proper care and welfare of all foster children in its care and custody, including T.A. and M.G.

118.    Defendant Gloria L. Brown Burnett is the Director of the Prince George's County Department of Social Services and is sued in her official capacity.  As Director of the Prince George's County DSS, Ms. Brown Burnett was responsible for named Plaintiff D.B.'s ongoing placement in a psychiatric hospital without medical necessity.  She has general responsibility for

managing Prince George's County DSS's foster-care system, for exercising authority over placement decisions, and for meeting the needs and ensuring the proper care and welfare of all foster children in its care and custody, including D.B.

119.    Defendant Susan Coppage, is the Director of the Queen Anne's County Department of Social Services and is sued in her official capacity.  As Director of the Queen Anne's County DSS, Ms. Susan Coppage is responsible for  movant-Intervenor and proposed new Plaintiff R.R.'s ongoing placement in a psychiatric hospital without medical necessity.  She has general responsibility for managing Queen Anne's County DSS's foster-care system, for exercising authority over placement decisions, and for meeting the needs and ensuring the proper care and welfare of all foster children in its care and custody, including R.R.

120.    Defendant Roy Brewington, is the Director of the Wicomico County Department of Social Services and is sued in his official capacity.  As Director of the Wicomico County DSS, Mr. Roy Brewington is responsible for movant-Intervenor and proposed new Plaintiff B.B.'s ongoing placement in a psychiatric hospital without medical necessity.  He has general responsibility for managing Wicomico County DSS's foster-care system, for exercising authority over placement decisions, and for meeting the needs and ensuring the proper care and welfare of all foster children in its care and custody, including B.B.

## APPLICABLE LAW

121.    Defendants' overstay practices and related programs and policies implicate a host of laws—federal and state, constitutional, statutory, and regulatory.

### Federal Disability Laws

122.    Under Title II of the ADA, qualified individuals with a disability cannot be excluded from participating in, or being the denied the benefits of, services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132; 28 C.F.R. § 35.130.  Title II prohibits unnecessary institutionalization and

requires public entities to administer services, programs, and activities in the most integrated

community setting appropriate to the needs of qualified individuals with disabilities.  *See*

*Olmstead*, 527 U.S. at 597, 600-01; *id.* at 607 (Stevens, J., concurring); 28 C.F.R. § 35.130(d).

Public entities must make "reasonable modifications in policies, practices, or procedures when

the modifications are necessary to avoid discrimination on the basis of disability, unless the

public entity can demonstrate that the modifications would fundamentally alter the nature of the

service, program, or activity."  28 C.F.R.§ 35.130(b)(7); *see Olmstead*, 527 U.S. at 603

(Ginsburg, J., plurality).

123.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, imposes similar

requirements on programs and activities that receive federal financial assistance.  *See also*

45 C.F.R. § 84.4(a)-(b).

124.    When state agencies keep foster children with disabilities confined in hospitals or

institutions when they are medically ready for discharge in lieu of providing appropriate

community-based services that would allow them to live in the community, attend school, and

participate in community life with nondisabled peers, they discriminate on the basis of disability

in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

125.    The protections of the ADA and Section 504 extend to children at risk of

institutionalization and segregation and are not limited to those individuals who are currently in

hospitals.  *See Pashby v. Delia,* 709 F.3d 307, 321-22 (4th Cir. 2013).  Accordingly, Defendants'

policies that compel families to reach such a crisis point that their children must be hospitalized

as a means of obtaining a foster-care placement via a voluntary placement agreement that will

eventually consign their children to RTC or other restrictive foster-care placements are discriminatory as well.

126.   Title II of the ADA is privately enforceable by Plaintiffs pursuant to 42 U.S.C. § 12133.

**Medicaid and EPSDT**

127.   Medicaid is a voluntary federal-state program under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, that provides medically necessary health care to low-income children and families, among others.  In Maryland, all foster children are categorically eligible for Medicaid services, including its EPSDT provisions.  Many children whose parents seek VPAs receive Medicaid services as well.

128.   When a state opts to participate in Medicaid, it receives federal matching funds if it agrees to adhere to Medicaid's statutory and regulatory requirements, as set forth in a Medicaid state plan that describes its administration of the program and identifies the services it will provide to eligible beneficiaries.  *See* 42 U.S.C. § 1396a. These provisions also require the state to provide EPSDT services to Medicaid-eligible children and youth under age 21. 42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

129.   The EPSDT provisions require Maryland to ensure that children receive *all* medically necessary diagnostic and treatment services "to correct or ameliorate" their physical and mental illnesses and conditions.  *Id.* §§1396a(a)(43)(C); 1396d(r)(5).  It therefore requires broader coverage than the state's Medicaid might otherwise identify and fund.  Maryland must identify children who have physical and mental illnesses and conditions, *id.* § 1396d(r)(1), and must provide medically necessary services to the children regardless of whether such services are included in its state plan. *Id.* § 1396d(r)(5); 42 C.F.R. § 441.56(c).  Accordingly, MDH must

provide intensive community-based behavioral health services to all eligible Maryland children who need them to avoid discriminatory hospitalization as required by the ADA and Section 504.

130.    The federal Center for Medicaid & Medicare Services ("CMS") has published guidance confirming that the behavioral-health services requested by Plaintiffs are indeed covered by EPSDT:

> CMS also notes that the obligation to provide all medically necessary care under EPSDT extends to prevention, screening, assessment and treatment for mental health and substance use disorders (SUDs).  Behavioral health services are available under several benefit categories under section 1905(a) of the [Medicaid] Act, such as physician and clinic services, federally qualified health center and rural health clinic services, inpatient and outpatient hospital services, rehabilitative and preventive services, and services of other licensed practitioners. These services must be provided pursuant to EPSDT when necessary to treat an identified behavioral health condition.
>
> ***
>
> The goal of the EPSDT benefit is to ensure that individual children get the health care they need in the right place when they need it. States have broad flexibility to accomplish this by designing a robust benefit package across the continuum of care that meets the specific needs of children and youth. This includes coverage of intensive community-based services, crisis stabilization, and intensive care coordination to meet the needs of high-risk children and youth.

Ctr. for Medicaid & CHIP Services, CMCS Informational Bulletin (Aug. 18, 2022).

131.    Pursuant to 42 U.C. § 1983, Medicaid recipients, including the Plaintiff Children, have a private cause of action to enforce applicable EPSDT requirements if the state agency fails to provide the medically necessary services to which the children are entitled under the Medicaid Act.

## Constitutional Rights

132.    Wrongful involuntary psychiatric hospitalization of foster children contravenes substantive due process in two separate ways: (1) by violating the liberty rights of all individuals not to be confined in institutions involuntarily, without medical necessity; and (2) by violating the duties to ensure foster children's safety, education, and welfare arising from a "special relationship" created

whenever a state agency gains custody of a foster child or asserts de facto custodial control over the child. Substantive due process also protects the rights of children to family integrity and association, which is violated when children are forced by the state to remain in hospitals in lieu of returning to their families with community services and supports. Finally, both procedural and substantive due process protect against a state policy that limits voluntary placement agreements to children whose parents agree to RTC or other highly restrictive placements without any statutory limitation or formal regulation requiring DHS and SSA to deny less restrictive foster-care placements to these children.

133.    First, the Supreme Court has squarely held that a state cannot involuntarily hospitalize, or keep hospitalized, a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends, because, "even if [the] involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." *O'Connor v. Donaldson*, 422 U.S. 563, 574-75 (1975).

134.    Second, when a state child-welfare agency such as DHS and a local DSS office interferes with a child's relationship with their parents and separates the child from their own family, it assumes and establishes a "special relationship" with the child, imposing a duty of care to provide for the child's health, safety, and well-being. Thus, whenever DHS and a local DSS take a child into their custody for placement into foster care, including for placement with relatives, the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights impose an affirmative duty to provide for the child's health, safety, education, and welfare, including the duty to keep the child reasonably free from harm. If the agencies fail to protect the child through deliberate indifference to harm or risk of harm, or through failure to recognize and apply reasonable professional standards or professional judgment, the agencies violate substantive due process by denying the child's constitutional right to liberty.

135.    Third, substantive due-process and procedural due-process rights are violated when Defendants effectively force children voluntarily placed by their parents in hospitals but who remain there without medical necessity while awaiting a voluntary placement pursuant to a VPA, often limiting them to placement an RTC or other highly restrictive placement that they do not need.  By SSA policy (not any statute or regulation), local DSS agencies may not accept the child for placement in a less restrictive setting such as treatment foster care or an "alternative living unit" ("ALU").  Because the children cannot return home and institutional facilities have long waiting lists, the children continue to languish in the hospital.  In such cases, DHS is asserting de facto custody and control over the child, creating a "special relationship" with the child that imposes a duty of care on the state to provide for the child's health, safety, and well-being.  This is particularly so in those cases when a local DSS opposes the child's return home and refuses to allow a hospital to discharge a child home to parents.  These children have no means of obtaining proper services from Defendants and are relegated to living, often for months, in hospitals or institutions while their parents acquiesce to, and then wait for, overly restrictive, medically unnecessary RTC beds to open.  When a bed does become available, it may be out of state, far from the child's home, creating even more family separation.

136.    Fourth, the substantive due-process right to liberty also protects a child's right to family integrity and family association.  That right is infringed by Defendants' policy requiring parents who seek services from Defendants, and who would prefer to keep their children at home or in their communities close to home, to accept voluntary placement in an RTC or similar restrictive setting, since it may be the only service offered to them.

137.    Pursuant to 42 U.S.C. § 1983, children in the custody or control of a local DSS, SSA, and DHS have a private cause of action to enforce their federal and Maryland constitutional rights to liberty and due process.

## Federal Child Welfare Laws

138.    The Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), as amended, 42 U.S.C. §§ 621 *et seq.*, 670 *et. seq.*, requires states receiving federal Title IV-E funds to help pay for foster-care placements of eligible children to submit state plans to the federal government that create various rights and address various requirements.

139.    Among the rights created by AACWA is the right of foster children to a case review system that ensures that their case plans are "designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." *Id.* §§ 671(a)(16), 675(5)(A).

140.    Additionally, foster children are entitled to "regular, ongoing opportunities to engage in age or developmentally appropriate activities." *Id.* § 675a(a)(3)(B).

141.    At court review hearings, the agency must document how, and thereby ensure, that the child's placement accords with "the reasonable and prudent parent standard." *Id.* § 675a(a)(3)(A).  This standard is characterized by "careful and sensible parental decisions that maintain the health, safety, and best interests of a child while at the same time encouraging the emotional and developmental growth of the child, that a caregiver shall use when determining whether to allow a child in foster care under the responsibility of the State to participate in extracurricular, enrichment, cultural, and social activities." *Id.* § 675(10)(A). Children in hospital overstays do not have any opportunity "to participate in extracurricular,

enrichment, cultural, and social activities," let alone those activities that a reasonable and prudent parent would provide to facilitate their age-appropriate developmental and emotional growth.

142.    Pursuant to the federal FFPSA ("Family First") legislation enacted in February 2018, DHS may use its federal Title IV-E foster-care subsidy funding for an array of evidence-based mental health and related services for families as part of a plan for preventing imminent foster-care placement of children who qualify as "candidates for foster care" or for facilitating prompt reunification. *Id.* §§ 671(e)(4)(A), 675(13).  On information and belief, the array of such evidence-based services is not yet widely available in Maryland to children and families.  FFPSA also sharply limits federal Title IV-E funding for cost of care and maintenance of foster-care placements of children in group or congregate-care facilities ("congregate care") rather than with families (licensed foster homes, relatives, or parents).  Federal IV-E funding for congregate care is available only for children placed in a "qualified residential treatment program" ("QRTP"). To be "qualified" under FFPSA, the program must, *inter alia*, be nationally accredited; serve no more than 25 children; provide trauma-informed treatments that integrate families where possible; provide thorough assessments of need within 30 days of placement; be judicially approved for the child within 60 days of placement; conduct prompt discharge planning; and deliver at least six months of family-based aftercare services and treatment. *Id.* §§ 672(k)(3)(A), 672(k)(4).  For children who are placed in treatment facilities that are not "qualified" per FFPSA, the state's Title IV-E payment is limited to administrative costs and may not subsidize the cost of care. *Id.* § 672(k)(5).

143.    FFPSA further requires that, within 30 days of placement in a QRTP, an assessment must be made by an independent qualified person as to whether the child may be placed in a foster home.  In making that assessment, "[a] shortage or lack of foster family homes

shall not be an acceptable reason for determining that the needs of the child cannot be met in a foster family home.  *Id.* § 675a(c)(1)(C).  The statute proscribes federal IV-E funding for the placement unless the assessment determines that child requires placement in the QRTP.  *Id.* §§ 672(k)(1)(B), 672(k)(3)(B).

144.    According to the Governor's Office of Crime Prevention, Youth, and Victim Services, by the conclusion of FY 2021, only 68% of residential programs for children used by Maryland employ trauma-informed treatment models required by FFPSA for QRTPs, which, GOCPY acknowledges is a "step in the right direction" but "needs to [be] increase[d]."  GOCPY FY 2021, *supra* at 9-10.  Only *two* providers had FFSPA-compliant aftercare services, and only *55 of 172* residential programs (32%) provide FFSPA-compliant discharge-planning services.  *Id.*  As of January 2023, SSA reported that only *six* residential providers are FFSPA-compliant and qualified as QRTPs.  Maryland thus likely must forego federal Title IV-E reimbursement for placements in the 166 non-compliant programs.

**Maryland Laws and State Programs**

A.    **Health laws and regulations**

145.    Maryland law limits emergency-room stays to a maximum of thirty hours.  *See* HG § 10-624(b)(5).  The law contains no exceptions.

146.    Children may not be committed for "inpatient care and treatment in a psychiatric facility unless a committing court finds on the record based on clear and convincing evidence that … [t]he child needs inpatient medical care or treatment for the protection of the child or others."  CJP § 3-819(h); *see also* HG §§ 10-617(a)(2) (applicable in general for all inpatient involuntary admissions), 10-632(e)(2) (same standard applicable in 10-day hearings).

147.    Defendants engage in *prima facie* violations of Maryland law when they fail to pick up from a hospital a child in DSS custody who no longer medically requires hospitalization and when the child remains in an emergency department for more than thirty hours.

**B.    Maryland foster care laws, regulations, and policies**

148.    Hospitals cannot provide non-medical custodial care for children unless they are licensed by the state to do so.  Maryland law requires any "institution" responsible "for the care, custody, or control of a child" to be licensed by SSA.  Md. Code Ann., Fam. Law ("FL") § 5-509(a)(1) ("a person shall be licensed by the Administration as a child care institution before the person may operate an institution for the care, custody, or control of a minor child"); *see also id.* § 5-526(c) ("[DHS] or the Department's designee, may not place a child in a residential group home or other facility that is not operating in compliance with applicable State licensing laws"); *see also* COMAR 07.02.11.11(I) ("[a]ny residential child care facility used by the local department shall meet the requirements for licensure for the facilities established in COMAR 14.31.05").  Hospitals are licensed to provide medical care.  They are not licensed by SSA, and they are not licensed to provide "for the care, custody, or control" of children.

149.    DHS and its component agency SSA have a duty to provide similar levels of protection for their health, safety, and quality of care provided to all foster children.  This standard is violated when they keep children in hospitals due to a shortage of appropriate foster-care placements.

150.    Each local DSS is responsible for ensuring that the foster children in their custody attend school or receive comparable instruction via tutoring when school is not available.  *See* COMAR 07.02.11.12(A) ("[t]he local department shall ensure that, within five school days of being placed in out-of-home placement, a child of school age is attending school, unless this is

unattainable for reasons outside the control of the local department"). Children residing in emergency rooms do not have access to education services. If they receive any services at all, children residing in hospitals receive only a few hours a week of tutoring. Children with disabilities residing in hospitals do not receive full implementation of their individualized education programs, which may call for up to 30 hours a week of specialized instruction and related services such as speech, occupational or physical therapy, counseling or other services.

151.    Although families seeking voluntary placement agreements with their local DSS are told that their children must wait for highly restrictive placements, Maryland statutes and regulations do not limit voluntary placement agreements to RTCs, 90-day diagnostic placements, and DDA facilities as stated in SSA's written policy. *See* FL §§ 5-525(b) (discussing requirements for voluntary placements); and 5-505.1 (requiring annual report specifying numbers of children under VPAs who are placed in therapeutic group homes, therapeutic foster homes, and non-therapeutic group homes, in addition to the more restrictive placements); *see also* COMAR 07.02.11.06.B.(5)(g)(i) (requiring placement of children with disabilities under VPAs to be in the "least restrictive setting"), 07.02..11.06.B(10) (extending all service and case-plan requirements to children with disabilities in voluntary placements), 07.02.11.11.C ("A child shall be placed in the least restrictive setting appropriate to the child's needs…"), and 07.02.11.13.B(10) (with regard to current and planned future placements, child's case plan must "discuss the safety and appropriateness of the placement with documentation describing how the placement is: (a) [t]he least restrictive setting available…") & (12) (child's case plan must "[i]nclude a plan for ensuring that the child receives safe and appropriate care").

152.    SSA's policy *requiring* highly restrictive placements violates SSA's own regulations.

153.    Maryland law further declares that "[i]t is the policy of this State (1) to protect minor children whose care has been relinquished to others by the children's parent; (2) to resolve doubts in favor of the child when there is a conflict between the interests of a minor child and the interests of an adult; and (3) to encourage the development of child care services for minor children in a safe, healthy, and homelike environment."  FL § 5-502(b).

154.    Maryland policy is clear that community-based services should be available to avoid hospital and other overstay placements.  The Governor's Children's Cabinet expressly proclaims that it is "committed to strengthening the system of care for children and youth at the local level through a coordinated approach to interagency case management," the purpose of which is "to return or divert children and youth from preventable out-of-home, out-of-State, and hospital and other overstay placements through the provision of community-based services."  *See Local Care Teams*, Governor's Off. of Crime Prevention, Youth, and Victim Servs., goccp.maryland.gov/localcareteams/.

155.    The mechanism Maryland has created to accomplish this purpose is the Local Care Team, located in each jurisdiction.  According to the Children's Cabinet, "Parents, family members or agencies make referrals directly to the Local Care Teams to seek assistance with accessing services, to develop plans of care for community-based services and to coordinate services from multiple agencies.  Families at risk of out-of-home or out-of-State placement, with complex needs and/or who are in crisis are identified as priorities for the Local Care Teams."  *Id.* But, because those services are not readily available to families in practice, families who are referred to Local Care Teams most often find themselves being told that their only option is to seek a voluntary placement agreement, which means that the Local Care Teams fail to meet the goal of diverting children from unnecessary hospitalization and institutionalization.

156.    At the state level, Local Care Teams are supposed to operate under the aegis of the Youth Resource Coordinating Committee ("YRCC") within the GOCPY and formerly known as the State Coordinating Council for Children and then the Interagency Placement Committee ("IPC").  *See* Md. Code Ann., Hum. Servs. ("HS") § 8-401 *et seq.*  The IPC and the YRCC also have been charged, respectively, with "identifying in-state placement needs," and "[p]romoting policy that develops a continuum of quality educational, treatment, and residential services in Maryland which will enable children with intensive needs to be served in the least restrictive setting appropriate to their individual needs."  *Interagency Placement Committee: Locally Coordinated Interagency Case Management*, Governor's Off. for Children, (https://goc.maryland.gov/wp-content/uploads/sites/8/2018/03/Interagency-Placement-Committee-12-21-2017.pdf).  Despite this broad mission, when considering individual cases, the IPC and the YRCC have focused predominantly on out-state placements.

157.    The above constitutional rights, statutes, regulations, and programs are enforceable by private causes of action or constitute important policy statements about the standard of care and protection owed to the Plaintiff Children by Defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

158.    For at least the last six years, Maryland's foster-care system has been in crisis, lacking sufficient placements to house all of the children committed to state custody.  Children have spent weeks or months waiting for appropriate placements, sometimes moving among multiple temporary placements while they wait.  This instability often causes children to spiral downward as the uncertainty of not knowing to where or when they are going to next move compounds the trauma that led them to foster care in the first place.

159.    The child-welfare Defendants (DHS, López, Liggett-Creel, Branch, Mensah, Brown Burnett, Coppage, and Brewington) (collectively, the "DHS Defendants") have a clear statutory and constitutional duty to ensure placements of foster children in state custody in the least restrictive settings that meet the health, safety, developmental, and educational needs of the youth they are serving.  The DHS Defendants violate this duty whenever they leave a Plaintiff child in a hospital without medical necessity.

160.    The hospital overstay crisis is compounded by the many children outside of formal foster care who remain in their parents' or guardians' legal custody but who are forced to reside in hospitals because Defendants do not provide the services that would allow them to return home (or to remain at home without requiring hospitalization in the first place), or to move to a community-based placement.  These children instead spend months awaiting execution of voluntary placement agreements with their local DSS for placement in an RTC, short-term diagnostic facility or, occasionally for older children, a DDA residential program. These children are competing with the Plaintiff Children for the same scarce services and beds that would prevent or resolve their overstays.  They incur the same harm sustained by their peers committed to state custody.  The overstay problem therefore cannot be resolved without resolving their needs as well.  Defendants violate their duty to these children with disabilities by failing to provide services to keep their families together and thereby cause these children to incur the same harm sustained by their peers in DHS custody.

161.    Maryland's lack of a continuum of mental-health and behavioral-health services for children compounds the placement shortage.  Crisis intervention and comprehensive wraparound services are not widely available in sufficient quantity or quality to address and de-escalate crises and stabilize children.  Fifteen years ago, Maryland began a five-year pilot to

establish these services for children such as the Plaintiffs under the "1915(c) Medicaid waiver" program (also known as the "RTC waiver"), and, two years later, the Children's Cabinet decided to support an expanded effort in multiple jurisdictions, eventually serving 300-400 children annually. Nevertheless, this pilot effort was abandoned in 2016, and MDH instead proposed to make available care coordination services through separate programs (Medicaid's "1915(i)" program intended to prevent unnecessary hospitalization and institutionalization, and "targeted case management"). But those programs did not offer a comparable scope of crisis intervention and, in any event, were limited in scope. For example, MDH projected that the 1915(i) program would serve 200 children annually, but, in FY 2019-21, it served only 10 to 40 children per year.

162.    DDA provides a crisis-response service for its clients, but it predominantly serves adults, not children.

163.    Similarly, Maryland lacks sufficient respite care to families to enable short-term placements in the community with prompt return to the family or to community-based placements. To the extent services exist, they are not well publicized to families and they are difficult for families to access. DDA's behavioral-health respite care is limited to adults and is not available to children.

164.    Maryland's Home and Community-Based Services waiver for children with autism spectrum disorder ("ASD") ("autism waiver") is designed to provide community-based, long-term, person-centered therapeutic services and support to eligible children and youth with ASD to enable home and community living as an alternative to institutional care. The autism waiver is a partnership between the Maryland State Department of Education and MDH. The current wait list for autism waiver services is approximately 6 years.

165.    When asked why the local DSS workers will not pick up children after hospital staff determines that hospitalization is no longer medically necessary and why the children must remain in hospital or institution overstay status despite the lack of any medical need, caseworkers typically explain that DSS lacks placements for the children.  These local departments are, therefore, using hospitals and institutions as de facto foster-care placements in violation of DHS's governing laws.

166.    Once hospitalization is no longer medically necessary, continued placement of the child in a hospital is illegal.  *See, e.g.*, COMAR 07.02.11.06.B(5)(g) (affirming that, for children with disabilities seeking voluntary placement, psychiatric hospitals are *never* a recognized placement, let alone an *appropriate* and *least restrictive* placement).  Hospitals are not licensed to provide foster-care or residential child-care services and therefore may not be utilized for those purposes.  *See* COMAR 07.02.11.11.I ("Any residential child care facility used by the local department shall meet the requirements for licensure for the facilities established in COMAR 14.31.05.").

167.    The Office of the Public Defender ("OPD") represents foster children in involuntary commitment hearings before administrative law judges ("ALJs") to determine if they meet the criteria for involuntary commitment and, therefore, continued hospitalization.  The OPD has reported that it represents approximately 50 such children a year outside of Baltimore City who are determined by an ALJ or by the hospital's treating psychiatric or medical staff not to need continued hospitalization but who are not discharged because the local DSS has no placement for them.  Sometimes the assigned local DSS worker simply fails to appear at the hospital to pick up the child.  Other times, DSS has gone to the juvenile court with jurisdiction over the child's Child in Need of Assistance case and asked for recommitment of the child for

psychiatric hospitalization because no placement is available, even though the child no longer needs hospitalization.

168.    In 2019, the OPD represented one child who had seven separate hospitalizations without medical necessity and justification.  Other children represented by the OPD have been hospitalized three or four times.

169.    Maryland children who are in overstay status in out-of-state hospitals and institutions are not represented by the OPD and do not receive due-process protections comparable to those received by children who are hospitalized within Maryland.  Children whose families are seeking VPAs also are not represented by the OPD.

170.    Prolonged unnecessary hospitalization or institutionalization can have severe detrimental effects on children's physical, social, and emotional development.  Numerous studies have shown that longer hospitalization of children increases the risk of readmission, with one study showing a 1% rate of increase for every five days of hospitalization; conversely, family support services may help reduce readmissions.  *See, e.g.*, Eugene Grudnikoff et al., *Correlates of psychiatric inpatient readmissions of children and adolescents with mental disorders*, 282 Psychiatry Rsch. 112596 (2019); David A.A. Miller et al., *Longitudinal examination of youth readmission to mental health inpatient units*, 25 Child & Adolescent Mental Health 238 (2020). A disengaged or disordered parent/primary caregiver relationship, typical for foster children, further increases that risk.  *See, e.g.*, Joseph C. Blader, *Symptom, family, and service predictors of children's psychiatric rehospitalization within one year of discharge*, 43 J. Am. Acad. Child & Adolescent Psychiatry 440 (2004); Brittany L. Lakin et al., *Parental Involvement as a Factor in the Readmission to a Residential Treatment Center*, 22 Residential Treatment for Child. & Youth 37 (2004).  Foster children living in congregate care have higher rates of hospital readmission.

*See* Jill B. Romansky et al., *Factors Related to Psychiatric Hospital Readmission Among Children and Adolescents in State Custody*, 54 Psychiatric Servs. 356 (2003).

171.    Because children in overstay status do not have a medical need for continued hospitalization, the hospitals do not receive Medical Assistance or private insurance reimbursement for boarding the children.  The hospitals thus bear a tremendous financial and logistical burden: Beds are not available for patients who need them, and additional staffing required to care for children in overstay status can total millions of dollars each year.

172.    Published national practice standards also acknowledge the extreme trauma imposed by instability in foster care and unnecessary institutionalization.  The Child Welfare League of America ("CWLA")'s Standards of Excellence provide that "[p]roactive efforts should continually promote stability and avoid disruptions in foster care, recognizing that a disruption can be another loss, rejection, and possible trauma for the child."  CWLA, Standards of Excellence for Family Foster Care Services 49.  Similarly, the Council on Accreditation ("COA")'s Standards for Public Agencies notes that "[s]ignificant research has demonstrated the correlation between placement instability and negative child outcomes including poor academic performance and social and emotional difficulties.  Regardless of a child's prior history of maltreatment or behavioral challenges, these negative outcomes increase following placement disruptions."  COA, Standards for Public Agencies, PA-CPS 11.05, Research Note**.**

173.    As discussed below, Defendants have had full knowledge of the overstay problem for years but have failed to resolve the crisis.

174.    As discussed above, Defendants have known since 2017 that the START program provides a successful model for serving dually diagnosed children and families to prevent unnecessary hospitalization.  *See supra* ¶ 18.  But the DHS Defendants have failed to pursue

START programs, and the MDH Defendants to date have failed to institute any START services beyond a limited pilot project. *Id.*

175.    At a facilitated quarterly meeting in the *L.J.* case in the summer of 2019, DHS stated that it would halt use of hospitals as placements for foster children when not medically required and that it was developing 40 new beds statewide to achieve this end.  As it turned out, only four of the 40 new beds were for DHS foster kids (the others were for developmentally disabled children), and those four were specifically earmarked for sexually trafficked youth—an important issue but not a solution to hospital overstays for the broader population of foster children.  Within a few months, Baltimore City foster children were again in overstay status along with their counterparts in other jurisdictions.

176.    In 2019, MDH convened a "Strategic Vision Group," a working group of department and outside experts and DHS officials, headed by an MDH Assistant Secretary, to address hospital overstays by both adults and children.  The group confirmed that "a crisis of placement" exists.  Its final report was prepared by a consulting firm headed by the former assistant secretary for human services in the State of Washington and the former director of the local DHHS in Montgomery County (also a former official in Prince Georges County).  Among its most critical findings for foster children:

- DHS's placement policies and priorities in the preceding three years had led to a crisis of placements for children and youth with serious mental illness and for autism spectrum aggressive youth, with a lack of staff trained in evidence based and informed practices and treatment, resulting in "hospital admission churn and trauma to children."

- There was a "[critical] unmet need to create a robust 24/7 crisis response system for children and youth and their families."

- Maryland has a "shortage of providers" offering evidence informed foster care "to meet the needs of specialty populations" such as runaway and human-trafficked youth, pregnant and parenting teens, physically aggressive youth often on the autism spectrum, and fire setters.

- "Tight referral protocols" do not exist that would permit local DSS agencies to arrange for discharge services and placements when the child or youth is admitted to a hospital or institutions.

- In-home and out-of-home respite options for parents and caregivers of children with serious emotional illnesses are needed.

- A broad consensus agreed that the State Medicaid Plan lacks a sufficient menu of approved evidence based or informed programs and interventions. Moreover, the criteria for selecting those that are available are "all incredibly challenging and often perceived as disincentives" for adoption by providers.

- New federal "Family First" program dollars promoting community placement for children and youth with significant emotional or behavioral disorders had not yet been aligned to maximize revenue for clinical services.

Health Mgmt. Assocs., Post-Acute Discharge Planning Workgroup 18–25 (2019). The report listed specific recommendations to address these deficiencies. *Id.* Despite these findings, which were shared with then-Secretary of DHS Lourdes Padilla and then-Secretary of MDH Robert Neall, few of the recommendations have been implemented by DHS or MDH apart from MDH's new crisis intervention service, 211+4, which connects callers to resources, and mobile response intervention that is being introduced in some jurisdictions.

177. The Maryland General Assembly has held multiple hearings about foster children in hospital overstays. It has repeatedly passed budget language requiring the State Respondents to submit annual reports explaining the scope of the problem and the initiatives and plans underway to resolve it, and the House has twice passed curative legislation. In 2020, the House of Delegates passed House Bill 1382, which would have required DHS to halt overstays, and the entire General Assembly included budget language (Chapter 19 of 2020) requiring DHS, MDH, and the Department of Juvenile Services to submit two reports on hospital overstays, overutilization, and placement shortages, including their plan to ameliorate the problems that would have been addressed by the proposed curative legislation. In accord with a recommendation by the Department of Legislative Services ("DLS"), the General Assembly

withheld $100,000 in funding from SSA and BHA until the agencies submitted a compliant first report.  The General Assembly subsequently withheld $250,000 in order to obtain the second report.

178.    In the spring of 2020, the Governor's Children's Cabinet issued a plan to address the overstay issue and respond to House Bill 1382.  The plan had three components: identification of adolescents in crisis and their immediate placement needs; ongoing "resource development" of RTCs with priority service for dually diagnosed children; and "real-time tracking" by DHS "of youth in hospitals or those experiencing behavioral health problems."  *See* Md. Child's Cabinet, Interagency Plan: Developing Resources to Address the Complex Needs of Maryland Youth in Care Exec. Summary (2020, rev. ed. 2021) [hereinafter Cabinet Plan].

179.    Also in late spring and throughout the summer of 2020, DHS and SSA repeatedly told *L.J.* plaintiffs' counsel that its plan to address the problem of hospital overstays was pending before Governor Hogan for review and approval.  They further advised that the plan could not be released unless it was approved by the Governor. In November 2020, they advised that the Governor had not approved the plan, that no alternative plan had been prepared for his consideration, and that they had contracted with Casey Family Services (which had subcontracted with the Strategic Vision Group's consultant) to examine the problem and recommend solutions to the legislature at the start of its 2021 session.  Though a report was supposed to be completed and public in December 2020, DHS subsequently advised that it had no plan to produce this report.

180.    DHS reported that its initial review indicated a need for ten additional psychiatric respite beds, but a comprehensive assessment that was underway faced limitations.  According to DLS, DHS gave no timeframe for completing this assessment.  Moreover, DHS advised that no

additional placement beds had been created since January 1, 2020 for youth with behavioral health needs.  Instead, an interagency group was exploring various options such as development of a comprehensive discharge plan and uniform protocols; creation of comprehensive mobile crisis and crisis stabilization services to improve uniformity statewide; and implementation and expansion of interventions for youth prior to the need for higher levels of care, including use of expanded eligibility criteria under a Medicaid waiver, which would allow for intensive in-home services and crisis stabilization services. But, again, the report had no timetable; no budget for new services and programs; no deadline for determination of the need for additional beds; and no specifics of a plan to increase psychiatric crisis response teams.  DLS concluded that the report "addressed each of the requested components, but few specifics were provided and no timeframes for developing detail were included in the report."

181.    The agencies conceded in their December 2020 legislative report that they lacked accurate data to track placement needs and provided no timetable as to when such data could be obtained.  Consistent with this admission, DHS told the General Assembly that, in calendar year 2019, only four foster children across the state had overstays in psychiatric hospitals or psychiatric wings of hospitals, each of which exceeded 100 days; one lasted for 486 days— approximately *16 months*-- and another lasted for 327 days—*nearly one year*. The number of children reported was untrue: the OPD had represented at least 90 such children in 2019.  DHS should have known that the information it provided to the General Assembly was wrong because DHS itself had asked the OPD to submit names of non-Baltimore City foster children with overstays, and OPD complied, identifying nearly 50 children.  DHS never disputed that list. Similarly, for January through September 17, 2020, DHS claimed that only 20 children had psychiatric overstays, a number that, again, was obviously low by several orders of magnitude.

DHS admitted that it compiled this tally through a hand-count and did not track overstays electronically.  Moreover, DHS has never collected data regarding overstays of children whose parents are seeking voluntary placement.

182.    In light of the data deficiencies and the ongoing concern about hospital overstays, in 2021, the joint budget committee chairs requested, and the General Assembly passed, new budget language requiring DHS to report the numbers and average lengths of stay of hospital and out-of-state overstays, plus the type of placement after discharge (if any). *See* J. Chairmen's Rep., 442d Sess., at 123–24 (Md. 2021).

183.    In February 2021, the 2020 Governor's Children's Cabinet's plan on overstays was updated and reported that the agencies' intent to allow "transition bed contracts" for short-term placements (90 days or fewer) to step down from RTC placements was on hold due to lack of funding to acquire space.  Cabinet Plan 3.  More encouraging, the revised plan asserted that DHS had created 47 new "Hi-Intensity" group-care beds and was issuing a request for proposals for ten new psychiatric respite beds.  *Id.* 4.  Nevertheless, the report lacked specifics, such as a timetable for completion of its recommendations, a budget for new services and programs, and a deadline for the determination of the need for new beds.  It provided no specifics of a plan to increase psychiatric crisis-response teams.

184.    Also in February 2021, DHS and MDH informed *L.J.* plaintiffs' counsel and monitor that a joint Cabinet-level effort had enabled them to reach an agreement to solve the overstay problem: DHS had "reconfigured" its funds to obtain eight new "high-intensity" beds at the Board of Child Care (a group-home provider); ten such beds at the Children's Home (another group-home provider); 27 new treatment beds at Arrow Ministries (a diagnostic group-home provider), along with seven new psychiatric respite beds.  Moreover, MDH had obtained funds

for up to 18 new beds, most likely at an RTC-level residential child-care facility and would issue a "request for interest" ("RFI") solicitation. This total of 63 new beds, DHS asserted, should be enough to solve the problem. Plans to file *this* lawsuit were therefore shelved.

185.    The plan was, for the most part, illusory. Instead of gaining 27 new beds at Arrow, those beds *replaced* 35 diagnostic beds that were being *closed—a net loss of eight beds*. Instead of gaining seven new psychiatric respite beds at Maple Shade, the sole provider of psychiatric respite care for foster children in the state, Maple Shade terminated its contract and *closed all 14 existing beds*—a total net loss of 22 beds from what had been promised. This net loss of beds was compounded by staffing shortages caused by COVID-19 and by the closure of two RTCs. MDH's RFI for 18 new beds generated no positive responses. All told, instead of gaining 63 new beds, the state, which had already started out with an insufficient number of beds and was losing beds due to COVID and RTC closures, *lost* four additional beds.

186.    On November 30, 2021, DHS reported to the General Assembly that, based on self-reported data from local DSS agencies—not a validated census or tally of actual placement—at least *86* foster children had been in hospital overstays during the first three quarters of 2021. Md. Dep't Hum. Servs., Report on Emergency Room Visits, Hospital Stays, and Placements after Discharge 6, Table 6 (2021). It further reported that, of the 436 foster children hospitalized for psychiatric reasons in FY 2021, 90 were discharged to highly restrictive RTCs. *Id.* 7; Table 7.

187.    In the fall of 2021, DHS and MDH announced another new Cabinet-level initiative. DHS would issue an RFP for 65 new beds (25 psychiatric respite beds and 40 new diagnostic, treatment, and evaluation beds in group-home-level facilities. MDH would issue an RFP for approximately 16 new beds (RTC or group-home, probably the former). This initiative also was unsuccessful. No providers submitted proposals to DHS. One provider submitted a proposal to MDH, which was accepted, to develop twelve beds for dually diagnosed

(developmental and mental-health disabilities) children at a group-care facility in Frostburg in Western Maryland, and one provider agreed to develop a new four-bed RTC on its group-home campus in Baltimore County with a projected opening date in June 2022. On information and belief, only one foster child in DHS custody in an overstay situation was placed at the Frostburg facility, which began accepting children on a limited basis in January 2022 and which recently closed with little or no notice. The Baltimore County RTC facility is not yet open, even though it was scheduled to open last June.

188. Of the promised reforms that DHS and MDH reported to the General Assembly, the area in which the agencies reported progress was a plan by MDH to establish a system that it describes as comprehensive mobile crisis-stabilization services across the state. MDH also touts a new real-time hospital bed reporting system that it contends will improve practice by identifying vacant beds, but this system will not assist getting children *out* of hospitals who do not need to be there. Finally, MDH reported its plans to open a few new RTC beds at its RTC "RICA" facility in Rockville, a highly restrictive facility.

189. Defendants have had multiple opportunities to use the legislative process to obtain resources to solve the problem. But, apart from obtaining a small rate increase that applied across-the-board to all providers to raise salaries in 2022—which had negligible impact on the supply of beds for children—neither DHS nor MHA have requested further resources, let alone resources that the General Assembly has failed to provide.

190. One longstanding reason why the private sector has not developed the OHP programs requested by DHS is an inadequate system for compensation. In 2013, the General Assembly's budget committees directed the state's Interagency Rate Committee to develop a new rate structure for residential child-care problems, following an evaluation that found that the

"current system for determining rates 'doesn't allow for innovation or collaboration; is tied to licensing category instead of services; lacks performance incentives; disregards location and the challenges of providing care in urban or rural settings; does not allow for the purchase of individual services to meet the child's identified needs; and does not align with the state's budget timeline." Harburger et al., *Maryland Children's QSRI*, *supra* at 3. On information and belief, DHS originally stated that it would do so through a new waiver program for Title IV-E foster-care funding. That never occurred. Subsequently, it contracted with UMSSW to develop a new rate system, which was supposed to be piloted and then fully implemented in 2021. In 2020, DHS canceled its contract with UMSSW and pushed the projected roll-out date back to 2026.

191.    No further initiatives to develop new beds are underway. At an *L.J.* facilitated problem-solving meeting in June 2022, DHS acknowledged that it has no further plans. MDH pointed to its statewide crisis intervention initiative (211+4), its new empty hospital-bed locator technology, and a new agreement to meet with DHS to discuss individual children, a process that should have been occurring all along. MDH acknowledged no further new plans beyond the small RICA expansion.

192.    The new Administration has acknowledged the problem publicly. At a Senate budget hearing in February 2023, DHS Secretary López acknowledged that ten Maryland foster children were then in hospital overstays (which he defined as post-48 hours of recommended discharge) and further said that this number had been generally consistent for a few months. He agreed that community services were needed to avoid hospitalization of children in the first place, stating, "Governments don't do a good job of raising children. Families do." At the same hearing, MDH Secretary Herrera Scott stated, "We don't have enough beds. Full stop." She added that "it's not just the number of beds, it's also the bed type and having the clinicians to

cover those beds." These statements echo former Comptroller Franchot's prior acknowledgement that "It is not a lack of money, it is a lack of political will to implement what is needed to take care of these severely disabled kids." Miller & Bowie, *supra* p. 23.

193.    Defendants have had ample notice of their violations of the rights of the Plaintiff Children and Maryland's shortage of beds and placements for foster children, including, but not limited to, the legislative activity discussed above and extensive coverage in national and local media. *See*, *e.g.*, Miller & Bowie, *How Maryland failed*, *supra* p. 22; Bowie, *Inside the ER*, *supra* p.6; Bowie et al., *Maryland kids*, *supra* pp. 5–6; Rachel Baye, *Lawmakers Try to End Long Hospital Stays for Foster Kids*, Nat'l Pub. Radio (Feb. 27, 2020), https://www.wypr.org/wypr-news/2020-02-27/lawmakers-try-to-end-long-hospital-stays-for-foster-kids; Baye, *Foster Kids*, *supra*[3] pp. 9–10; Pamela Wood, *With nowhere to go, foster children staying on in Maryland hospitals and psychiatric units after treatment*, Balt. Sun (Feb. 3, 2020, 7:41 PM), https://www.baltimoresun.com/politics/bs-md-pol-ga-foster-children-hospitals-20200203-i3r5anhvxfgzna44nxhavu6dhe-story.html; *cf.* Hallie Miller & Liz Bowie, *Maryland foster children are being kept overnight in hotels and downtown office buildings*, Balt. Banner (Sept. 15, 2022, 6:00 AM). https://www.thebaltimorebanner.com/politics-power/state-government/maryland-foster-children-are-being-kept-overnight-in-hotels-and-downtown-office-buildings-POMWECJMHFCP7EQQRRCGRI54YE/#:~:text=Foster%20children%20are%20living%20in,and%20care%20for%20the%20kids.; Phil Davis, *Shortage of inpatient beds in Maryland psychiatric hospitals is putting children at risk, officials worry*, Balt. Sun (Nov. 3, 2021, 5:00 AM).

---

[3] This initial story aired on NPR's *Weekend Edition with Scott Simon* and won the Radio Television Digital News Association's 2021 National Edward R. Murrow Award.

194.    Hospital overstays remain a grave problem for scores of children in Maryland—both children in foster care and children awaiting voluntary placement.  Defendants have no concrete plan, no timetable, and no budget to solve the problem.  Nearly thirty years after the *Lisa L.* case settled with what was believed to be a global solution, it is as if the case never existed.  Maryland, per capita the wealthiest state in the country, continues to fail its neediest children.  Without judicial intervention, Defendants will continue to violate the children's rights and cause them irreparable harm.

## CLASS ALLEGATIONS

195.    The named Plaintiffs bring this action pursuant to Fed R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and all others similarly situated, as representative members of the following proposed class:

> All Maryland children with disabilities in the custody of a local Department of Social Services who are now, or who will be, placed in a hospital even though they have been determined by their medical providers or an ALJ to not require hospitalization and in need of a non-hospital or non-institutional placement, or who are at imminent risk of continued placement in hospitals without medical necessity, with the exception of children in the custody of the Baltimore City Department of Social Services.

196.    The class is seeking declaratory and injunctive relief and damages as remedies in this matter. The Defendants have acted or refused to act on grounds generally applicable to the class as a whole, requiring declaratory and injunctive relief.  Certification of the class is, therefore, proper under Federal Rules of Civil Procedure 23(b)(1)(A) and (b)(2).  Moreover, Plaintiffs seek per-diem damages for each day spent by a class member in a hospital overstay or RTC overstay, and for each day that the child did not receive required educational services.  As these damages would be calculated in the same per-diem amounts for all class members, and because the declaratory and injunctive relief predominate over damages, they are appropriately

addressed under Rule 23(b)(2).  Alternatively, they may be brought under Rule 23(b)(3), as common issues predominate and a class action is a superior method of managing class members' claims.

197.    The members of the class are so numerous that joining individual members is impracticable.  The OPD estimates that it currently represents approximately 50 class members in foster care per year.   All told, based on a partial survey of Maryland hospitals, the MHA estimated that, during the past summer, at least 50 children are in hospital overstay status on any given day.

198.    Class members can readily be identified from records maintained by local DSS agencies, hospitals, and the OPD.  The General Assembly has required Defendants to track all foster children in overstay status.

199.    Numerous questions of law and fact are common to the entire Plaintiff class. These common questions predominate over any questions affecting only individual class members.

200.    The wrongs suffered and remedies sought by the named Plaintiffs are identical to those of the class and result from a common course of conduct.  Their claims are typical of those of the class members and are based on the same factual and legal theories.

201.    Through their next friends, the named Plaintiffs will fairly and adequately assert and protect the interests of all class members.  They are seeking systemic relief that will benefit all members of the putative class.  They do not have any known conflicts of interest with any class members, and their interests are not antagonistic to those of the class members.  They have retained counsel experienced in handling class actions and complex litigation, and their next friends have demonstrated interest in the welfare of children and families.  Neither the named

Plaintiffs nor their counsel have any interest that might prevent them from actively and vigorously pursuing this action.

202.    Defendants have acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

203.    In addition to common issues predominating over individual issues, a class action is superior to other available means for the fair and efficient prosecution of this action.  Children warehoused in hospitals and institutions do not have ready recourse to bring these claims individually.  As the duration of these violations typically lasts for several weeks or months, and, according to the Defendants, is decreasing in length of time, the individual claims often could become moot before they could be adjudicated, thereby preventing systemic relief that would benefit other class members.

204.    A class action will result in an orderly and expeditious administration of the class members' claims and will ensure economy of time, effort, and expense, as well as uniformity of decision-making.

## CLAIMS FOR RELIEF

### Count One
### Discrimination on Basis of Disability
### (Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

### (Against All Defendants)

205.    Plaintiffs incorporate by reference paragraphs 1 through 204 of this Complaint as if fully set forth herein.

206.    The Named Plaintiffs and the proposed class members are qualified individuals with a disability under the ADA.

207.    DHS, MDH, SSA, DDA, BHA, and MMA, as well as the local Baltimore County DSS, Montgomery County DHHS, Prince Georges County DSS, Queen Anne's County DSS, and Wicomico County DSS agencies, are public entities subject to the requirements of Title II of the ADA.  Defendants López, Liggett-Creel, Branch, Mensah, Brown Burnett, Coppage, and Brewington (collectively, the "DHS Defendant Officials") and Defendants Herrera Scott, Burgess, Simons, and Moran (collectively, the "MDH Defendant Officials") are Maryland officials responsible for administering and/or supervising district programs and activities related to foster care, voluntary placement, behavioral services, developmental disabilities services, and/or the Medicaid program.

208.    Defendants, including the Secretaries of MDH and DHS, have responsibility for funding and providing, or for ensuring the provision of, intensive community-based services to the Plaintiff Children.  Instead, while acting under color of state law, Defendants have knowingly and consistently failed to ensure the provision of medically necessary intensive community-based services to the Plaintiff Children and have taken actions that have caused those services to be unavailable to the Plaintiff Children or have deliberately excluded children with disabilities under 18 years old from eligibility for their services.

209.    According to federal and state law, DHS, SSA, and its local DSS offices are required to prioritize placement of foster children in families and communities, rather than in institutions.  They also must provide them with community-based mental and behavioral-health services.

210.    Instead, DHS, SSA, and its local DSS offices have refused, and are refusing, to pick up foster children from the hospital who are medically ready for discharge, and are further requiring that children who are not yet in DSS foster care receive out-of-home services in an

RTC, DDA-licensed group home, or diagnostic facility as a condition of receiving a VPA, rather than placing them in integrated community-based placements with supportive services.

211.    Title II of the ADA requires, *inter alia*, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities, of a public entity, or be subjected to discrimination by any such entity." *See* 42 U.S.C. § 12132.  Defendants are excluding youth with disabilities, as well as youth with specific disabilities, from their programs, supports, and services that are offered to other foster youth, as well as to other youth with disabilities.

212.    Title II further provides that public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or services that is either "not equal to that afforded others" or "not as effective in affording equal opportunity" to gain the same result or benefit as provided to others.  *See* 28 C.F.R. § 35.130(b)(1)(ii)-(iii).

213.    Title II requires public entities to make reasonable modifications to their child-welfare programs to avoid discrimination on the basis of disability.  *See* 28 C.F.R. § 35.130(b)(7).

214.    As foster children in state custody, the Plaintiff Children are categorically eligible for Medicaid and are presumed eligible, based on disability, for MDH's publicly funded mental-health and other community services that already exist.  Similarly, DHS, SSA, and local DSS offices offer family preservation services and supports and out-of-home placements that have not been made available to Plaintiffs.  Defendants have not made reasonable modifications, to the extent any are necessary, to provide the Plaintiff Children access to community-based services, programs, and placements.

215.    Title II further prohibits public entities from utilizing "criteria or methods of administration" "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3). Defendants discriminate against the Plaintiff Children based on disability by relying on criteria or methods of administration that prioritize or permit their institutional placement in hospitals despite their eligibility for an array of home and community-based placements and services. These criteria or methods of administration include failing to expand community-based foster-care placements, including treatment foster-care placements, emergency foster homes, and psychiatric respite facilities; and by failing to expand access to, and to maintain, waitlists and/or shortages of community-based intensive in-home services, community-based wraparound services, community-based crisis-intervention services, respite and step-down programs, and community-based outpatient mental health and behavioral-health services.

216.    Defendants have discriminated against the Plaintiff Children in violation of the ADA by failing to administer services, programs, and activities in the most integrated setting appropriate for their needs and by needlessly placing or keeping them in an institutional setting to receive behavioral health services, causing them to suffer harm. Defendants' unnecessary segregation of individuals with disabilities constitutes unlawful discrimination under Title II of the ADA. Defendants are discriminating against youth with disabilities by administering and funding their child-welfare programs and system of mental-health and developmental-disabilities services for youth in a manner that results in their unnecessary institutionalization or serious risk of such institutionalization. By failing to provide placements, services, and supports that enable

youth with disabilities to remain in their own homes or in integrated family-like settings in the community, Defendants have violated Title II of the ADA and their implementing regulations.

217.    In *Olmstead*, the United States Supreme Court held that unnecessary institutionalization may constitute unlawful discrimination under the ADA.  Under the *Olmstead* plurality decision, states must provide community-based treatment for individuals with disabilities when (1) such placement is appropriate; (2) the affected persons do not oppose such treatment; and (3) the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with disabilities.  *See id.* at 607 (Ginsburg, J., plurality).

218.    The relief sought by Plaintiffs would not require a fundamental alteration to Maryland's programs, services, or activities.  For Medicaid-eligible youth, MDH and Defendants Herrera, Scott, Burgess, Simons, and Moran ("the MDH Defendants") are already required by federal law to provide intensive community-based services.  Compliance with the ADA and Section 504 would not impose unreasonable costs on Defendants.

219.    Other youth with behavioral-health impairments are at imminent risk of remaining hospitalized without medical need because of MDH's systemic and pervasive failure to provide adequate, appropriate community-based services.

220.    The Plaintiff Children, including the named Plaintiffs, seek (or sought) community-based treatment and placement and do not (or did not) oppose their removal from their hospitals for placement in the community.

221.    Hospitals are not an appropriate setting for the Plaintiff Children, as all have been determined not to require hospitalization, by definition.

222.    In light of their keen awareness of the problem and its persistence for at least the last five years, Defendants' discrimination against the Plaintiff Children is intentional and willful and demonstrates deliberate indifference to the Plaintiff Children's rights.

223.    Defendants' discrimination against the Plaintiff Children's disabilities in violation of the ADA also violates the Fourteenth Amendment to the U.S. Constitution, as it results in an egregious deprivation of liberty and substantive due process.

224.    As a result of Defendants' actions and inactions in violation of the ADA, the Plaintiff Children have suffered actual injury and will continue to suffer irreparable harm; they have suffered, and will continue to suffer, from discrimination, unnecessary institutionalization, the inability to access community-based mental-health services and other supports, inability to go to school or pursue vocational training, and injury to their prospects for lifelong success and a meaningful life.

225.    In the absence of relief from this Court, Defendants will continue to institutionalize and deny Plaintiff Children their right to live in the most integrated setting appropriate to their needs.

### Count Two
### Discrimination on Basis of Disability
### (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)

### (Against All Defendants)

226.    Plaintiffs incorporate by reference paragraphs 1 through 225 of this Complaint as if fully set forth herein.

227.    The Plaintiff Children are "otherwise qualified individuals with a disability" under Section 504.

228.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

229.    The Plaintiff Children are otherwise qualified individuals with disabilities entitled to the protections of the Rehabilitation Act.  See 29 U.S.C. § 705(20)(B) (citing to the ADA's definition at 42 U.S.C. § 12102).

230.    The Rehabilitation Act defines a "program or activity," in pertinent part, as "all of the operations of a department [or] agency ... of a State or of a local government."  29 U.S.C. § 794(b)(1).

231.    DHS, MDH, SSA, DDA, BHA, and MMA, as well as the local Baltimore County DSS, Montgomery County DHHS, Prince Georges County DSS, Queen Anne's County DSS, and Wicomico County DSS agencies, are public entities that receive "federal financial assistance" and are, thus, subject to the requirements of the Rehabilitation Act.  The DHS Defendant Officials and the MDH Defendant Officials are Maryland officials responsible for administering and/or supervising district programs and activities related to foster care, voluntary placement, behavioral services, developmental disabilities services, and/or the Medicaid program. The Rehabilitation Act defines a "program or activity" in pertinent part, as "all of the operations of a department [or] agency … of a State or of a local government."  29 U.S.C. § 794(b)(1).

232.    Defendants, including the Secretaries of MDH and DHS, have responsibility for funding and providing, or for ensuring the provision of, intensive community-based services to the Plaintiff Children.  Instead, while acting under color of state law, Defendants have knowingly and consistently failed to ensure the provision of medically necessary intensive community-based services to the Plaintiff Children and have taken actions that have caused those services to

be unavailable to the Plaintiff Children or have deliberately excluded children with disabilities under 18 years old from eligibility for their services.

233.    According to federal and state law, DHS, SSA, and its local DSS offices are required to prioritize placement of foster children in families and communities, rather than in institutions.  They also must provide them with community-based mental and behavioral-health services.

234.    Instead, DHS, SSA, and its local DSS offices have refused, and are refusing, to pick up foster children from the hospital who are medically ready for discharge, and are further requiring that children who are not yet in DSS care and custody receive out-of-home services in an RTC, DDA-licensed group home, or diagnostic facility as a condition of receiving a VPA, rather than placing them in integrated community-based placements with supportive services.

235.    Child-welfare services, including foster care, the Maryland Medicaid program, state-funded disability services, and oversight of hospitals and other institutional placements, are programs or activities of DHS and MDH and their Defendant officers.

236.    As with the ADA, the Rehabilitation Act contains an "integration mandate" requiring covered entities to provide aids, benefits, and services that afford people with disabilities "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs."  45 C.F.R. § 84.4(b)(2).

237.    Defendants' agents have placed the Plaintiff Children in hospitals and failed to remove them when hospital care is no longer medically necessary and/or have acted or failed to act in a manner that puts the Plaintiff Children at imminent risk for placement in hospital overstay status, a wholly segregated placement that is not as effective as community-based

behavioral and mental-health treatment, denies children adequate social-emotional caregiver-child interactions, and is likely to lead to less positive outcomes for the Plaintiff Children than would provision of community-based treatment and placement in a community-based setting.

238.    Defendants and their agents have institutionalized the Plaintiff Children, and/or placed them at serious risk of institutionalization, in a hospital overstay, a wholly segregated setting that violates the integration mandate.  Defendants are excluding youth with specific types of disabilities from their programs, supports, and services that are offered to other foster youth.

239.    Section 504 requires that public entities may not deny a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is either not equal to that afforded others or is not as effective in affording equal opportunity to gain the same result or benefit as provided to others.  *See* 45 C.F.R. 84.4(b)(ii) and (iii).  It therefore requires public entities to make reasonable modifications to their child welfare programs to avoid discrimination on the basis of disability.

240.    As foster children in state custody, the Plaintiff Children are categorically eligible for Medicaid and are presumed eligible, based on disability, for MDH's publicly funded mental-health and other community services that already exist.  Similarly, DHS, SSA, and local DSS offices offer family-preservation services and supports and out-of-home placements that have not been made available to Plaintiffs.  Defendants have not made reasonable modifications, to the extent any are necessary, to provide the Plaintiff Children access to community-based services, programs, and placements.

241.    Section 504 prohibits public entities from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination or have the purpose or effect of defeating or substantially impairing

accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. *See* 45 C.F.R. § 84.4(b)(4) (implementing the Rehabilitation Act). Defendants discriminate against the Plaintiff Children based on disability by relying on criteria or methods of administration that prioritize or permit their institutional placement in hospitals despite their eligibility for an array of home and community-based placements and services. These criteria or methods of administration include failing to expand community-based foster-care placements, including treatment foster-care placements, emergency foster homes, and psychiatric respite facilities; and by failing to expand access to, and to maintain, waitlists and/or shortages of community-based intensive in-home services, community-based wraparound services, community-based crisis-intervention services, respite and step-down programs, and community-based outpatient mental-health and behavioral-health services.

242. Defendants have discriminated against the Plaintiff Children in violation of Section 504 by failing to administer services, programs, and activities in the most integrated setting appropriate for their needs and by needlessly placing or keeping them in an institutional setting to receive behavioral health services, causing them to suffer harm. Defendants' unnecessary segregation of individuals with disabilities constitutes unlawful discrimination under Section 504.

243. In *Olmstead*, the United States Supreme Court held that unnecessary institutionalization may constitute unlawful discrimination under the ADA. Section 504 imposes identical requirements on programs and activities that receive federal financial assistance. *See, e.g.*, 45 C.F.R. 84.4(b)(2).

244. The relief sought by Plaintiffs would not require a fundamental alteration to Maryland's programs, services, or activities. For Medicaid-eligible youth, the MDH Defendants

are already required by federal law to provide intensive community-based services.  Compliance with Section 504 would not impose unreasonable costs on Defendants.

245.    Other youth with behavioral-health impairments are at imminent risk of remaining hospitalized without medical need because of MDH's systemic and pervasive failure to provide adequate, appropriate community-based services.

246.    The Plaintiff Children, including the named Plaintiffs, seek community-based treatment and placement and do not oppose their removal from their hospitals for placement in the community.

247.    Hospitals are not an appropriate setting for the Plaintiff Children, as all have been determined not to require hospitalization, by definition.

248.    As a result of Defendants' actions and inactions, the Plaintiff Children have suffered and will continue to suffer irreparable harm, they have suffered and/or will continue to suffer from discrimination, unnecessary institutionalization, the inability to access community-based mental-health services and other supports, inability to go to school or pursue vocational training, and injury to their prospects for lifelong success and a meaningful life.

249.    In the absence of relief from this Court, Defendants will continue to institutionalize and deny Plaintiff Children their right to live in the most integrated setting appropriate to their needs.

**Count Three**
**Violation of the EPSDT Requirements of the Medicaid Act**
**(42 U.S.C. § 1396d, et seq. and 42 U.S.C. § 1983)**

**(Against Defendants MDH, Herrera Scott, Simons, Burgess, and Moran)**

250.    Plaintiffs incorporate by reference paragraphs 1 through 222 of this Complaint as if fully set forth within.

251.    The MDH Defendants, while acting under the color of law, have violated the Medicaid Act, including the Act's EPSDT mandate, by failing to provide the Plaintiff Children with intensive community-based services when such services are medically necessary to treat or ameliorate the Plaintiff Children's mental-health or behavioral-health conditions.  42 U.S.C. §§ 1396a(a)(43), 1396d.

252.    The MDH Defendants have responsibility for funding and providing, or for ensuring the provision of, intensive community-based services to the Plaintiff Children.  Instead, while acting under the color of state law, these Defendants have knowingly and consistently failed to provide medically necessary intensive community-based services to the Plaintiff Children and have taken actions that have caused those services to be unavailable to the Plaintiff Children, resulting in harm to them.

253.    Defendants' failures constitute deliberate indifference and failure to exercise professional judgment regarding Plaintiffs' rights under the Medicaid Act, as enforced through 42 U.S.C. § 1983.

### Count Four
### Deprivation of Liberty and Denial of Substantive Due Process
### (Fourteenth Amendment to the U.S. Constitution,
### Article 24 of the Maryland Declaration of Rights, and 42 U.S.C. § 1983)

### (Against Defendants López, Liggett-Creel, Branch, Mensah, Brown Burnett, Coppage, and Brewington)

254.    Plaintiffs incorporate by reference paragraphs 1 through 253 of this Complaint as if fully set forth herein.

255.    When foster children are placed in state custody, DHS and the local DSS agency assume an affirmative duty under the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights to protect those children and to keep them reasonably free from harm and from risk of harm.

256.    The foregoing actions and inactions of the DHS Defendant Officials, who, in their official capacities, directly and indirectly control, and are responsible for, the policies of DHS, SSA, and/or the applicable local DSS agencies, constitute a failure to meet their affirmative duty to protect all representative Plaintiffs and class members and to keep them reasonably free from harm and risk of harm.  These failures are a substantial factor leading to, and a proximate cause of, the violation of the constitutionally protected liberty interests of the Plaintiff Children.

257.    The foregoing actions and inactions of the DHS Defendants, rendered in their official capacities, constitute a pattern, custom, policy and/or practice contrary to law and any reasonable professional standards, and substantially depart from accepted professional judgment. These actions and inactions present a deliberate indifference to known harms and imminent risk of harm to the Plaintiff Children and to their constitutionally protected rights and liberty interests, such that these Defendants were plainly placed on notice and chose to ignore the dangers in a manner that shocks the conscience.

258.    As a result of the actions and inactions of the DHS Defendants, the Plaintiff Children have been harmed, or are at continuing and imminent risk of harm, and have been deprived of their substantive due-process rights as guaranteed by the Fourteenth Amendment and Article 24, including, but not limited to, the right to be reasonably free from harm while in state custody.

259.    In violating the Plaintiff Children's federal constitutional rights to substantive due process under the Fourteenth Amendment, the DHS Defendants have acted under color of state law and, thus, are liable under 42 U.S.C. § 1983.

**Count Five**
**Denial of Procedural and Substantive Due Process**
**(Fourteenth Amendment to the U.S. Constitution,**
**Article 24 of the Maryland Declaration of Rights, and 42 U.S.C. § 1983)**
**(Against Defendants López, Liggett-Creel, Branch, Mensah, Brown Burnett,**
**Coppage, and Brewington)**

260.    Plaintiffs incorporate by reference paragraphs 1 through 258 of this Complaint as if fully set forth herein.

261.    Under Maryland law, children who are not in DSS custody but who are in need of services are entitled to enter into VPAs with their local DSS to be placed in foster care and receive necessary services and protection that they are unable to receive at home with their families.

262.    The DHS Defendants deny these children this right by insisting, without any basis in law, that they are not entitled to enter into VPAs except to enter RTCs or other highly restrictive placements without regard to whether the children require such restrictive placements or could be served in less restrictive settings with more intensive services.

263.    The DHS Defendants' policy of denying VPAs except for placement in RTCs or other restrictive placements is arbitrary, capricious, unreasonable, and contrary to Maryland law.

264.    As a result of the DHS Defendants' adherence to this arbitrary and capricious policy, these children must wait in illegal, medically unnecessary, highly restrictive hospital settings for an RTC placement to be located, even if they could be placed in a more appropriate, less restrictive, non-institutional setting.  This policy forces these children to forfeit their liberty for long periods of time, often many months, in exchange for the opportunity for their parent to enter into a VPA with their local DSS sometime in the future when an RTC or other restrictive-setting bed becomes available.

265.    The policy further violates the children's liberty interests in a second way. Because these children cannot return home and institutional facilities have long waiting lists, DHS is asserting de facto custody and control over them, creating a "special relationship" that imposes a duty of care on the state to provide for their health, safety, and well-being.  In such cases, by forcing parents to forego custody of their children in order to obtain services for their children, the DHS Defendants are engaging in a policy of family separation at odds with their obligation to engage in family preservation.  Such policy violates those children's substantive due-process rights to family integrity and association.

266.    The foregoing actions and inactions of the DHS Defendants, rendered in their official capacities, constitute a pattern, custom, policy and/or practice contrary to law and any reasonable professional standards, and substantially depart from accepted professional judgment. These actions and inactions present a deliberate indifference to known harms and imminent risk of harm to the children and to their constitutionally protected rights and liberty interests, such that these Defendants were plainly placed on notice and chose to ignore the dangers in a manner that shocks the conscience.

267.    By arbitrarily, capriciously, and unreasonably compelling these children to forfeit their liberty in exchange for obtaining the future benefit of a VPA, a benefit they are entitled to receive under Maryland law without any such devastating consequence, the DHS Defendants violate their constitutional right to liberty without providing due process of law as required by the Fourteenth Amendment to the U.S. Constitution and Article 24 of the Maryland Declaration of Rights.

268.    By violating these children's liberty rights without providing due process, the DHS Defendants have acted under color of state law and, thus, are liable under 42 U.S.C. § 1983.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

1.    CERTIFY the proposed class pursuant to Federal Rule of Civil Procedure 23;

2.    ADJUDGE and DECLARE that:

a.    Defendants have discriminated against the Plaintiff Children on the basis of disability in violation of the ADA by failing to administer services, programs, and activities in the most integrated setting appropriate for their needs and by needlessly placing or keeping them in an institutional setting to receive behavioral health services, causing them to suffer harm;

b.    Defendants have discriminated against the Plaintiff Children on the basis of disability in violation of Section 504 of the Rehabilitation Act of 1973 by failing to administer services, programs, and activities in the most integrated setting appropriate for their needs and by needlessly placing or keeping them in an institutional setting to receive behavioral health services, causing them to suffer harm;

c.    The MDH Defendants have violated the Medicaid Act, including the Act's EPSDT mandate, by failing to provide the Plaintiff Children with intensive community-based services when such services are medically necessary to treat or ameliorate the Plaintiff Children's mental health or behavioral health conditions;

d.    The DHS Defendants have deprived the Plaintiff Children of their substantive due process rights as guaranteed by the Fourteenth Amendment and Article 24,

including, but not limited to, the right to be reasonably free from harm while in state custody; and

       e.    The DHS Defendants have violated the liberty rights of children stuck in hospitals while awaiting placements pursuant to VPAs, without providing due process guaranteed by the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

3.    ORDER that, for purposes of this case, an "overstay" is deemed to occur six hours after the child's medical staff or an ALJ determines that care by the hospital or institution is no longer medically necessary, but the child is nonetheless required to stay in the facility.

4.    EITHER (a) ORDER that Defendants shall immediately remove plaintiffs from their illegal placements and ensure they are placed in licensed foster-care settings or with appropriate parents, kin, or guardians, along with provision of all medically necessary services, and FURTHERORDER that Defendants are permanently enjoined from violating the rights of the Plaintiff Children and DRM's other constituents in hospital overstays as set forth in the findings of the Court set forth in Requested Relief Paragraph 2, *supra*, OR, IN THE ALTERNATIVE, (b) ORDER the relief set forth in Paragraphs 5-29, *infra*. With that caveat, the Court should:

5.    ORDER that, within five business days of the date of the Order, SSA issue a formal notice to every local DSS informing the agencies that (a) hotels, ALUs, independent living, and emergency foster homes are legal and often preferable options for foster children than are hospital and institution overstays; and (b) a decision to put or keep a child in a hospital or institution overstay must be based upon individualized and detailed clinical determinations and expressly found by the local DSS director that, for clinical reasons, the child cannot viably be placed in a hotel, ALU, independent living, or emergency foster home (public or private) with

appropriate supportive services.  DHS or the local DSS agency must provide a copy of this

determination to DRM, the Mental Health Division of the OPD, the child's parents or guardians,

and to the child's CINA attorney.

6.       ORDER that, within two business days from when a foster child enters overstay

status, the local DSS shall request educational services from the child's local school system if the

child is not already receiving educational services and that if the educational services are not

provided within the next five business days, the local DSS shall provide comparable tutoring

services until the required educational services are provided by the local school system to the

child.

7.       ORDER that, if the foster child has disabilities and receives special education and

related services, the local DSS shall make every effort to ensure that the child receives those

services and shall document and notify the child's CINA attorney of its effort.

8.       ORDER that, within 15 days of the date of the order, all local DSS agencies and

SSA shall identify the designees who will receive all notices from hospitals and residential

facilities regarding overstays and shall provide that contact information to all hospitals and

facilities in Maryland, as well as to all hospitals and facilities in other jurisdictions caring for

Maryland foster children.

9.       ORDER that, within 15 business days of the date of the order:

a.       Defendants shall establish a committee to be comprised of DHS and MDH

officials, and local and national experts who are knowledgeable about assessment of clinical

needs and placement of children in overstay status from a list of candidates who are acceptable to

DRM, and other members as appropriate, including clinicians, the child's parents, and local

agency personnel;

b.      Upon establishment, the committee shall meet to determine the least restrictive and most appropriate type of placement for each foster child in overstay status and each child whose discharge from a hospital or institution might be delayed due to a lack of an immediately available appropriate placement in the least-restrictive setting. The committee shall complete its review within one week of receipt of information about the child, or, if that is not possible, as soon as possible thereafter;

c.      The committee shall reconvene and review the child's case within every additional thirty-day period in which the child remains in overstay status;

d.      DHS shall ensure that each local DSS shall notify each Plaintiff Child's CINA attorney, the child's parents or guardians, the Mental Health Division of the OPD, and DRM within 24 hours of the committee's decision and shall report all efforts to place the child and the reasons for each program's refusal to accept the child;

e.      The committee shall also review all voluntarily placed children or children in the VPA process who are being proposed for out-of-home placement to determine the least restrictive and most appropriate option; and

f.      DHS shall compensate any experts described in subsection at market rates for their time served on the committee and shall enter into all necessary agreements to provide them with full access to all clinical and case records they identify as helpful for their work in assessing the placement needs and options for the children.

10.      ORDER that, within 30 days of the date of the order, the local DSS with custody of a foster child in overstay status shall send written notice by electronic mail to the foster child's CINA attorney, the Mental Health Division of the OPD, DRM, and the child's parents or guardians (by regular mail if email is not possible) within 24 hours of a foster child entering into

overstay status. The notice shall identify the foster child; the facility and unit where the child is

placed; the child's placement that preceded the overstay; the child's CINA attorney, the child's

guardianship status and the contact information for guardians; and, if at a hospital, the name of

the attending/treating physician or psychiatrist and social worker with lead responsibility for the

child's case.

11.     ORDER that, within 30 days of the date of the order, MDH promulgate an

emergency regulation providing that, whenever a hospital or facility determines that current or

continued placement is not medically necessary, it must immediately send electronic notice to

the local DSS or, for voluntarily placed children, to the child's parent or guardian, the Director of

SSA or its designee, DRM and the Mental Health Division of the OPD that the placement is no

longer medically necessary and that the child is in overstay status.

12.     ORDER that, within 60 days of the date of the order, SSA shall issue standards

and emergency rates for the utilization of hotels, ALUs, emergency foster homes,

noninstitutional residential child care, and child-placement agencies as alternatives to hospital

and institutional overstays.

13.     ORDER that, within 60 days of the date of the order, SSA shall issue a policy to

local DSS offices providing for the recruitment, opening, maintenance, and support of

emergency foster homes with sufficient supportive services to allow them to be used in lieu of

hospital and institution overstays.

14.     ORDER that, within 60 days of the date of the order, MDH shall issue an RFP for

the statewide implementation of comprehensive START services to include the elements of the

most comprehensive full-service proposal submitted to MDH by the Center for Start Services in

response to RFP No. 20-DDA-019 issued on July 16, 2019.  Such RFP shall provide for

contracts with a term of three years or longer. The contract shall be of sufficient scope to provide START services statewide to meet the estimated need for services.

15.     ORDER that, within 90 days of the date of this order, DHS must rescind its formal policy limiting VPAs to voluntarily placed children entering RTCs or certain DDA residential programs and shall inform local DSS agencies that they should enter into VPAs with families seeking placements for children they cannot care for in their homes, even if the voluntarily placed children do not require RTC-level care and even if no placement is immediately available.

16.     ORDER that, within 90 days of the date of the order, DHS shall investigate and consider utilizing alternative methods of providing treatment foster care, including the possibility of "professionalizing" treatment foster care parents for the highest-intensity children and to report the results of its investigation, its decision, and the rationale for that decision to DRM and plaintiffs' counsel in the *L.J.* case.

17.     ORDER that within 90 days of the date of the order, MDH shall (a) rescind all restrictions and make application to CMS for revision of Medicaid waiver applications that limit or prevent DDA's provision of services to children; (b) amend Medicaid's medical necessity criteria for children's services by providing access by children with developmental disability diagnoses such as autism to multiple types of services such as Psychiatric Rehabilitation Program ("PRP") and Targeted Case Management ("TCM"), and eliminate service-combination exclusions for children simultaneously enrolled in PRP with respite, TCM, and other higher levels of care; and (c) with input from DRM and mental health service provider and recipient stakeholders, design and conduct a review of Maryland's 1915(i) waiver program and provide the results of its review to DRM and the stakeholders;

18.     ORDER that, within 180 days of the date of the order, DHS and MDH shall ensure that all children in out-of-home placements or at risk of out-of-home placement have full and immediate access to the following services, within five business days of referral as medically necessary: intensive in-home support services, parent-child interactive therapy, functional family therapy, multisystemic therapy, day-hospital programs, and other evidence-based behavioral health and mental health services.  Such intensive therapy services shall be provided in "wraparound" intensity as medically necessary.

19.     ORDER that, within 180 days of the date of the order, MDH shall complete, publish, and send to DRM its plan for the statewide delivery of high-fidelity wraparound with care coordination by a care management entity to all families in need of such services.

20.     ORDER that, within 180 days of the date of the order, MDH shall review and begin the process of revising the *Lisa L.* regulations in collaboration with DRM.  The new regulations shall apply to all private hospitals, including those hospitals without a separately identified psychiatric inpatient unit, and to all units of those hospitals, including their emergency departments.

21.     ORDER MDH and DHS to convene weekly meetings of foster care providers, DRM, and other advocacy and stakeholder groups to discuss and address the need for additional placement options for the foster youth who are in, or who are likely to enter into, overstay status, the providers' views about solutions to overstays, including placement options and the range of needed supports from DHS and MDH, and the providers' interest in and concerns about providing such services.

22.     ORDER DHS to issue an emergency solicitation for respite/step-down beds and other placement options discussed in paragraphs 176 and 180, *supra*, that, to the extent feasible,

take into account the issues raised by the providers and advocacy groups and is reasonably calculated to eliminate overstays.

23.     ORDER DHS to work with local DSS agencies to develop (a) public emergency foster homes that, with appropriate supportive services, could be appropriate placements for at least some of the children in overstay status and to ensure that even when not in use, the homes remain available on an as-needed basis, and (b) an expanded supply of longer-term community placements to ensure that children are placed in the least restrictive placement.

24.     ORDER DHS to assess all children placed in treatment foster homes to determine who may be stepped down to lesser care and, within one year of the order, step down all such foster children as needed and appropriate.

25.     ORDER DHS and MDH to conduct an analysis of all cases of youth in overstay status during FY 2019 through FY 2023, and a sample of cases of children at risk of overstay due to placement instability during that period in order to (i) identify places of potential intercept where early intervention and/or lower levels of care were not accessed and to determine why that did not occur; and (ii) provide data to guide the development of solutions to overstays, including, but not limited to, new placement options (and associated bed capacity), changes to current placement options, or other supportive services that could reasonably be expected to significantly reduce cases of youth in overstay status in the future.

26.     ORDER that DHS and MDH take all reasonable steps to implement the assessment findings and recommendations, and order DHS to provide a copy of the analysis to DRM and to plaintiffs' counsel in the *L.J.* case;

27.     ORDER DHS and MDH to consult with the Alliance of Black Mental Health Professionals or similar organizations on strategies and methods to eliminate implicit bias in placement decisions.

28.     ORDER DHS to provide step-down placements and services for children under VPAs leaving residential care who need community placements;

29.     ORDER MDH and DHS to promulgate regulations requiring all hospitals and MDH or DHS-licensed residential facilities to alert them immediately of any voluntarily placed child or child under a VPA who is determined to be in overstay status.

30.     ORDER that the provisions of the Court's order are binding and shall be judicially enforceable, that they shall remain in effect for a minimum of 10 years and that they shall terminate at any time thereafter upon a determination by this Court that the state of Maryland has enacted sufficient statutory provisions and protections to satisfy the Court that overstays will not recur in the future.

31.     ORDER the appointment of an independent monitor to investigate and periodically report on Defendants' compliance with the Court's Order, and where violations occur, to recommend sanctions and further corrective relief, with further provisions establishing the independent monitor's full access to Defendants' records, staff, and policies, including confidential case-specific child-welfare and healthcare information, as needed to perform these tasks.

32.     ORDER that, in addition to the independent monitor, DRM also shall be responsible for monitoring compliance with this agreement and for seeking enforcement if substantial compliance does not occur, and that, to facilitate DRM's monitoring, DHS and MDH shall agree to such protective orders as are needed to provide DRM with full access to

confidential child-welfare and healthcare information pertaining to the class of children and upon

request by DRM (a) shall make records available for any class member in an overstay situation;

(b) recognize DRM's right, as Maryland's protection and advocacy organization, to access any

child in an overstay facility and to discuss the child's case with staff at the facility; and (c)

provide DRM with weekly reports on all children known to be in overstay status.

33.    ORDER that DRM shall be entitled to receive reasonable attorney's fees and costs

for monitoring the implementation of the provisions of the order.

34.    AWARD damages to all Plaintiff Children on a per-diem basis, for each day spent

by a class member in a hospital overstay, and for each day that the Plaintiff child did not receive

required educational services.

35.    ORDER Defendants to pay reasonable attorney's fees and costs to Plaintiffs'

counsel pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a**.**

36.    ADJUDGE, ORDER, and AWARD such further relief as this Court deems just,

necessary and proper.

Dated:   __August 25, 2023_____

_____/s/_____            _____/s/_____
Leslie Seid Margolis                Mitchell Y. Mirviss
(signed by Luciene Parsley with permission    (signed by Luciene Parsley with permission
of Leslie Seid Margolis)            of Mitchell Y. Mirviss
Federal Bar No. 23422               Federal Bar No. 05535
Disability Rights Maryland          (410) 244-7412
1500 Union Avenue, Suite 2000       Fax: (410) 244-7742
Baltimore, MD 21211                 Venable LLP
LeslieM@disabilityrightsmd.org      750 East Pratt Street, 9th Fl.
(410) 727-6352                      Baltimore, MD  21202
Fax: (410) 727-6389                 (410) 244-7412
                                    Fax: (410) 244-7742
                                    mymirviss@venable.com

_____/s/_____
Luciene M. Parsley
Federal Bar No. 27089
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
LucieneP@disabilityrightsmd.org
(410) 727-6352
Fax: (410) 727-6389


_____/s/_____
Megan R. Berger
(signed by Luciene Parsley with permission of Megan R. Berger)
Federal Bar No. 21705
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
Megan.Berger@disabilityrightsmd.org
(410) 727-6352
Fax: (410) 727-6389


Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs T.G., et al., demand a jury trial of all issues triable by jury.


_____/s/_____
Leslie Seid Margolis
(signed by Luciene Parsley with permission
of Leslie Seid Margolis)
Federal Bar No. 23422
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
LeslieM@disabilityrightsmd.org
(410) 727-6352
Fax: (410) 727-6389

_____/s/_____
Mitchell Y. Mirviss
(signed by Luciene Parsley with permission
of Mitchell Y. Mirviss
Federal Bar No. 05535
(410) 244-7412
Fax: (410) 244-7742
Venable LLP
750 East Pratt Street, 9th Fl.
Baltimore, MD  21202
(410) 244-7412
Fax: (410) 244-7742
mymirviss@venable.com


_____/s/_____
Luciene M. Parsley
Federal Bar No. 27089
Disability Rights Maryland
1500 Union Avenue, Suite 2000

Baltimore, MD 21211
LucieneP@disabilityrightsmd.org
(410) 727-6352
Fax: (410) 727-6389


_____/s/_____
Megan R. Berger
(signed by Luciene Parsley with permission of Megan R. Berger)
Federal Bar No. 21705
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
Megan.Berger@disabilityrightsmd.org
(410) 727-6352
Fax: (410) 727-6389