# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| T.G., BY HIS NEXT FRIEND,<br>BEVERLY SCHULTERBRANDT, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARYLAND DEPARTMENT OF HUMAN<br>SERVICES, et al.,<br><br>*Defendants*. | Civil Action No.: 8:23-cv-01433-MJM |

_____

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
_____

**ANTHONY G. BROWN**
**ATTORNEY GENERAL OF MARYLAND**

Ann Sheridan (Fed. Bar No. 11137)
Ann.sheridan1@maryland.gov
Elise Song Kurlander (Fed. Bar No. 23186)
Elise.song@maryland.gov
Barry Dalin (Fed. Bar No. 21121)
Barry.dalin@maryland.gov
Assistant Attorneys General
Maryland Department of Human Services
311 West Saratoga Street, Suite 1015
Baltimore, Maryland 21201
(410) 767-7226
(410) 333-0026 (facsimile)

Nicole Lugo Clark (Fed. Bar No. 26983)
Nicole.LugoClark@maryland.gov
Brandy J. Gray (Fed. Bar No. 28455)
Brandy.Gray1@maryland.gov
Assistant Attorneys General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
(410) 767-1861
(410) 333-7894 (facsimile)

*Attorneys for the Maryland Department of*
*Human Services, et al.*

*Attorneys for the Maryland Department of*
*Health, et al.*

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.   PLAINTIFFS LACK STANDING. ................................................................. 2

    A.   The Amended Complaint Negates Standing for Injunctive Relief. ................................................................................ 2

    B.   Plaintiffs' Systemic Relief Requests Fail the Redressability Test. ........................................................................ 3

    C.   Plaintiffs' Proposed Next Friends Are Improper. ............................. 5

    D.   DRM Lacks Associational Standing. .................................................. 9

II.   COUNTS ONE AND TWO MUST BE DISMISSED BECAUSE WAITING FOR A SAFE AND APPROPRIATE PLACEMENT IS NOT DISCRIMINATION UNDER THE ADA AND THE REHABILITATION ACT. .................................... 12

III.   COUNT THREE MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT IDENTIFY ANY SERVICES THAT HAVE BEEN DENIED IN VIOLATION OF THE EPSDT MANDATE. .................................................................. 16

IV.   COUNT FOUR MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT PLAUSIBLY PLED A SUBSTANTIVE DUE PROCESS VIOLATION. ................... 20

    A.   Plaintiffs' Allegations Do Not Support a Deprivation of Liberty Claim. ................................................................. 21

    B.   Plaintiffs' Allegations Do Not Support a Conditions of Custody Claim. ................................................................ 23

V.   COUNT FIVE MUST BE DISMISSED BECAUSE THE ALLEGED FACTS DO NOT SUPPORT A DUE PROCESS CLAIM ON BEHALF OF VPA SEEKERS. ........ 26

    A.   VPAs are Contracts, Not Entitlements, Precluding a Procedural Due Process Claim. ......................................... 26

    B.   No Precedent Supports Plaintiffs' Substantive Due Process Claim for VPA Seekers. .............................................. 28

VI.     Sovereign Immunity Bars Plaintiffs' Request for Monetary
        Damages ................................................................................................. 29

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*A. A. by & through P.A. v. Phillips*, No. 21-30580, 2023 WL 334010 (5th Cir. Jan. 20, 2023) ................................................................................................................. 17

*Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000) ............................................................. 27, 28

*Arc of Washington State Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005) ...................... 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 3, 17

*Ashley v. N.L.R.B.*, 255 F. App'x 707 (4th Cir. 2007) ....................................................... 27

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004) ........................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 16

*Betances v. Fischer*, No. 11-CV-3200 (RWL), 2023 WL 8699001 (S.D.N.Y. Dec. 15, 2023) ................................................................................................................... 11

*Brown v. D.C.*, 928 F.3d 1070 (D.C. Cir. 2019) ............................................................... 15

*Bryson v. Stephen*, No. 99-CV-558-SM, 2006 WL 2805238 (D.N.H. Sept. 29, 2006) .... 16

*California v. Texas*, 593 U.S. 659 (2021) ......................................................................... 4

*Carcaño v. Cooper*, 350 F. Supp. 3d 388 (M.D.N.C. 2018) ............................................. 6

*Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007) ........................ 8

*Chagby v. Target Corp.*, No. CV 08-4425-GKH(PJWX), 2008 WL 5686105 (C.D. Cal. Oct. 27, 2008) .......................................................................................................... 2

*Charlie H. v. Whitman*, 83 F. Supp. 2d 476 (D.N.J. 2000) .............................................. 28

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................................. 30

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................................. 3

*Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428 (D. Nev. May 14, 2007) ................................................................................................................... 23

*Cochran v. Norkunas*, 398 Md. 1 (2007) ........................................................................ 26

*Collins v. Hamilton*, 349 F.3d 371 (7th Cir. 2003)............................................................ 17

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) .................................................................................................................................. 30

*Dandridge v. Williams*, 397 U.S. 471 (1970) ..................................................................... 5

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)...................... 29

*Doe v. Div. of Youth & Fam. Servs.*, 148 F. Supp. 2d 462 (D.N.J. 2001)........................ 29

*Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337 (4th Cir. 2017)................................... 4

*Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996)............................ 7

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772 (D. Md. 2010) ............. 26

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ........................................................................ 22

*Gardner by Gardner v. Parson*, 874 F.2d 131 (3d Cir. 1989) ........................................ 5, 9

*Hamdi v. Rumsfeld*, 294 F.3d 598 (4th Cir. 2002) ............................................................. 5

*In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477 (2007) ................................. 7

*In re K.L.*, 252 Md. App. 148 (2021) ................................................................................. 7

*J.R. v. Gloria*, 593 F.3d 73 (1st Cir. 2010)....................................................................... 20

*Johnson v. Solomon*, 484 F. Supp. 278 (D. Md. 1979) .................................................. 5, 22

*Jonathan R. v. Justice*, No. 3:19-CV-00710, 2023 WL 184960 (S.D.W. Va. Jan. 13, 2023) ........................................................................................................................... 23, 24

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020).................................................. 4, 5

*Katie A., ex rel. Ludin v. Los Angeles Cnty.*, 481 F.3d 1150 (9th Cir. 2007).............. 18, 19

*Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009) ....................................................... 6

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490 (7th Cir. 2005) ........................................................................................................................ 3, 4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................................... 11

*M.D. v. Abbott*, 152 F. Supp. 3d 684 (S.D. Tex. 2015) .................................................... 23

*M.D. v. Abbott*, 907 F.3d 237 (5th Cir. 2018) ................................................. 14, 23, 25, 30

*M.S. v. Brown*, 902 F.3d 1076 (9th Cir. 2018) ................................................................ 4, 5

*Mallette v. Arlington Cnty. Employees' Supplemental Ret. Sys. II*, 91 F.3d 630 (4th Cir. 1996) ........................................................................................................................ 27

*Marisol A. v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996) ................................................ 23

*Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007) ............ 10

*Murdaugh Volkswagen, Inc. v. First Nat'l Bank*, 741 F.2d 41 (4th Cir. 1984) .................. 9

*Muthana v. Pompeo*, 985 F.3d 893 (D.C. Cir. 2021) ........................................................ 7

*Nat'l Fed'n of the Blind v. United States Dep't of Educ.*, 407 F. Supp. 3d 524 (D. Md. 2019) ...................................................................................................................... 2, 3

*O'Connor v. Donaldson*, 422 U.S. 563 (1975) ................................................................ 21

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ....................................... 12, 15, 16

*Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) ........................................... 10

*Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13 (1st Cir. 2019) ..................................................................................................................... 10, 11

*Parham v. J. R.*, 442 U.S. 584 (1979) ................................................................... 7, 22, 24

*Patten v. Nichols*, 274 F.3d 829 (4th Cir. 2001) ..................................................... 20, 21, 28

*Pereira by Pereira v. Kozlowski*, 996 F.2d 723 (4th Cir. 1993) ...................................... 17

*Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995) ........................................................... 28

*Reno v. Flores*, 507 U.S. 292 (1993) .............................................................................. 22

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013) .......................................................................................... 11

*Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363 (D.R.I. 2011) ............................... 30

*Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir. 2005) ....................................................... 16

*Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26 (1976) ........................................... 4

*State v. Runge*, 317 Md. 613 (1989) .................................................................................. 8

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) .......................................... 3, 4

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ..................................................... 11

*T.W. by Enk v. Brophy*, 124 F.3d 893 (7th Cir. 1997) .................................................... 7, 8

*Tennessee v. Lane*, 541 U.S. 509 (2004) ........................................................................ 30

*Troxel v. Granville*, 530 U.S. 57 (2000) ........................................................................... 7

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996) ................................................................................................................................. 11

*United States v. Georgia*, 546 U.S. 151 (2006) ............................................................... 29

*United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398 (9th Cir. 1990) ................................................................................................. 11

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ...................... 4

*W. Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937) ...................................................... 26

*Warth v. Seldin*, 422 U.S. 490 (1975).............................................................................. 10

*Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202 (D.D.C. 2007).................. 9, 10

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ..................................................................... 8

*Wyatt B. by McAllister v. Brown*, No. 6:19-CV-00556-AA, 2021 WL 4434011 (D. Or. Sept. 27, 2021) ........................................................................................................................ 23

*Zinermon v. Burch*, 494 U.S. 113 (1990) ........................................................................ 27

**Statutes**

28 U.S.C. § 12101(a)(3) .................................................................................................. 30

28 U.S.C. § 12101(a)(6) .................................................................................................. 30

28 U.S.C. § 1746 ............................................................................................................... 9

42 U.S.C. § 1396a(a) ....................................................................................................... 17

42 U.S.C. § 1396d(r) ....................................................................................................... 17

vii

42 U.S.C. § 1396n ............................................................................................... 19

Md. Code Ann., Cts. & Jud. Proc. § 3-816.1(c)(4) (LexisNexis 2020) ........................... 13

Md. Code Ann., Cts. & Jud. Proc. §§ 3-801 *et seq.* (LexisNexis 2020) ........................ 22

Md. Code Ann., Fam. Law § 5-501(m) (LexisNexis 2019) ............................................ 26

**Rules**

Fed. R. Civ. P. 8(a) ...................................................................................... 2, 16

Local Rule 103.1(d) ............................................................................................. 2

Maryland Rule 19-301.6(b) ................................................................................... 9

Maryland Rule 2-202(b) ................................................................................... 6, 7

**Miscellaneous**

*Behavioral Health Emergency Department Wait Times and Service Improvement in Maryland*, Maryland Health Services Cost Review Commission (January 2022), https://dlslibrary.state.md.us/publications/Exec/MDH/HSCRC/HB1121,2020Ch29(2021)_2022.pdf ........................................................................................ 2, 24

*Fiscal & Policy Note*, H.B. 0406 (2022 Legis. Sess.) https://mgaleg.maryland.gov/2022RS/fnotes/bil_0006/hb0406.pdf (last visited Mar. 5, 2024) ........................................................................................................ 5

*Fiscal & Policy Note*, H.B. 1382 (2020 Legis. Sess.) https://mgaleg.maryland.gov/2020RS/fnotes/bil_0002/hb1382.pdf (last visited Mar. 5, 2024) ........................................................................................................ 5

Maryland Medicaid State Plan, https://health.maryland.gov/mmcp/Pages/Maryland-Medicaid-State-Plan-.aspx ........................................................................ 18, 19, 20

Rachel Baye, *Foster Kids in Maryland Are Being Left in Psych Hospitals Due to Space Constraints*, Nat'l Pub. Radio (Feb. 15, 2020), https://www.npr.org/2020/02/15/806282700/children-in-marylands-foster-care-system-are-being-left-in-psychiatric-hospitals ............................................................. 1

A. Jawed, R. Boro-Hernandez, D. Pickett, *Homeless in the Hospital: A Call to Strengthen Multidisciplinary Care for Children Awaiting Out-of-Home and Psychiatric Placements*, Frontiers in Pediatrics (Jan. 4, 2023), https://www.frontiersin.org/articles/10.3389/fped.2022.1057956/full ......................... 1

## INTRODUCTION

Although one would not know it from reading Plaintiffs' opposition to the motion to dismiss, the issue of hospital overstays is neither unique to Maryland nor to foster children.  It is a crisis that families, child welfare agencies, and hospital staff are struggling with nationwide.  A recent article in *Frontiers in Pediatrics* reports that annually 40,000 to 66,000 children are boarding in hospitals awaiting residential, group home or psychiatric placement.  The authors make recommendations for care and treatment of children while in overstay status, and specifically note the need to mitigate the "inflammatory rhetoric" that the situation can engender.[1]

There is no shortage of such rhetoric in Plaintiffs' opposition, including assertions that Defendants consider Plaintiffs "irremediably dangerous," Opp. 15, 56 n.30, 58;[2] are guilty of "victim-blaming," Opp. 18; have committed "pure stereotyping," Opp. 51; are engaging in "intentional discrimination," Opp. 51; believe they have "plenary power to override" medical decisions, Opp. 57; and see no "imperative to remove" children from overstays, Opp. 57. Defendants *never said* those things, nor would they *ever stand* for them.  Let Defendants be clear: they are "dedicated to ensuring that 100% of our youth have appropriate placements."[3]

Defendants cannot force relatives, foster families, or residential treatment centers to take in a child, but they can – and do – work with them to make it happen and they can – and do – pay

---

[1] See A. Jawed, R. Boro-Hernandez, D. Pickett, *Homeless in the Hospital: A Call to Strengthen Multidisciplinary Care for Children Awaiting Out-of-Home and Psychiatric Placements*, Frontiers in Pediatrics (Jan. 4, 2023), https://www.frontiersin.org/articles/10.3389/fped.2022.1057956/full.

[2] References to Plaintiffs' Opposition, ECF 54, are denoted "Opp.," references to Plaintiffs' Amended Complaint, ECF 37, are denoted "Compl.," and references to Defendants' Motion to Dismiss, ECF 47-1, are denoted "MTD."  The Amended Complaint is referred to interchangeably throughout as either the "Complaint" or the "Amended Complaint."

[3] Rachel Baye, *Foster Kids in Maryland Are Being Left in Psych Hospitals Due to Space Constraints*, Nat'l Pub. Radio (Feb. 15, 2020), https://www.npr.org/2020/02/15/806282700/children-in-marylands-foster-care-system-are-being-left-in-psychiatric-hospitals.

for a wide array of medical and behavioral health services to support youth in their homes and communities once discharged.   Plaintiffs' own filings confirm this—most of the named Plaintiffs are no longer hospitalized, Compl ¶¶ 49, 57, 65, 73; the rest are or will be moved soon, Opp. 25.

Plaintiffs' Complaint should be dismissed.  Not because this issue is not important; it most certainly is.  But the Plaintiffs do not have standing with respect to the relief they seek; the legal theories asserted do not support their claims; finding an appropriate placement for a foster child is an individualized effort not suitable for class-wide relief; and because solving the larger, systemic issue of hospital overstays, which extends well beyond foster children, is an issue best dealt with by the Maryland General Assembly, which is well aware of the problem and is focused on resolving it.[4]

## ARGUMENT[5]

### I.   PLAINTIFFS LACK STANDING.

#### A.    The Amended Complaint Negates Standing for Injunctive Relief.

Plaintiffs contend that Defendants have confused standing with mootness.  Opp. 23-26.  In reality, they have misjudged the effect their Amended Complaint had on the original named Plaintiffs' standing to pursue injunctive relief.  The problem for Plaintiffs is that the operative complaint for evaluating standing here is their Amended Complaint.  *Nat'l Fed'n of the Blind v. United States Dep't of Educ.*, 407 F. Supp. 3d 524, 530 (D. Md. 2019) (evaluating standing from

---

[4]   *See Behavioral Health Emergency Department Wait Times and Service Improvement in Maryland*, Maryland Health Services Cost Review Commission ["Commission Report"] (January 2022) at 2 (responding to Committee request for proposals to address ED wait times and hospital overstays), https://dlslibrary.state.md.us/publications/Exec/MDH/HSCRC/HB1121,2020Ch29(2021)_2022.pdf.

[5] Defendants reassert their challenge to the excessive length of Plaintiffs' Complaint.  MTD 13-15.  Under Local Rule 103.1(d), Plaintiffs should have sought permission to exceed the 40-page pleading limitation by explaining why compliance was impracticable.  They never did so and instead unilaterally decided the Rule did not apply to them.  Opp. 20-21.  Similarly, Rule 8(a) should bar Plaintiffs from alleging violations of laws they bring no claims under, Compl ¶¶ 138-157.  *See Chagby v. Target Corp.*, No. CV 08-4425-GKH(PJWX), 2008 WL 5686105, at *6 (C.D. Cal. Oct. 27, 2008).  Enforcement of both rules is warranted.

"the date of the Amended Complaint").  When Plaintiffs filed their Amended Complaint, all four

original Plaintiffs were no longer hospitalized.  Compl ¶¶ 49, 57, 65, 73.  "Past exposure to illegal

conduct" does not confer standing for injunctive relief.  *City of Los Angeles v. Lyons*, 461 U.S. 95,

102 (1983).  Plaintiffs plead no facts illustrating that they face any illegal conduct or a genuine

threat of another overstay.  MTD 17-18; Opp. 26 ("Plaintiffs did not focus on recurrent overstays

in the Amended Complaint").  The risk of another overstay is thus far "too speculative to confer

standing to seek injunctive and declaratory relief."[6]  *See Nat'l Fed'n of the Blind*, 407 F. Supp. 3d

at 535.

Plaintiffs' concerns about mootness are notable.  Opp. 23-26.  Perhaps these fears stem

from Plaintiffs' knowledge that Defendants will eventually remove all children from overstays,

leaving this Court with nothing to resolve.  Opp. 25 ("All Plaintiff children will leave their

overstays before the suit's conclusion.").

### B.    Plaintiffs' Systemic Relief Requests Fail the Redressability Test.

Plaintiffs suggest that their alternative requested relief "has nothing to do with standing."

Opp. 26.  To Plaintiffs, their requested relief is immaterial to determining redressability because

"[r]elief is decided by the facts proven at trial, not what is pled."  Opp. 28.  That is not so.

"Redressability [] depends upon the relief requested, not the relief [plaintiff] could prove

it was entitled to on the merits."  *Lac Du Flambeau Band of Lake Superior Chippewa Indians v.

Norton*, 422 F.3d 490, 502 (7th Cir. 2005); *see also Steel Co. v. Citizens for a Better Env't*, 523

U.S. 83, 103 (1998) (redressability considers whether "the requested relief will redress the alleged

---

[6] Plaintiffs suggest that discovery will reveal overstay recurrences, Opp. 26, but discovery is not a cure for defective pleadings, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 686 (2009) ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  Similarly, data from Baltimore City, Opp. 26, is irrelevant here, Compl. ¶ 6 n.1 (excluding Baltimore City from this case).

injury"); *Steel Co.*, 523 U.S. at 105-09 (analyzing whether each requested remedy satisfied this standard). Plaintiffs' alternative relief requests matter. If Plaintiffs' alternative requests are merely proposals that they do not intend to seek after trial, Opp. 19, 27, then they should have no issue with the Court dismissing them as failing the redressability standard. *See Steel Co.*, 523 U.S. at 107. If they intend to seek those remedies, then they must accept the scrutiny redressability requires. Redressability comprises two elements. *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). Plaintiffs' request for systemic relief fails both.

The first element considers whether the requested relief is substantially likely to remedy the alleged injury. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). The relationship between the relief requested and the injury suffered is critical. *California v. Texas*, 593 U.S. 659, 671 (2021). The relationship between Plaintiffs' systemic relief requests is attenuated from their claimed injuries. MTD 19-20. The systemic relief is intended to "resolve the crisis and prevent recurrence," Opp. 27, not to remedy the individual Plaintiffs' alleged harm, MTD 19-20. Plaintiffs do not dispute this point, Opp. 26-29, but instead charge Defendants with positing a "false distinction between individual and class claims," Opp. 27. The only claims that matter are the individual ones. *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing . . . ."). The individual Plaintiffs must establish, but have not established, standing for systemic relief. *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017).

The second element considers whether the Court has authority to award the relief requested. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018). Plaintiffs want this Court to order the State to promulgate regulations, issue/rescind certain policies, initiate procurement actions, create/expand certain placements, and subject itself to 10 years of federal monitoring. MTD 20-

21.  Federalism principles and Article III limitations strongly disfavor such actions.  *See M.S.*, 902 F.3d at 1083; *Juliana*, 947 F.3d at 1172-73; *see also Dandridge v. Williams*, 397 U.S. 471, 487 (1970) ("[T]he intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court.").

Plaintiffs claim courts can issue "detailed orders to state agencies."  Opp. 28.  That may generally be true, but this Court and the Maryland Legislature have already rejected proposals like Plaintiffs' systemic remedies.  For example, in *Johnson v. Solomon*, this Court rejected relief intended to compel the State to establish an optimal array of least restrictive foster care placements.  *See* 484 F. Supp. 278, 304-06 (D. Md. 1979) (holding that such proposals "are more suitably addressed to the state legislature rather than to a federal court").  Similarly, the Maryland Legislature has twice rejected legislation designed to "compel DHS to address the hospital overstay issue."[7]  Compl ¶ 37.  *Johnson* and Maryland's legislative prerogatives should be respected.  The only remedy Plaintiffs can possibly pursue is a narrowly tailored injunction ordering their removal from the hospital (sovereign immunity bars their request for money damages, *see infra* 29-30).

## C.    Plaintiffs' Proposed Next Friends Are Improper.

Plaintiffs preliminarily question dismissal as the appropriate remedy for improper next friends.  Opp. 29-30.  Binding precedent from the Fourth Circuit says it is, *Hamdi v. Rumsfeld*, 294 F.3d 598, 607 (4th Cir. 2002), and nothing limits that remedy to the habeas realm.[8]

---

[7]  Those bills included similar proposals to Plaintiffs' requests.  *See  Fiscal & Policy Note*, H.B. 1382 at 2-6 (2020 Legis. Sess.) https://mgaleg.maryland.gov/2020RS/fnotes/bil_0002/hb1382.pdf (last visited Mar. 5, 2024); *Fiscal & Policy Note*, H.B. 0406 at 2-6 (2022 Legis. Sess.) https://mgaleg.maryland.gov/2022RS/fnotes/bil_0006/hb0406.pdf (last visited Mar. 5, 2024).

[8] Plaintiffs cite *Gardner by Gardner v. Parson*, 874 F.2d 131 (3d Cir. 1989), for the proposition that dismissal is inappropriate, Opp. 30.  *Gardner* does not say this; *Gardner* says that a court cannot allow a child's interests to go unprotected after their initial next friend is properly dismissed.  *Gardner*, 874 F.2d at 138-41.

### 1. The Court Should Disregard the Affidavits Supporting Next Friend Standing.

Plaintiffs' pleadings fail to explain why their parents cannot represent them, nor do they discuss their relationships with the proposed next friends. MTD 22-24. Consequently, Defendants facially challenged next friend standing. MTD 23-25; *see also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (a facial challenge asserts that standing is insufficiently pleaded, whereas a factual challenge contends that the pleadings are untrue). In response, Plaintiffs submitted two declarations attempting to demonstrate next friend standing. Berger Decl., Ex. A, ECF 54-1; Jennings Decl., Ex. B, ECF 54-2. Declarations countering facial standing challenges are impermissible. *See Carcaño v. Cooper*, 350 F. Supp. 3d 388, 404 (M.D.N.C. 2018). This Court should decline to consider them.

Even if the Court considers the declarations, they have limited probative value. They were created post-hoc in the face of litigation. They are replete with inadmissible hearsay. *See* Berger Decl., Ex. A, ECF 54-1 at ¶¶ 2-5, 9; Jennings Decl., Ex. B, ECF 54-2 at ¶¶ 3, 5-7; *see also Carcaño*, 350 F. Supp. 3d at 404 n.10. They also lack dates of when certain discussions supposedly occurred, raising concerns about whether they occurred before or after this lawsuit was initiated.

### 2. Maryland Law Provides Parents with Priority to Represent Their Children.

Plaintiffs do not contest that Maryland representational rules apply; instead, Plaintiffs claim that Defendants have misread Rule 2-202(b) as granting parents "exclusive authority to sue as the child's guardian and bars use of next friends." Opp. 30. Plaintiffs believe anyone, even a

stranger, can represent a child, and parents are automatically disqualified from doing so once their child is adjudicated a CINA. Opp. 31-33. They are mistaken.

Parents have a fundamental right to make important decisions about their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). The right bestows parents with "primacy" in representing their child in a lawsuit under Rule 2-202(b), whether as a guardian or a next friend. *See In re K.L.*, 252 Md. App. 148, 184 (2021). Parents do not lose those rights simply because a child is adjudicated a CINA. *Id.* at 177, 183. On the contrary, the law presumes that a parent still acts in the child's best interests. *Parham v. J. R.*, 442 U.S. 584, 602-03 (1979). Plaintiffs' assertions that their parents are adverse parties and unfit to represent them because of a CINA finding strips parents of their fundamental parental rights by excluding them from a significant event in their children's lives.[9] Nothing indicates that Plaintiffs' parents cannot represent them.[10] Parents' priority over this representational role should be preserved.

### 3. The Original Named Plaintiffs' Next Friends are Strangers.

"Not every person who is interested in serving as a minor's next friend qualifies for that role." *Muthana v. Pompeo*, 985 F.3d 893, 902 (D.C. Cir. 2021). The proposed representatives must have more than an "ideological interest" in the litigation, *T.W. by Enk v. Brophy*, 124 F.3d 893, 896 (7th Cir. 1997), and they must have some relationship with the minor, *Muthana*, 985 F.3d at 902. The proposed representatives for the original named Plaintiffs are child advocates who have involved themselves here not because they knew the children but because their advocacy makes them committed "to end[ing] the egregious violations of law alleged in the complaint,"

---

[9] Plaintiffs find this argument dubious, Opp. 33, but their skepticism ignores the State's duty to promote reunification with the parent. *See In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 500 (2007).

[10] Although the affidavits reference attempted discussions with Plaintiffs' parents, those portions are inadmissible hearsay. *See* Berger Decl., Ex. A, ECF 54-1 at ¶ 5; Jennings Decl., Ex. B, ECF 54-2 at ¶ 7. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

Berger Decl., Ex. A, ECF 54-1 at ¶¶ 6-9.  "[P]ersons having only an ideological stake in the child's case are never eligible" to serve as next friends.  *T.W.*, 124 F.3d at 896-97 (rejecting a child advocate as a minor's next friend).  This reasoning is underscored by the limited contact the proposed representatives have had with these Plaintiffs: T.G. and M.G. have never met their next friends in person, while T.A. and D.B. have met their next friends seemingly only once.  *See* Berger Decl., Ex. A, ECF 54-1 at ¶ 10.  Even with relaxed relationship requirements, a couple of virtual meetings or one in-person meeting is insufficient.  *See Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 518-20 (D. Neb. 2007) (raising concerns with next friends who "had little prior or no recent contact . . . with the named plaintiffs they seek to represent").

### 4. CINA Attorneys Should Not Serve as Next Friends.

CINA attorneys are inappropriate next friends.  Their duties are to protect the child's interests in state child welfare proceedings, not to promote federal systemic litigation.  It is notable that the CINA attorneys for all the original named Plaintiffs declined to serve as next friends.  Berger Decl., Ex. A, ECF 54-1 at ¶ 2.  Nevertheless, one CINA attorney did agree to serve for the new named Plaintiffs.  Plaintiffs claim this is fine because "the juvenile courts are aware of her service here and one authorized her to proceed here."[11]  Opp. 35.

But legitimate concerns linger.  First, contrary to Plaintiffs' suggestions, Opp. 36, CINA confidentiality rules are designed to safeguard privacy for privacy's sake, *see State v. Runge*, 317 Md. 613, 620 (1989), given the sensitive topics covered, *see Sumpter v. Sumpter*, 427 Md. 668, 684 n.11 (2012).  Neither the juvenile court order nor Maryland ethical rules explicitly permitted Ms. Jennings to share confidential information with Plaintiffs' counsel for purposes of pursuing

---

[11]  Plaintiffs fault Defendants for not providing the Court with this order.  Opp. 35, 37.  Plaintiffs, not Defendants, bear the burden of demonstrating that Ms. Jennings is an appropriate next friend.  *Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990).

systemic reform litigation.  *See* Md. R. 19-301.6(b) (permitting disclosure to "prevent reasonably certain death or substantial bodily harm," stop a crime or fraud, secure ethical advice, or defend against a client-initiated suit).  Second, Ms. Jennings would be operating as an attorney in one case and alter ego for the children in another.  Nothing indicates that she has clarified this crucial distinction for R.R. and B.B.  *See Gardner*, 874 F.2d at 140 n.14 (cautioning that "appointment of counsel as representative is not always prudent" because "a lawyer who acts in both capacities may sometimes fail to distinguish the two roles").  Finally, Ms. Jennings should be working to achieve the children's permanency plans, which implies encouraging their parents or adoptive resources to act in this representational role rather than usurping it.

### D.    DRM Lacks Associational Standing.

#### 1.    The Court Should Disregard the Affidavit Supporting Associational Standing.

For the reasons explained above, the Court should disregard DRM's affidavit.  In addition to containing inadmissible hearsay, *see* Margolis Decl., Ex. D, ECF 54-4 at ¶¶ 11-12, 14, the affidavit is not made under the penalties of perjury, in contravention of 28 U.S.C. § 1746.

#### 2.    The Named Plaintiffs Do Not Possess Indicia of Membership in DRM.

Plaintiffs highlight an oral ruling from another judge as establishing DRM's indicia of membership.  Opp. 37-38.  But oral rulings are not binding, *Murdaugh Volkswagen, Inc. v. First Nat'l Bank*, 741 F.2d 41, 44 (4th Cir. 1984), and the ruling articulated the relevant test as "disjunctive," Opp. 38, when it is conjunctive, *see Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015).  The oral ruling holds no weight here.  Ruling, Ex. C., ECF 54-3, at 12-14.

A non-membership organization has indicia of membership when the individuals it claims to represent (1) elect the entity's leadership, (2) serve in the entity, and (3) finance the entity's activities.  *See Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007).

9

There is no dispute that DRM's "constituents" at large are actively involved in the organization. Opp. 38-40. The issue is the lack of direct involvement from and specific contact with the individually named Plaintiffs. *See Leavitt*, 477 F. Supp. 2d at 209-11 (rejecting indicia of membership because the named plaintiffs did not "play any role in selecting [the group's] leadership, guiding its activities, or financing those activities"). DRM claims to express the named Plaintiffs' views and protect their interests by emphasizing its connections with others. Opp. 38-40. It does not assert that it has communicated with the named Plaintiffs directly about this suit, and that it has obtained their consent to sue on their behalf. *See Leavitt*, 477 F. Supp. 2d at 211 (finding an associational standing claim "weakened" because the organization "did not communicate" with the named plaintiffs "until after" it decided to sue). Associational standing does not permit such a disconnect between the represented and their claimed representatives.

### 3. Damages and Particularized Injunctions Require Individual Involvement.

Unlike Plaintiffs' contention, Opp. 40, the prudential bar on associational standing when individualized proof is required applies here. Although the circuits are split on whether PAIMI abrogated this limitation,[12] the split itself shows that PAIMI did not clearly do so, leaving the restriction intact. *See Warth v. Seldin*, 422 U.S. 490, 510 (1975) (statutes must "expressly or by clear implication" abrogate prudential standing limitations).

Associations cannot pursue money damages for their members. *See, e.g.., Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its

---

[12] Two circuits have found that PAIMI did not abrogate this element, *see Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 34 (1st Cir. 2019); *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 n.7 (8th Cir. 2007); one found it did, *see Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1113 (9th Cir. 2003).

members"); *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990) (same).  The case law does not differentiate between per-diem damages and other types of damages.  If anything, per-diems are more individualized, and the cases Plaintiffs cite to the contrary have nothing to do with associational standing.[13]  Opp. 41.

Plaintiffs' granular injunction requests also require individualized proof.  MTD 30 n.34. Moving children out of overstays and identifying/providing tailored services is an individualized exercise.  The needs of each child must be considered, precluding DRM from seeking such relief. *See Parent/Pro. Advoc. League*, 934 F.3d at 35.

### 4.  DRM Cannot Sue on Behalf of Unidentified VPA Seekers.

Plaintiffs clarify—for the first time—that DRM is asserting the VPA claims, Opp. 42; yet, they have not identified one named Plaintiff who has ever sought or been denied a VPA, MTD 30-31.  That is fatal: "an organization suing as representative [must] include one member with standing to present, in his or her own right, the claim . . . pleaded by the association." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (same).  The failure to identify someone "doom[s]" DRM's representational standing.  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  But even if DRM identified someone, that individual and DRM would still lack standing because the alleged harm—the failure to remove the VPA seeker from the hospital—is not caused by Defendants.  VPA seekers remain in the custody of their parents, and it is the parents' obligation, not the State's, to care for them once they are ready for discharge.  MTD 55-56.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)

---

[13]  Notably, one of those cases, referenced at Opp. 41-42, was recently vacated because the requested per diem damages were determined to require individualized proof.  *See Betances v. Fischer*, No. 11-CV-3200 (RWL), 2023 WL 8699001, at *20-24 (S.D.N.Y. Dec. 15, 2023).

(injury must be "traceable to the challenged action of the defendants, and not the result of the independent action of some third party not before the court").

## II. COUNTS ONE AND TWO MUST BE DISMISSED BECAUSE WAITING FOR A SAFE AND APPROPRIATE PLACEMENT IS NOT DISCRIMINATION UNDER THE ADA AND THE REHABILITATION ACT.

Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act provide that a state or local entity may not discriminate against a qualified individual with a disability or exclude a qualified individual with a disability from participation in the services, programs, or activities of a public entity. Plaintiffs do not allege that foster children with disabilities are excluded from the state foster care program; indeed, Defendants spend a disproportionate amount of time and resources ensuring that the needs of foster children with disabilities are addressed.

Plaintiffs nonetheless claim that Defendants violate the ADA and the Rehabilitation Act when a foster child is in a hospital overstay while waiting for state and local officials to find an appropriate placement, relying on the Supreme Court's conclusion in the *Olmstead* case that "[u]njustified isolation . . . is properly regarded as discrimination based on disability" under the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999). But foster children are in overstays only for the amount of time that state and local officials, working together with the hospital clinical team, can identify an appropriate placement with appropriate treatment and support services to keep the child safe once they are discharged. Often, this takes only a matter of days or weeks, although for particularly complex cases (such as when a youth has a history of violent behavior), it can take longer. Regardless, *Olmstead*, and the cases applying it, expressly recognize that *waiting* for a community placement is not an ADA violation. *See id.* at 605-06. Accordingly, Counts I and II should be dismissed.

Consistent with the ADA regulation that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), Defendants' paramount concern for each child in its custody is to ensure that they are in placements that are safe and appropriate considering their individual needs.  Defendants' regulations provide that "a child shall be placed in the least restrictive setting appropriate to the child's needs," and that "in order of preference, a child shall be placed with a relative caregiver, in a foster home, or in a group care setting."   COMAR 07.02.11.11(C)(1), (A).  The local department of social services "shall place a child in a foster care or preadoptive home, except when the child requires extra care and supervision which cannot be provided in a foster care or pre-adoptive home."  *Id.* (E).  A child's case plan must "include consideration of the least restrictive setting appropriate to the child's safety and care needs" and "discuss the safety and appropriateness of the placement with documentation describing how the placement is (a) the least restrictive setting available and (b) in close proximity to the parents' or legal guardian's home, consistent with the best interest and special needs of the child." COMAR 07.02.11.13(B)(8), (10).  By statute, the juvenile court must also periodically review the child's case to determine whether the local department has made reasonable efforts to ensure that the child's placement is "in the least restrictive setting appropriate, available, and accessible for the child[.]" Md. Code Ann., Cts. & Jud. Proc. § 3-816.1(c)(4) (LexisNexis 2020).

Because what is safe and appropriate for an individual child will vary, Defendants recognize and use a wide array of community placements, including not only relative caregivers and licensed foster families, but also "treatment foster care" (sometimes called therapeutic foster care) for children with serious emotional, behavioral, medical, or psychological conditions; therapeutic group homes that provide residential child care as well as access to a range of

diagnostic and therapeutic mental health services for children and adolescents; "alternative living units" providing residential services for children who require specialized living arrangements because of a developmental disability; and psychiatric respite, among others.   COMAR 14.31.05.03 (Definitions).

Finding the right placement for a foster child with significant needs is delicate and complex.  Among other things, all placements are voluntary:  the State cannot force a family or a residential treatment program to take a child.  As the Fifth Circuit explained in *M.D. v. Abbott*, "the availability of foster homes, particularly those that provide the most 'home-like,' 'least-restrictive' environments, is something uniquely out of the State's control" because the State "cannot force people to volunteer," and even "obtaining the requisite number of foster homes" cannot "resolve the ongoing placement challenges related to ensuring a child's *unique fit* with a prospective placement." 907 F.3d 237, 268 (5th Cir. 2018) (cleaned up) (emphasis added).  Arranging a safe and appropriate placement often involves repeated discussions and must be coordinated with securing necessary treatment services in or near the placement.  Because it can "take a village" to find the right placement for a child with complex medical or behavioral health needs, Maryland has set up "local care teams" and a "state coordinating council" who bring a variety of resources focused on finding the best placement for individual children with "intensive needs."  COMAR 14.31.01 *et seq.*  All of this takes not only effort, but also time.

That this placement process takes time is the crux of Plaintiffs' Complaint, which alleges that a stay of mere hours after a child is ready for discharge is discrimination in violation of the statute.  Relief ¶ 3.  As reflected in their requested relief, in Plaintiffs' view, it would be preferable (and presumably not an ADA violation) to move the child immediately into a hotel or an "emergency foster home," Relief ¶ 5, even though these settings are far less equipped – or, more

14

likely,  not equipped at all – to deal with the child's ongoing medical or behavioral needs and would necessarily be temporary, requiring an additional move once a long-term placement is secured.

This interpretation of what the ADA and Rehabilitation Act require is not supported by the text of the statute; it is inconsistent with the regulations, which require administration of services and programs "in the most integrated setting *appropriate* to the needs of qualified individuals with disabilities;" and it is flatly rebuffed by the Supreme Court's decision in *Olmstead*, in which the plurality noted that "the ADA is not reasonably read to impel States to . . . plac[e] patients in need of close care at risk" by moving them out of institutional care into inappropriate placements. Justice Kennedy, joined by Justice Breyer in concurring in the judgment, further observed:

> it would be unreasonable, it would be a tragic event, then, were the . . . ADA to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision.

*Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring).

Moreover, the *Olmstead* court, and cases following it, expressly acknowledge that there is no ADA violation when the State has a "waiting list that move[s] at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated."  *Id.* at 605-06.  In so holding, the Court endorsed the position of the defendants in that case that "[i]t is reasonable for the State to ask someone to wait until a community placement is available."  *Id.* at 606;  *see also Brown v. D.C.*, 928 F.3d 1070, 1092-93 (D.C. Cir. 2019) (Wilkins, J., concurring) (rejecting notion that "speed and success of [community] placements" is the "exclusive" determinant of ADA liability); *Arc of Washington State Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005) (no ADA violation when community services were "available to all Medicaid-eligible disabled persons as

15

slots become available, based only on their mental-health needs and position on the waiting list"); *Sanchez v. Johnson*, 416 F.3d 1051, 1068 (9th Cir. 2005) ("*Olmstead* does not require the immediate, state-wide deinstitutionalization of all eligible developmentally disabled persons, nor that a State's plan be always and in all cases successful."); *Bryson v. Stephen*, No. 99-CV-558-SM, 2006 WL 2805238, at *6 (D.N.H. Sept. 29, 2006) (finding that an average wait of 12 months is not an unreasonable period to wait for community services).

As evidenced by the experience of the named Plaintiffs, and the statistics cited in Plaintiffs' Complaint, there is no dispute that foster children are moved out of hospitals as soon as an appropriate placement, with corresponding treatment services, is identified and secured. Given the complexity of finding placements and services for children with disabilities, the allegations in the Complaint do not suggest that this process fails to occur at a "reasonable pace," and the Complaint certainly does not allege overstays are driven "by the State's endeavors to keep its institutions fully populated." *See Olmstead*, 527 U.S. at 605-06. Neither the ADA nor Section 504 requires rushing children out into hotels or "emergency" foster care immediately once they are clinically eligible for discharge, as Plaintiffs request and allege. These counts should be dismissed.

## III. COUNT THREE MUST BE DISMISSED BECAUSE PLAINTIFFS DO NOT IDENTIFY ANY SERVICES THAT HAVE BEEN DENIED IN VIOLATION OF THE EPSDT MANDATE.

Plaintiffs' Opposition, like their Complaint, fails to specify the services that Plaintiffs allege (1) to be mandated by Medicaid's "early periodic screening, diagnosis and treatment" ("EPSDT") benefit and (2) the MDH Defendants have refused to make available. Instead, both the Complaint and Opposition set forth only "formulaic recitation[s] of the elements of a cause of action" and "naked assertion[s]" devoid of "further factual enhancement" that do not meet Rule 8(a)'s pleading standards. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). Accordingly,

Count III fails to state a claim, and it should be dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Medicaid's EPSDT benefit, while important, is not the open-ended and undefined mandate that Plaintiffs describe. Opp. 51-52. Rather, it extends only to "necessary health care, diagnostic services, treatment, and other measures *described in section 1905(a)* [of the Social Security Act] to correct or ameliorate defects and physical and mental illnesses and conditions" identified through a medical screening. 42 U.S.C. § 1396d(r), codifying SSA Section 1903(r) (defining scope of EPSDT) (emphasis added). Section 1905(a), in turn, lists 30 specific categories of services which a State can (or, for a child, must) include in its Medicaid program, including inpatient and outpatient hospital services; clinic services; physician services; services provided by other licensed professionals such as psychologists or licensed clinical social workers; prescription drugs; and rehabilitative services. *See* 42 U.S.C. § 1396a(a), codifying SSA Section 1905(a).

Plaintiffs' Opposition, like their Complaint, fails to articulate what Section 1905(a) service MDH is failing to provide or refusing to pay for, which is the first and fundamental step in establishing an EPSDT violation. *Cf. Pereira by Pereira v. Kozlowski*, 996 F.2d 723, 727 (4th Cir. 1993) (State violated EPSDT when it refused to pay for child's heart transplant); *Collins v. Hamilton*, 349 F.3d 371, 376 (7th Cir. 2003) (State violated EPSDT when it refused to cover psychiatric residential treatment facilities). Instead, Plaintiffs make vague references to "intensive community-based services," Opp. 52, which is not a defined service in Section 1905(a) or anywhere else in the Social Security Act. *See* § 1396a(a); *A. A. by & through P.A. v. Phillips*, No. 21-30580, 2023 WL 334010, at *2-3 (5th Cir. Jan. 20, 2023) (unpublished) (holding that a class consisting of children seeking "intensive home- and community-based services" is not ascertainable because "intensive care coordination, crisis services, and intensive behavioral

17

services and supports . . . are not defined, nor are they specific, billable behavioral health services ordered by a doctor or licensed mental health professional").

Nor do Plaintiffs explain why the services that MDH covers do not satisfy EPSDT.  MDH provides a range of community-based behavioral health services to Medicaid-enrolled children including outpatient hospital mental health and substance use disorder treatment, psychiatric rehabilitation, mobile treatment services, intensive outpatient and partial hospitalization services. COMAR 10.09.59; COMAR 10.67.08.02.  MDH makes certain services specifically available only to children under age 21 as part of the EPSDT benefit, including psychiatric residential treatment services and community-based "therapeutic behavioral services." COMAR 10.09.23.04(D)(2)(k). Therapeutic behavioral services are one-on-one services intended for children who have been "assessed as having behaviors or symptoms related to a mental health diagnosis that . . . prevent transition to a less restrictive placement."  Maryland Medicaid State Plan (State Plan), Attachment 3.1-A Page 29C-50, available at https://health.maryland.gov/mmcp/Pages/Maryland-Medicaid-State-Plan-.aspx.  MDH also provides intensive case management for children and youth with mental health diagnoses to help gain access to a "full range of behavioral health services" as well as other necessary supports.  *Id.*, Supplement 3 to Attachment 3.1-A, Page 10-H; COMAR 10.09.90.02.  Plaintiffs fail to specify whether MDH has denied their claims for these services covered by the Medicaid program, or whether they allege that EPSDT requires additional (unspecified) services be provided as well, or something else entirely.

To the extent that Plaintiffs are alleging a right to a "bundle" of services or specified treatment modality, "the EPSDT provisions require only that the individual services listed in [Section 1905(a)]  be provided, without specifying that they be provided in any particular form." *Katie A., ex rel. Ludin v. Los Angeles Cnty.*, 481 F.3d 1150, 1157 (9th Cir. 2007).  In *Katie A.*, the

Ninth Circuit vacated the district court's holding that the Plaintiffs were likely to prevail in establishing that California was in violation of EPSDT because it did not provide bundled "wraparound services" and "therapeutic foster care" (TFC).   *Id.* at 1159-60.   As the court explained, "[i]f all mandated services under [Section 1905(a)] are being supplied effectively, the State is not obliged to go further and package the services as wraparound and TFC."   *Id.* at 1158.

In any event, in addition to the Section 1905(a) services MDH provides to children as described above, MDH has elected to provide extensive packages of services to children pursuant to authority granted under Section 1915 of the Medicaid statute, 42 U.S.C. § 1396n, which is a separate provision from Section 1905(a) and thus outside of the EPSDT mandate.   MDH provides home-and-community based services (described in Section 1915(c) of the Act) for children who meet an institutional level of care, including the Family Supports Waiver, the Model Waiver for Fragile Children, and the Waiver for Children with Autism Spectrum Disorder.[14]   Further, MDH provides an expansive array of home and community-based services, authorized through Section 1915(i), for children and youth with serious emotional disturbances, who must meet certain medical necessity criteria.   *See* State Plan, Attachment 3.1–I, Page 13; *see also* COMAR 10.09.89.03(E)(2).   Although outside of the scope of the EPSDT mandate, the Section 1915(i) package of services provides the type of services that Plaintiffs appear to believe are unavailable, including family peer support services, respite services, behavioral services, and "intensive in-home services," defined as "a series of components, including functional assessments and treatment planning, individualized interventions, transition support, and in some cases, crisis response and intervention."   State Plan, Attachment 3.1-I, at 20.   These services are intended "to

---

[14] These waivers and the benefits they provide are described on CMS's Maryland Waivers Factsheet, available at https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/Waiver-Descript-Factsheet/MD.

support a child to remain in his or her home and reduce hospitalizations and out-of-home placements or changes of living arrangements through focused interventions in the home and community." *Id.* The settings in which Section 1915(i) services are available include "a home or apartment that is a licensed family foster care home or a licensed treatment foster care home." *Id.* at 15.

Plaintiffs completely misconstrue the changes that the Maryland General Assembly enacted last year. Opp. 53. The General Assembly *expanded* the current program to include 100 slots for non-Medicaid eligible children, but it did not eliminate or cap the number of Medicaid children who qualify for services. All foster children are eligible for Medicaid, and any Medicaid-enrolled child who meets the medical necessity criteria for Section 1915(i) services is eligible for them and can be enrolled. Plaintiffs also mischaracterize MDH's opposition to opening the Section 1915(i) to *all* Medicaid children, which would have eliminated the current medical necessity criteria. *Id.* As MDH explained to the legislature, eliminating the requirement that a child be diagnosed with a serious emotional disorder could make the service harder to access for those children and families (including foster families) with the highest needs. MDH Letter, Ex. G., ECF 54-7.

Because Plaintiffs have failed to allege any specifics as to what services they seek that MDH does not already offer (either within or even outside of the EPSDT benefit), Count III against the MDH defendants should be dismissed.

## IV.   COUNT FOUR MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT PLAUSIBLY PLED A SUBSTANTIVE DUE PROCESS VIOLATION.

An "extremely high" standard applies to substantive due process claims. *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010). Conduct must "shock the conscience" to be cognizable. *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). "Only the most egregious, arbitrary governmental

conduct" will suffice.  *Id.*  Plaintiffs' two substantive due process claims— (1) deprivation of liberty, and (2) conditions of confinement—do not meet this standard.  Four Plaintiffs are no longer hospitalized, and those remaining are in State custody, are safe, have their basic needs met, and will be transferred soon.  No substantive due process violations have occurred here.

## A.   Plaintiffs' Allegations Do Not Support a Deprivation of Liberty Claim.

Contrary to Plaintiffs' contention, Opp. 55-59, hospital overstays do not constitute a *per se* deprivation of liberty in violation of *O'Connor v. Donaldson*, 422 U.S. 563 (1975).  In *O'Connor*, the plaintiff's liberty was squarely at issue, and he was suing the person who held the keys to his freedom.  *Id.* at 564-69.  Here, in contrast, Plaintiffs are and will remain in State custody, and their relocation elsewhere depends on variables outside of the State's control, including the willingness of a family to accept the child and the availability of service providers to treat the child.

The facts in *O'Connor* help illustrate this point.  Mr. Donaldson, the Plaintiff in *O'Connor*, had been involuntarily committed to a state mental hospital for 15 years even though he presented no danger to the public, was not receiving treatment, and had identified persons who were "willing and able to assume responsibility" for his care in the community.  *Id.* at 570.  He sued the superintendent of the state mental hospital, who had denied his many requests for release solely on the grounds that he was "sick."  *Id.*  Thus, *O'Connor* simply stands for the proposition that "[a] finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement."  *Id.* at 575.

It is absurd to compare the situation in *O'Connor*, where the responsible State official *refused to consider discharge*, with the hospital overstays at issue here, where the discharge decision has already been made, and state and local officials are working diligently to identify a safe and appropriate post-discharge placement.  Nothing in *O'Connor* suggests that the Due

Process Clause required the State to develop and fund a community for the plaintiff in that case, as Plaintiffs contend here. *See* Opp. 61-62 (faulting the State for failing to develop a multitude of programs that might avoid hospital overstays). To the contrary, the Court in *O'Connor* repeatedly stressed that "willing and able" responsible parties had volunteered to oversee Mr. Donaldson's care if discharged. "The mere novelty" of Plaintiffs' claim defeats the assertion that it is protected by substantive due process. *Reno v. Flores*, 507 U.S. 292, 303 (1993).

Significantly, Plaintiffs do not challenge the State's procedures governing their placement into or exit out of State custody.[15] Nor do they challenge the procedures governing their admission to or discharge from the hospital. For that reason, the *O'Connor* progeny upon which they rely does not assist them. *See Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (holding that procedural safeguards afforded to insane persons could not be denied to a sane acquittee); *Parham*, 442 U.S. at 587 (addressing "what process is constitutionally due a minor child whose parents or guardian seek state administered institutional mental health care for the child"); *Johnson*, 484 F. Supp. at 282 n.2 (challenging "the commitment process itself and not the particular conditions of [] confinement").

Unlike *O'Connor* and the other cases cited by Plaintiffs, foster children *will remain in the custody of the State* even after they are discharged from the hospital. Plaintiffs' Due Process claim is therefore not about whether the State should retain custody, as in *O'Connor*, but rather a challenge to how the State exercises its custodial discretion. In similar cases, courts across the country have repeatedly held that foster children do not have a liberty interest or other Due Process

---

[15] The procedures governing Plaintiffs' State custody are outlined in Title 3, subtitle 8 of the Courts and Judicial Proceedings Article of the Maryland Code. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 3-801-3-830 (LexisNexis 2020). Those procedures include many protections for foster children, such as frequent periodic review hearings and appointment of counsel.

right to be placed in the "least restrictive environment."  *See Jonathan R. v. Justice*, No. 3:19-CV-00710, 2023 WL 184960, at *8 (S.D.W. Va. Jan. 13, 2023) ("[T]he Fourteenth Amendment does not protect against unnecessary institutionalization, nor does it guarantee placement in the least restrictive setting."); *Wyatt B. by McAllister v. Brown*, No. 6:19-CV-00556-AA, 2021 WL 4434011, at *9 (D. Or. Sept. 27, 2021) ("The right to substantive due process does not, however, extend to placement in an optimal or least-restrictive setting, or to the availability of an array of placement options."); *M.D. v. Abbott*, 152 F. Supp. 3d 684, 808 (S.D. Tex. 2015) ("Plaintiffs do not have a constitutional right to be placed in the least restrictive, most family-like placement"), *aff'd in relevant part*, 907 F.3d 237, 268 (5th Cir. 2018); *Clark K. v. Guinn*, No. 2:06-CV-1068-RCJ-RJJ, 2007 WL 1435428, at *15 (D. Nev. May 14, 2007) (holding that there is no substantive due process right to be placed in "the least restrictive placement based on the foster child's needs"); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) (dismissing the plaintiffs' claims "to the extent that custodial plaintiffs allege a substantive due process right to a least restrictive, optimal placement").  Plaintiffs allege the same due process protections that other courts have repeatedly dismissed, and this Court should dismiss them as well.

### B.      Plaintiffs' Allegations Do Not Support a Conditions of Custody Claim.

Plaintiffs acknowledge receiving shelter; clothes; food; physical safety; and "some degree" of therapy, educational services, and recreation, Opp. 62-63, and they do not claim that the hospitals are dangerous environments with a known history of abuse.  *See, e.g.*, *Jonathan R.*, 2023 WL 184960 at *6-7.  Instead, they contend that "[f]orcing children to languish in hospitals without medical need" constitutes maltreatment.  Opp. 60-61.  To support that contention, they cite to conditions of their hospitalizations such as lack of access to more intensive therapy.  Opp. 61-63.  But "substantive due process does not demand optimal treatment."  *Jonathan R.*, 2023 WL 184960,

at *7.  The State "need only provide for Plaintiffs' basic human needs and prevent any further abuse or neglect." *Id.*  Accordingly, there is no substantive due process right to "supportive and case management services to ensure placement stability and ensure the child is free from harm," *Id.* at *8-9.  Defendants have satisfied all their substantive due process obligations.

Contrary to Plaintiffs' contention, Opp. 60-61, they have not alleged facts demonstrating abandonment or maltreatment.   The nonconclusory allegations indicate that Plaintiffs were admitted to the hospital for medically necessary treatment, Compl. ¶¶ 55, 57, 65, 73, 81, 92, and are staying beyond clearance for discharge while Defendants undertake extensive efforts to identify safe and appropriate placements for them, not that Defendants simply choose not to pick them up.  Plaintiffs' hyperbolic statement that Defendants are overriding the hospitals' medical determinations and deciding "*ipse dixit* that a child is too dangerous to be picked up from the hospital" is not supported by any credible allegation.[16]   Data reveals that "facilities denying admission, taking too long to process referrals, or lacking bed space" are the "most common reasons for discharge delays." *Commission Report* at 8-9, *supra* 2 n.4.  "[T]he most often cited reason for a youth meeting overstay criteria is waiting for an inpatient psychiatric bed." *Id.* Defendants cannot force facilities to accept Plaintiffs, nor can they magically create more facilities; all they can do is keep Plaintiffs in a safe place while actively looking for suitable placements, which is exactly what Defendants do.

---

[16] Contrary to Plaintiffs' inappropriate condemnations, Opp. 56-59, Defendants *never* said or implied that they could disregard medical decisions to confine Plaintiffs indefinitely because Defendants unilaterally determined that Plaintiffs were incorrigibly dangerous; rather, Defendants asserted that they cannot ignore Plaintiffs' specialized needs—pled by Plaintiffs themselves—and must be cautious with where they place them to ensure the wellbeing of all involved, MTD 46-47.  *See Parham*, 442 U.S. at 601 ("A person needing, but not receiving, appropriate medical care may well face even greater social ostracism resulting from the observable symptoms of an untreated disorder.").

Moreover, the risk of emotional harm caused by a hospital overstay is not the type of harm protected by the due process clause.  Rather, it is akin to the type of generalized and unavoidable harm that may be attendant to the foster care system:

> Many inherent features of the foster care system, such as the ambulatory nature of children's placements, have negative psychological consequences . . . but they are not the type of significant, abuse-related psychological damage the Constitution prohibits . . . [E]gregious intrusions on a child's wellbeing—such as, for example, persistent threats of bodily harm or aggressive verbal bulling—are constitutionally cognizable.  Incidental psychological injury that is the natural, if unfortunate, consequence of being a ward of the state does not rise to the level of a substantive due process violation.

*M.D.*, 907 F.3d at 251.

Plaintiffs do not plead any severe psychological abuse; instead, they assert emotional harm caused by the isolation incidental to any hospitalization.  Opp. 60-61.  Undeniably, "[s]uch negative consequences are regrettable, but they are not the type of significant, abuse-related psychological damage the Constitution prohibits."  *M.D.*, 907 F.3d at 251.

To the extent Plaintiffs challenge the level of services provided to them while they are in the hospital, that challenge fails because they have alleged facts demonstrating that those conditions were not within Defendants' control.  For example, the Complaint alleges that T.G. needed glasses "but the hospital restricted him from having glasses due to concerns that he might utilize the glasses inappropriately."  Compl. ¶ 49.  The complaint alleges that T.G., T.A., D.B., and B.B. did not receive individual therapy because it was not available at the "short-term crisis intervention facility" where they were awaiting placement.  Compl. ¶¶ 49, 57, 65, 95.  R.R. "did not receive any individual therapy for the first four months of her hospitalization due to conflicts with insurance."  Compl. ¶ 83.  She is now receiving therapy, but her therapist recommends more

intensive therapy that is not available at the hospital.  Compl. ¶ 83.  These allegations do not support a claim that State action caused any inadequacies in the conditions of Plaintiffs' custody.

Whether articulated as a deprivation of liberty or a challenge to custodial conditions, Plaintiffs' substantive due process claim fails; accordingly, Count Four should be dismissed.

## V.   COUNT FIVE MUST BE DISMISSED BECAUSE THE ALLEGED FACTS DO NOT SUPPORT A DUE PROCESS CLAIM ON BEHALF OF VPA SEEKERS.[17]

### A.   VPAs are Contracts, Not Entitlements, Precluding a Procedural Due Process Claim.

Plaintiffs have attempted to create a procedural due process claim for VPA seekers without ever defining the term.  Opp. 66-70.  It is no surprise, then, that they have landed so far from its actual meaning in claiming that VPAs are an entitlement.  Opp. 67-69.  They are not.

VPAs are contractual.  Specifically, they are "a binding, written agreement that . . . is *voluntarily entered into* between a local department and . . . the parent."  Md. Code Ann., Fam. Law § 5-501(m) (LexisNexis 2019) (emphasis added).  Mutual assent is thus an "essential prerequisite."  *Cochran v. Norkunas*, 398 Md. 1, 14 (2007).  VPAs are "request[ed]," COMAR 07.02.11.06(B)(1), and the State can execute one when certain criteria are met, COMAR 07.02.11.06(B)(5), but nothing compels it do so.  The Supreme Court long ago rejected the notion that due process protects some freedom to contract, and it certainly never held that one party can force another party to enter one.  *See W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937) ("The Constitution does not speak of freedom of contract.").  The State has discretion to decide which applicants are best suited for VPAs.

---

[17]   Plaintiffs' failure to respond, Opp. 66-72, to Defendants' argument that the VPA seekers' family association claim is meritless, MTD 56, constitutes an abandonment of that claim.  *See Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777 (D. Md. 2010).

Plaintiffs taunt Defendants about this discretion, Opp. 66-69, but discretion marks the key "distinction between an 'entitlement' and a mere 'expectancy.'  An individual simply has nothing more than a mere hope of receiving a benefit unless the decision to confer that benefit is in a real sense channeled by law." *Mallette v. Arlington Cnty. Employees' Supplemental Ret. Sys. II*, 91 F.3d 630, 635 (4th Cir. 1996) (statute stating qualifying members "shall receive" benefits confers entitlement).  Plaintiffs cite no authority compelling the State to contract with VPA seekers; instead, they assert that VPA seekers "should be" entitled to enter VPAs.[18]  Opp. 68.  Such expectations do not confer an entitlement sufficient to support a procedural due process claim.

Regardless, no Plaintiff alleges to have ever sought a VPA or employed the available procedures to redress their concerns about VPAs.  MTD 57-58.  That is fatal both because Plaintiffs lack standing to bring Count Five, and "because a due process violation 'is not complete' when the asserted deprivation occurs; rather it is only complete when the government 'fails to provide due process,'" *Ashley v. N.L.R.B.*, 255 F. App'x 707, 710 (4th Cir. 2007) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).  Accordingly, "a plaintiff may not bypass a seemingly adequate administrative process and then complain of that process's constitutional inadequacy in federal court." *Id.* at 709.  In claiming otherwise, Opp. 70 n.39, Plaintiffs conflate exhaustion with the requisite harm. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).  "Exhaustion simpliciter is analytically distinct from the requirement that the harm alleged has occurred . . . . [A] procedural due process violation cannot have occurred when the governmental actor provides apparently

---

[18]  Plaintiffs' emphasis on placement in the least restrictive setting is unavailing.  Opp. 68-70.  Placement decisions become relevant only after the initial discretionary decision to enter a VPA is made because, prior to that time, there is no custodial relationship between the child and the State.

adequate procedural remedies[,] and the plaintiff has not availed himself of those remedies."[19]  *Id.*
No Plaintiff has ever been harmed by any procedures involving VPAs.  Count Five fails to state a
cognizable claim for a procedural due process violation.

### B.    No Precedent Supports Plaintiffs' Substantive Due Process Claim for VPA Seekers.

Plaintiffs characterize their substantive due process claim for VPA seekers as "novel,"
Opp. 18, but "unprecedented" is more accurate.  Indeed, Plaintiffs cite *no* authority supporting
their unfounded contention that the State owes a duty to children who are outside of its custody
and instead remain in the custody and care of their parents.  Opp. 70-72.  They do not do so because
there is no authority.  The cases are legion that "if there is no custodial relationship, then the state
has no duty to protect."  *Patten*, 274 F.3d at 841; *see also Pinder v. Johnson*, 54 F.3d 1169, 1175
(4th Cir. 1995); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 505-07 (D.N.J. 2000) (dismissing a
"substantive due process claim on behalf of non-custodial children").

Plaintiffs attempt to manufacture a custodial relationship by claiming that the State's
failure to provide certain services and placements cause their overstays.[20]  Opp. 71-72.  Contrary
to Plaintiffs' assertions, the State's alleged failure to provide certain services does not create a "de
facto" custodial relationship between the State and the VPA seekers.  Rather, the State is refusing
to voluntarily accept physical custody of the VPA seekers because they are inappropriate
candidates for a VPA, which the law permits.  *See* COMAR 07.02.11.06(B)(5)(k) (the State must
make efforts to *prevent* VPA placement).  Plaintiffs' contrary claims flout the Supreme Court's

---

[19] Procedures are only considered futile, thereby permitting a plaintiff to forgo them before stating a procedural due process claim, when "concrete evidence" illustrates that "access to [them] is absolutely blocked" or they are a "sham."  *Alvin*, 227 F.3d at 118.  There are no such pleadings here.

[20] Plaintiffs' analogy to *Miranda* interrogations is incomprehensible. Opp. 71-72.  Interrogations with multiple police officers exerting authority in an enclosed setting is wholly unlike the amorphous failure to provide government services.  The latter cannot reasonably be said to restrain anyone's liberty.

holding that due process "does not require the State to provide its citizens with particular protective services," and therefore "the State cannot be held liable . . . for injuries that could have been averted had it chosen to provide them." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 196-97 (1989).  Permitting this claim to proceed under Plaintiffs' concocted custody theory would open the floodgates to lawsuits premised on the distorted idea that the lack of discretionary government services can somehow, someway cause a custodial relationship spurring a due process duty.  No appellate court has ever held anything close to actionable.  Count Five must be dismissed.

## VI.    SOVEREIGN IMMUNITY BARS PLAINTIFFS' REQUEST FOR MONETARY DAMAGES

Plaintiffs seek compensatory damages "only under Count One, their ADA claim." Opp. 42.  Because Eleventh Amendment and sovereign immunity bars that request, Plaintiffs are not entitled to any damages, even if the ADA claim is not dismissed (which it should be).

In *United States v. Georgia*, the Supreme Court enumerated a three-part test for determining, on a claim-by-claim basis, whether ADA Title II abrogated a State's immunity.  The test requires courts to determine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  546 U.S. 151, 159 (2006).  Plaintiffs' damages claim fails at each step.

As shown above, it is well established that the Fourteenth Amendment does not guarantee foster children a right to be placed in the least restrictive setting.  *See supra* 22-23.  Because the ADA "far exceeds what is constitutionally mandated" with respect to children in foster care, *Doe v. Div. of Youth & Fam. Servs.*, 148 F. Supp. 2d 462, 488-89 (D.N.J. 2001), it is not congruent and

29

proportional to subject Maryland to the possibility of damages under these circumstances, *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

Plaintiffs' reliance on *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005), is misplaced.  Opp. 43-44.  *Constantine* applies "*only*" to public higher education.  411 F.3d at 488 (emphasis in original)), just as *Tennessee v. Lane* addressed "only the class of cases implicating the accessibility of judicial services,"  541 U.S. 509, 531 (2004).  As these cases make clear, application of the ADA's abrogation of immunity must be evaluated separately depending on the type of public program at issue.

While the Supreme Court in *Lane* found ample evidence before Congress of discrimination in judicial services, and discrimination in education was specifically listed as a congressional area of concern in enacting the ADA, 28 U.S.C. § 12101(a)(3), (6), there were no congressional findings regarding foster care, and operating a foster care system "remains primarily a state interest," *Sam M. ex rel. Elliott v. Chafee*, 800 F. Supp. 2d 363, 380 (D.R.I. 2011).  Abrogating immunity and permitting Title II remedies against a public university that refuses to reschedule an exam, which was within the school's control, *Constantine*, 411 F.3d at 499, is wholly distinguishable from subjecting a State to Title II remedies due to complicated foster care placement issues caused by factors "uniquely out of the State's control," *M.D.*, 907 F.3d at 268.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed.


Respectfully submitted,                                      Dated: March 5, 2024


ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Elise Song Kurlander*      */s/ Nicole Lugo Clark*

ANN M. SHERIDAN (Fed. Bar No. 11137)
Ann.sheridan1@maryland.gov
ELISE SONG KURLANDER (Fed. Bar No. 23186)
Elise.song@maryland.gov
BARRY DALIN (Fed. Bar No. 21121)
Barry.dalin@maryland.gov
Assistant Attorneys General
Maryland Department of Human Services
311 West Saratoga Street, Suite 1015
Baltimore, Maryland 21201
(410) 767-7726
(410) 333-0026 (facsimile)

NICOLE LUGO CLARK (Fed. Bar No. 26983)
Nicole.LugoClark@maryland.gov
BRANDY J. GRAY (Fed. Bar No. 28455)
Brandy.Gray1@maryland.govAssistant
Assistant Attorneys General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
(410) 767-5292
(410) 333-7894 (facsimile)

Attorneys for the Maryland Department of
Human Services, Rafael López, Stephen
Liggett-Creel, Gregory Branch, Oscar Mensah,
Gloria L. Brown Burnett, Susan Coppage, Roy
Brewington

Attorneys for the Maryland Department of
Health, Laura Herrera Scott, Bernard
Simons, Ryan B. Moran, Lisa Burgess


## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of March, 2024, the foregoing was filed through the

ECF system and served electronically on counsel for the Plaintiffs via the Court's ECF system.


*/s/ Elise Song Kurlander*

ELISE SONG KURLANDER
Federal Bar No. 23186