**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | | |
|---|---|---|
| T.G., et al., | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 8:23-cv-01433-MJM |
| MARYLAND DEPARTMENT OF HUMAN SERVICES, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO REOPEN AND
SUPPLEMENT MOTION FOR CLASS CERTIFICATION AND CLASS COUNSEL**

Leslie Seid Margolis (Fed. Bar No. 23422)
Luciene M. Parsley (Fed. Bar No. 27089)
Megan R. Berger (Fed. Bar No. 21705)
Disability Rights Maryland
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
LucieneP@disabilityrightsmd.org
LeslieM@disabilityrightsmd.org
Megan.Berger@disabilityrightsmd.org
Ph: (410) 727-6352 / Fax: (410) 727-6389

Mitchell Y. Mirviss (Fed. Bar No. 05535)
Venable LLP
750 East Pratt Street, 9th Fl.
Baltimore, MD 21202
mymirviss@venable.com
Ph: (410) 244-7412 / Fax: (410) 244-7742

Attorneys for Plaintiffs

## TABLE OF CONTENTS

**Page**

DISCOVERY PROCESS AND EXPERT REVIEW ................................................................2

CREDENTIALS OF PLAINTIFFS' EXPERTS ................................................................5

SUMMARY OF LEGAL STANDARDS FOR CLASS CERTIFICATION ................................7

SUPPLEMENTAL ARGUMENT ................................................................8

I.      The Class Is Ascertainable. ................................................................8

II.     The Class is Sufficiently Numerous to Make Joinder Impracticable. ................................9

III.    Discovery and Recent Case Law Confirm the Existence of Common Issues. ................................................................12

        A.      Recourse to Hospital Overstays. ................................................................14

        B.      Plaintiffs' Experts Identify Multiple Common Practices and Problems. ................................................................19

                1.      Defendants Do Not Ensure Adequate Assessment of the Children. ................................................................19

                2.      Defendants Fail to Ensure that Children's Traumas Are Recognized and Addressed. ................................................................21

                3.      Defendants Fail to Ensure Adequate Capacity and Quality of Community-Based Placements, Services, and Other Supports. ................................................................23

                4.      Defendants Lack an Effective Means to Facilitate Timely Discharge. ................................................................28

        C.      The Harm Caused by Overstays Is a Common Issue. ................................................................31

III.    The Proposed Class Continues to Satisfy Rules 23(a)(3), (a)(4), (b)(2), and (b)(3). ................................................................34

CONCLUSION ................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...........................................................................................8

*B.D. by Wellington v. Sununu*,
   No. 21-CV-4-PB, 2024 WL 4227544 (D.N.H. Sept. 18, 2024).......................................... *passim*

*B.K. by Tinsley v. Snyder*,
   922 F.3d 957 (9th Cir. 2019) ..........................................................................18, 21

*Baby Neal v. Casey*,
   43 F.3d 48 (3d Cir. 1994)..................................................................................17

*Broussard v. Meinecke Discount Muffler Shops, Inc.*
   155 F.4th 331 (4th Cir. 1998) ..........................................................................34

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*,
   375 F.2d 648 (4th Cir. 1967) ............................................................................9

*Davis v. Shah*,
   821 F.3d 231 (2d Cir. 2016)..............................................................................13

*Elisa W. v. City of New York*,
   82 F.4th 115 (2d Cir. 2023) ........................................................................16, 17, 21

*G.T. v. Bd. of Educ. of Kanawha Cnty.*,
   117 F.4th 193 (4th Cir. 2024) ..........................................................................18

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)..........................................................................................14

*In re Under Armour Secs. Litig.*,
   631 F. Supp. 3d 285 (D. Md. 2022)...............................................................34, 35

*J.D. v. Azar*,
   925 F.3d 1291 (D.C. Cir. 2019) .......................................................................11

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) ............................................................................16

*Jonathan R. v. Justice*,
   344 F.R.D. 294 (S.D. W. Va. 2023)............................................................. *passim*

*Legal Aid Soc'y of Alameda Cnty. v. Brennan*,
    608 F.2d 1319 (9th Cir. 1979) ...............................................................................25

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012) ...............................................................................13

*Olmstead* [*v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999)............................... *passim*

*S.R. v. Pa. Dep't of Hum. Servs.*,
    325 F.R.D. 103 (M.D. Pa. 2018).....................................................................17, 18

*Tinsley v. Faust*,
    411 F. Supp. 3d 462 (D. Ariz. 2019) ..................................................................6, 28

*Connor B. ex rel. Vigurs v. Patrick*,
    278 F.R.D. 30 (D. Mass. 2011)............................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..........................................................................8, 14, 16, 17

*Wyatt B. v. Brown*,
    No. 6:19-cv-005556-AA, 2022 WL 3445767 (D. Or. 2022)...................................17

*Yaffe v. Powers*,
    454 F.2d 1362 (1st Cir. 1972)...............................................................................9

*In re Zetia*,
    7 F.4th at 236 .....................................................................................................9

## Rules

Fed. R Civ. P. 8(b)(6)..............................................................................................25

## Other Authorities

2024 Jt. Chairmen's Rep. 144-45 ...............................................................................15

HB 962, Public Health - Pediatric Hospital Overstay Patients and Workgroup on
    Children in Unlicensed Settings and Pediatric Overstays, 2025 Md. Laws ch.
    479..................................................................................................................15

Jean Marbella, *Maryland ending practice of housing foster children in hotels*,
    Baltimore Sun (Oct. 27, 2025)..............................................................................15

Lee O. Sanderlin, *Maryland to end controversial practice of housing foster
    children in hotels*, Baltimore Banner (Oct. 27, 2025).............................................15

Plaintiffs, a proposed class of foster children languishing in hospitals without medical need ("hospital overstays") or at imminent risk of hospital overstays (together, "Plaintiff Children") and Disability Rights Maryland, Inc., moved for class certification of their ADA and Section 504 claims challenging Defendants' discriminatory policies and practices that keep Plaintiffs hospitalized, turning hospitals into illegal unlicensed foster-care placements—because Defendants lack placements and services to enable timely return to their communities. At a motions hearing on August 28, 2024, the Court dismissed two claims (EPSDT[1] and due process) without prejudice, denied dismissal of the ADA and Section 504 claims, and closed the class-certification motion for administrative purposes, subject to reopening. *See* Order ¶¶ 1, 2, and 4, Aug. 29, 2024, ECF No. 75 (the "Order").[2] Having taken discovery regarding 144 class members who had 181 overstays from January 1, 2023 to January 21, 2025 and secured expert opinions supporting class certification, Plaintiffs move to reopen their motion and supplement it with the new evidence.

Unfortunately, the passage of time since the Court's Order has not diminished the need for this litigation. Though DHS has prohibited housing foster children in hotels, motels, and DSS offices, it continues to house foster children in hospitals without medical need for hospitalization. It has now been seven years or more since Maryland began to resort to hospital overstays due to its placement shortage.

In support of the reopened motion for certification, Plaintiffs incorporate by reference the prior motion papers (ECF Nos. 2 (original motion and memo), 43-2 (amended memo), and 44

---

[1] Capitalized terms and acronyms have the same meaning as in the prior memoranda.

[2] The Court closed the case administratively to permit discovery on class certification because Defendants objected to addressing the issue at the hearing in light of Plaintiffs' pending motion to amend by interlineation, which they had not addressed due to a stay. *See* Pls. Mot. to Amend by Interlineation, Sept. 15, 2023, ECF No. 43; Hr'g Tr. 116-17. The Court addressed this by administratively closing the motion, allowing discovery to proceed, and allowing Plaintiffs to reopen and supplement the motion when discovery was complete. Hr'g Tr. 124-27.

(reply)) and supplement them with (i) information gleaned in discovery; (ii) expert opinions; and (iii) legal briefing addressing the new information.  At the August 28, 2024 hearing, this Court stated that it was principally concerned with numerosity.  *See* Hr.'s Tr. 121, Aug. 28, 2024.  This memo focuses on numerosity and commonality.

## DISCOVERY PROCESS AND EXPERT REVIEW

Plaintiffs requested all DSS case files for all Maryland foster children outside of Baltimore City in overstay since January 1, 2023.  *See* Ex. 1, Parsley Decl. ¶ 3.  At Defendants' request, Plaintiffs agreed to a cut-off of January 21, 2025, creating a two-year window.  *Id*. ¶ 4.  Plaintiffs received case files for overstays during this period as well as DHS's "hospital youth liaison's" logs of communications and efforts to remove the children from the hospitals.  *Id*. ¶ 5.

Defendants produced two spreadsheets identifying all hospital overstay incidents during the covered period, which were amended with corrections.  *See id.* ¶¶ 6-7; Ex. 2, DHS revised spreadsheet Ex. A and Ex. A Supp.  The final tally was 229 (Ex. A) and 23 names (Ex. A Supp.), from which 70 overstays occurring prior to December 31, 2022 or provided in error were eliminated, leaving 182 overstays between January 1, 2023 and January 21, 2025, with **95 occurring in 2024**.  Ex. 1, Parsley Decl. ¶ 7.  Because 37 of those 182 overstays were multiple incidents for the same children, a total of 145 children were identified including the six named Plaintiffs, subsequently reduced to 144 (six named Plaintiffs and 139 class members).  *Id.* ¶ 8

From this group of 139 names, Plaintiffs' experts randomly selected a sample of 25 cases.  *See* Ex. 3, R. Epstein & M. White, Expert Opinion in Support of Class Certification, Dec. 11, 2025 ("Expert Rep.") 6.  Plaintiffs' experts have decades of experience in foster care and behavioral health for children.  One expert, Dr. Marty Beyer, reviewed hundreds of thousands of pages of case files, DHS logs, and hospital records, and summarized their overstay experiences and the circumstances.  *Id.* Appendices C-GG ("Beyer Apx.").  Using her case summaries, the other

experts, Dr. Richard Epstein and Marci White, determined that the overstays were linked by common, widespread pertinent policies and practices.

First and foremost, the experts confirm "the core fact" that what "all these children have in common is that the Defendants, who are responsible for providing them with the care they need, leave them in the hospital after they are ready for discharge." *Id.* at 4. This fact alone meets the commonality requirement. *See* ECF No. 43-2 at 19-20; No. 44 at 11-16. But the experts demonstrate additional common features that cause class members to languish in overstays:

a) Defendants' failure to ensure that there are comprehensive, accurate and up to date assessments of the children and their families and their needs;

b) Defendants' failure to ensure that these children have been provided services to address the child's complex traumas, and the negative impact of those traumas on attachment and permanency, development, and functioning;

c) Defendants' failure to ensure that there is an adequate supply and quality of home-and community-based placements which are appropriate for these children, along with the coordinated community-based services and other supports that these children, their families, and/or other caregivers need for the children to succeed in those settings; and

d) once the children are hospitalized, Defendants' failure to ensure, and assume responsibility for, organized hospital discharge planning driven by each child and family's actual needs[,] rather than Defendants' need to "solve the overstay."

*Id.* at 5. The expert report also examines the six named Plaintiffs and compares their cases to those of the 25 randomly sampled cases. It concludes that "the named Plaintiffs are typical of other Maryland children with disabilities who experience hospital overstays while in Defendants' custody and that the named Plaintiffs and these other children are similarly situated." *Id.* at 4.

Notably, the experts rely on an assessment conducted by Chapin Hall at the University of Chicago School of Social Work, a premier child welfare research institution, on behalf of Defendant SSA, and issued in 2025. *See id.* at 7. SSA "asked Chapin Hall to conduct a "comprehensive statewide assessment of the placement needs of youth currently in and anticipated

to enter out-of-home care in Maryland," including "youth who experienced hospital overstays." *Id.* The report provides both detailed data analysis and a case review of children in hospital overstays. *See* Ex. 4, Larry Small, et al., Final Report Maryland Social Services Administration Placement Needs Assessment (2025) ("Chapin Hall Rep.") 47-59, 82-103. Dr. Epstein and Ms. White found that Chapin Hall's report "is consistent with our opinion that there is a class of these children with disabilities in the Defendants' care who are not receiving the services and supports they need to have their needs successfully accommodated in their homes and communities when they leave the hospital." Ex. 3, Expert Rep. 7-8.

These conclusions are buttressed by DHS's records of its handling of hospital overstays, which provide damning documentation of their failures to integrate Plaintiffs in less restrictive settings in communities and their keen awareness of the harm and inappropriateness of a hospital being used for foster care. Two examples illustrate the gravity of the problem:

### Child "P1" [P stands for Plaintiff]

- Email from local DSS: "[P1] is NOT admitted to HoCo general hospital. ***She is in an ER bed and they are not providing any medical or psychiatric services to her. This is why she is stuck.*** We cannot bring an outside provider into the hospital and therefore cannot get a CON [a "Certificate of Need" for admission to a residential treatment center ("RTC")]. She will be stuck there unless a provider is identified that will take her without a CON. She refuses to go to a hotel (which we all agree is not a place for her), none of the foster homes are willing to accept her and her age limits what other options we have." Ex. 5, SSA-2479-80 (emphasis added throughout all "SSA-__" citations to Ex. 5).

- Email from DHS youth hospital liaison: "There is a youth in our custody who has been stuck in an emergency department for over 2 weeks. *She is 12 years old.* She is ***confined to a 5 bed secured area and only permitted to wear paper scrubs. She has not had any visitors***. DSS reports speaking with her but they have not seen her. Is there any guidance around DSS workers visiting youth in the hospital? At the initial crisis or weekly visits? This youth was previously in a hotel with a 1:1 and ***there are no potential placements in sight***." SSA-2482.

- Email from local DSS: "[P1] is currently a hospital overstay in the ED. She is not admitted so ***she is not receiving medication, therapy or case management***." SSA-2491.

- Email from DHS hospital youth liaison: "…[A]s of today **no one from DSS has visited the youth in the hospital since she was admitted** on January 18, 2024. She has been **confined in a secluded area of an ED for 28 day**s…" SSA-2495.

## Child P2

- Emails from hospital to SSA and local DSS: "Not sure who to report this to but [P2]'s **DSS sitter today is completely passed out**. I know the job is boring at best but I did want to pass this along." SSA-2583. "Also wanted to let you **know the sitter for [P2] was sleeping today** when I went by at 10:30 am." SSA-2591.

- Email from local DSS: "I did reach out to the one on one service provider" and "reiterated with him that his staff should engage with [UBM] when they are at the hospital. I brought it to his attention that there was some concern about the **staff not engaging with [P2] and spending time on social media and playing on the phone.**" SSA-2599.

- Local DSS notes of meeting with staff at 2nd hospital: "Hospital asked to complete CON with other options being explored. Hospital reports she requires outpatient care and therapy in the community, they do not see her needing an RTC. **She does not need to be hospital, she is not on med, she is open to other placements, no need for RTC**…. She has been able can hold it together with only a couple incidents over 21 days due to stress she is under being confined in hospital room then can be successful in less restrictive." SSA-2546.

- P2 had been in one of her overstays for **85 days** when her team wrote: "The team is however concerned about [UBM's] mental state. She has now been in the hospital for almost 3 months and it has taken a great toll on her mental stability." SSA-2548. **Four months later**, an E.R. director wrote to the local DSS: "Furthermore, while pt is currently being held in the Emergency Department it is important to understand that **she is NOT receiving support services, such as therapy, while she waits**. This is not the proper setting for support services, she is merely in holding…Are any efforts being made to provide pt with schooling material?... Please understand the situation is dire as pt is only having her minimal needs met (food, clothing, shelter) while she sits here each day." SSA-2637. **A month later**, an email added: "The [E.D.] is not representative of [P2's] current functioning in a community setting; **she is not interacting with peers, she's not attending school or other required scheduled activities, she's not spending any time outside, and she is constantly monitored by a sitter and now additionally a 1:1, and she's not being provided any therapeutic or treatment services**." SSA-2667.

- P2 twice spent over three months in overstays (two different hospitals).

Numerous other chilling examples of harm from Defendants' use of overstays are provided below.

## CREDENTIALS OF PLAINTIFFS' EXPERTS

Plaintiffs' experts are leading authorities in child welfare, foster care, behavioral health, and related systems reform with extensive experience working with state agencies.

Richard Epstein, Ph.D., is a Professor at Northwestern University Feinberg School of Medicine, Department of Psychiatry & Behavioral Sciences, and is associate director of its Mental Health Services & Policy Program, which conducts research, evaluation, quality improvement, and technical assistance for publicly funded child welfare and mental health services. He has nearly 20 years' experience in child welfare and mental-health and has worked with multiple state child-welfare systems on quality improvement initiatives motivated by federal class actions. Dr. Epstein has multiple contracts with Illinois implementing the *B.H. v. Mueller* federal foster-care consent decree entered in 1991 (hospital overstays have been among *B.H.*'s issues). In 2015-21, Dr. Epstein was a research fellow at Chapin Hall and led multiple initiatives related to *B.H.* In 2008-15, he was a professor at Vanderbilt University School of Medicine, Department of Psychiatry & Behavioral Science, where he directed its Center of Excellence for Children in State Custody and worked on initiatives related to the *Brian A.* foster-care class action and the *John B.* EPSDT class action. *See* Ex. 3, Expert Rep. 1-2 & *id.* Apx. A, Epstein C.V.

Marci White, M.S.W., has more than 40 years of experience in this field. The U.S. District Court for the District of Arizona has "credit[ed] her decades of experience 'with the design, implementation, management, and monitoring of behavioral health service systems for children involved in the foster care, mental health, and juvenile justice system'" and relied on her opinion certifying a class and subclasses of foster children challenging mental-health deficiencies in Arizona's foster care system. *Tinsley v. Faust*, 411 F. Supp. 3d 462, 477 (D. Ariz. 2019). From 1981 to 1998, she helped implement a federal consent decree, *Willie M. v. Hunt*, addressing North Carolina children with significant behavioral-health needs, initially as monitoring staff for a court-appointed panel and later as the state's compliance officer. She has overseen a statewide therapeutic foster-care program and conducted quality service reviews. In 2015, Ms. White was

court-appointed as an expert in the *B.H. v. Mueller* case to advise the court on how to improve placements and behavioral-health services. She has served as an expert or consultant on state child mental-health systems in over ten federal cases. *See* Expert Rep. 2-3 & Apx. B, White C.V.

Marty Beyer, Ph.D., has five decades of experience, especially in class-action monitoring and mental health services in foster care and juvenile justice. In 2023-24, she was the federal court-appointed Special Master for Oregon's temporary-lodging foster-care class action, addressing issues similar to those presented in this case. From 2003 to 2023), she served on the *Katie A.* federal court-appointed panel monitoring mental health-services to children in Los Angeles. From 2011 to 2017, she was a mental health monitor for New York state juvenile justice facilities on behalf of the U.S. Department of Justice ("DOJ"). She also investigated juvenile facilities in Mississippi and Georgia for DOJ. Dr. Beyer was an expert in the landmark *Rosie D.* case addressing Massachusetts mental-health services under ESPDT and later worked on the *Rosie D.* monitor's service-design team. From 1998 to 2003, she helped Alabama develop a system of care following the *R.C.* federal foster-care decree. Connecticut, D.C., Florida, Hawaii, Maryland, New York City, Oregon, Tennessee, and West Virginia have retained her as a consultant. In Maryland, *inter alia*, from 1989-91, she served on an expert panel monitoring implementation of the *Lisa L.* settlement addressing overstays in public hospital facilities. *See* Ex. 6, Beyer C.V.

## SUMMARY OF LEGAL STANDARDS FOR CLASS CERTIFICATION

Plaintiffs must prove that they satisfy Rule 23's requirements: (a) the class members are ascertainable; (b) they are sufficiently numerous that their joinder is impractical; (c) they share one or more common questions of fact or law; (d) the named plaintiffs' claims are typical of the class; (e) counsel and named plaintiffs are adequate representatives of the class; and (f) classwide injunctive and declaratory relief are sought because Defendants have acted or refused to act on

grounds generally applicable to the class.  If per-diem damages are not certifiable under Rule 23(b)(2), Plaintiffs must show under Rule 23(b)(3) that common issues predominate for damages and that class treatment is manageable and superior to individual adjudications.  The Court has discretion  to conduct a "rigorous analysis" in which "'it may … probe behind the pleadings[.]'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (citation omitted).  Evidence is required, but "[m]erits questions" should be considered "only to the extent[] that they are relevant" to certification.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## SUPPLEMENTAL ARGUMENT

The evidence amply and conclusively supports class certification under Rule 23.

## I.    The Class Is Ascertainable.

Defendants' ready ability to identify all 144 children and youth in DHS custody outside of Baltimore City in 2023-2024 who had hospital overstays demonstrates ascertainability.  These children are regularly tracked and identified by Defendants.  *See* Ex. 2.

Defendants have suggested that the class definition including children at imminent risk of overstays is vague and unascertainable, but this is not correct.  Plaintiffs' interrogatories defined these additional foster children as including hospitalized children who are not (yet) in overstay situations and those who had overstays.  *See* Ex. 1, Parsley Decl. ¶ 9.  Those children are known, identified, and tracked, just like the children in overstays, and their aggregate data is reported annually to the General Assembly.  Chapin Hall compared the number of *all* hospitalized foster children to those that eventually result in overstays and determined that a substantial proportion— 15%— of *all* hospitalized foster children end up in overstays.  *See* Ex. 4, Chapin Hall Rep. 47. That fact alone confirms that the hospitalized children are ascertainable and that they are at clear and substantial risk of overstay.  In any event, the ascertainability requirement does not apply to

Rule 23(b)(2) class certification for systemic relief that does not require identification of individual class members. *See Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972).

## II.    The Class Is Sufficiently Numerous to Make Joinder Impracticable.

The DHS spreadsheet of class members, with 144 children identified from January 1, 2023 to January 21, 2025, conclusively demonstrates numerosity. In the Fourth Circuit, the threshold for numerosity typically ranges from 20 to 40 class members when based on numbers alone, though no specific number is required and the Fourth Circuit has approved certification of an 18-person class. *See* Pls. Am. Mem. in Supp. 12, ECF No. 43-2; *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). Plaintiffs cited numerous cases that certified smaller classes than 20 members. *See* Pls. Am. Mem. in Supp. 11-13, ECF No. 43-2. Defendants' identification of **144 foster children**, none of them from Baltimore City, who had one or more overstays in the general 2023-24 two-year period, with **95 overstays occurring in 2024**, exceeds the standard threshold several times over.

Publicly available data confirm these numbers. On October 14, 2025, 12 children were reported by DHS to be in overstays. McKenzie Frost, *While "extremely rare," DHS says foster care children may be placed in homeless shelters* (Oct. 15, 2025), *available at* https://foxbaltimore.com/news/local/while-extremely-rare-dhs-says-foster-care-children-may-be-placed-in-homeless-shelters. Three of these probably were Baltimore City children, giving a net of nine class members on a single day. *See* Ex. 7, Mirviss Decl. ¶ 4. DHS's most recent legislative report identified 60 foster children outside of Baltimore City who had overstays in the year ending September 30, 2024. Ex. 8, DHS, Report on Emergency Room Visits, Hospital Stays, and Placements after Discharge (Feb. 6, 2025). These numbers are comparable to the 2023 numbers

discussed in the original Motion: 123 children in overstays in a 12-month period ending September 30, 2023 (with at least 60 likely in the proposed class) and in DHS Secretary López's 2023 legislative testimony (10 foster children in overstays on Feb. 13, 2023). *See* Pls. Am. Mem. in Supp. 6, ECF No. 43-2.

With the children at imminent risk of overstays (*i.e.*, hospitalized children or children with past overstays) added, the number multiplies. For example, children hospitalized for behavioral health reasons—nearly 90% of the children—are at great risk of overstay: of 196 foster children with in-patient psychiatric hospitalizations reported for the year ending September 30, 2023 and 195 foster children sent to the E.D. for behavioral reasons, 21.5% (84 children) entered overstays.[3] Most recently, in the year ending September 30, 2024, 337 non-Baltimore City foster children were hospitalized for psychiatric reasons, 45 of whom (13.4%) experienced overstays.[4] Every hospitalized foster child is at imminent risk of overstay, making joinder even less practicable.

Children also remain at imminent risk of hospital overstays after they are discharged. Chapin Hall determined that 52 of the 195 children it reviewed—27%—experienced more than one overstay.[5] Ex. 4, Chapin Hall Rep. 47. Thus, all foster children who have had overstays are class members, a number that probably exceeds 200.

---

[3] *See* Ex. 9, DHS, Report on Emergency Room Visits, Hospital Stays, and Placements after Discharge, 3-5 (Jan. 2, 2024). In the 21-month period ending September 2021, DHS reported 407 psychiatric hospitalizations and 147 overstays reported (36%). Ex. 10, Report on Emergency Room Visits, Hospital Stays, and Placements after Discharge, 2-3, 5-6 (Nov. 30, 2021). For the next 12-month period ending September 2022, there were 105 overstays with 310 hospital visits or admissions (34%). Ex. 11, DHS, Report on Emergency Room Visits, Hospital Stays, and Placements after Discharge, 2-3, 5 (Jan. 1, 2023).

[4] *See* Ex. 8, DHS, Report on Emergency Room Visits, Hospital Stays, and Placements after Discharge, 11, 21-22 (Feb. 6, 2025).

[5] Chapin Hall defined an overstay as a child whose hospital stay exceeds the anticipated duration at the time of admission by 10 days or more. This is narrower than Defendants' definition: a child who is not removed from the hospital when reported to be ready for discharge.

Based on numbers alone, joinder simply is not practicable.

In the prior certification briefing, Plaintiffs demonstrated additional grounds upon which the typical 20 to 40-member threshold is relaxed because of the difficulty of joinder, including:

- *Inclusion of future members* in the class and the "impracticality of counting such class members, much less joining them." Pls. Am. Mem. in Supp. at 12-14, ECF No. 43-2 (quoting *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019)).

- *Transient and fluid class composition* because class members enter and leave the class before they can even be identified, let alone served and joined. *Id*. at 14.

- *Injunctive and declaratory relief. Id.* at 15.

- *Special characteristics of the class members* that impede independent participation. *Id*. at 16. Plaintiffs are minors with disabilities committed to state custody who have been or will be involuntarily placed in psychiatric hospitals and other hospital settings and who cannot afford counsel and cannot sue independently, and whose claims are not financially attractive to the private bar. *See, e.g.*, *B.D. by Wellington v. Sununu*, No. 21-CV-4-PB, 2024 WL 4227544, at *8 (D.N.H. Sept. 18, 2024) ("Finally, the class members are all children who suffer from disabilities, many of whom are segregated from the greater community in congregate care placements. Identifying, contacting, and bringing individual litigation on behalf of each of these individuals would present significant challenges that are only compounded by the fact that the putative class members are under the defendants' custody.").

- *Confidentiality bars* against communication with potential joining plaintiffs. Pls. Am. Mem. in Supp. 12-14, 2, ECF No. 43-2, at 16.

- *Geographic dispersion. Id.* at 17. The DHS spreadsheet confirms that class members span the breadth of Maryland from the Western mountains to the Eastern Shore, again impeding joinder and participation.

- *Fear of adverse action. Id.*

- *Unavailability of appointed counsel. Id.* at 18.

This combination of factors puts this case far outside any recognized threshold: 144 class members over two years, plus additional class members with clear risk of injury, plus future plaintiffs, transient claims, minor plaintiffs with disabilities, among others. Under these circumstances, joinder of individual class members is a virtual impossibility.

### III. Discovery and Recent Case Law Confirm the Existence of Common Issues.

Appendix A to Plaintiffs' original motion listed numerous common classwide issues of fact and law, including 19 issues common to all claims and six issues common to Plaintiffs' ADA and Section 504 *Olmstead* claims. *See* Appendix A at 1-3, ¶¶ 1-25, ECF No. 2-04. Defendants' memorandum in opposition did not address these and instead argued that Plaintiffs' claims are individualized and do not involve systemic policies. The pertinent issues are restated and incorporated by reference here. *See* new Appendix A. If Defendants' legal argument regarding individualized issues fails, as ample precedent holds, these fully suffice to satisfy Rule 23(a)(2).

The common issues specific to *Olmstead* (slightly revised) are:

(20) whether, by failing to provide less restrictive placements and community-based services, Defendants are excluding youth with disabilities, as well as youth with specific disabilities, from their programs, supports, and services that are offered to other foster youth, as well as to other youth with disabilities, based on their disabilities.

(21) whether, with regard to Plaintiff Children who are or will be in hospital overstays, or at imminent risk of hospital overstays, Defendants have made and are making reasonable modifications to their child welfare and healthcare programs, including access to community-based services, programs, and placements, to avoid discrimination on the basis of disability.

(22) whether Defendants discriminate against the Plaintiff Children based on disability by failing to administer services, programs, and activities in the most integrated setting appropriate for their needs and by needlessly placing or keeping them in an institutional setting, causing them to suffer harm.

(23) whether Defendants discriminate against the Plaintiff Children based on disability by relying on criteria or methods of administration that prioritize or permit their institutional placement in hospitals despite their eligibility for an array of home and community-based placements and services, including (a) failing to expand community-based foster care placements, including treatment foster care placements, emergency foster homes, and psychiatric respite facilities; and (b) failing to expand access to, and failing to maintain, waitlists and/or shortages of community-based intensive in-home services, community-based wraparound services, community-based crisis intervention services, respite and step-down programs, and community-based outpatient mental health and behavioral health services.

(24) whether the relief needed to put Defendants in compliance with the ADA or Section 504 would require a fundamental alteration to Maryland's programs, services, or activities, or would otherwise impose unreasonable costs on Defendants.

These are comparable to similar *Olmstead* issues that the U.S. District Court for the District of New Hampshire recently ruled satisfy Rule 23(a)(2) in an *Olmstead* class action challenging the excessive placement of foster children in congregate or institutional care:

> In order to succeed on their ADA claims, B.D. will need to demonstrate that the defendants' operation of its foster care program subjects class members to unnecessary institutionalization or risk thereof. [*M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012)]; *see also Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016)]. B.D. will also need to demonstrate that the defendants' practices could be reasonably modified, considering the states resources and obligations to others with disabilities. *Olmstead* [*v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999)]. And the court will need to consider the defendants' argument that ADA claims cannot be based on a risk of institutionalization, as well as its affirmative defenses that the integration mandate is ultra vires and the proposed modifications would constitute a fundamental alteration. … Accordingly, B.D.'s claims give rise to common questions regarding (1) whether the challenged practices are, in fact, occurring; (2) whether those practices subject class members to unnecessary institutionalization or a risk thereof; (3) whether those practices can be reasonably modified; (4) whether instituting the requested modifications would require the state to fundamentally alter its program; (5) whether the integration mandate is ultra vires; and (6) whether ADA claims can be based on a risk of unnecessary institutionalization. Because each of these questions turn on common proof and give rise to common answers, commonality is satisfied.

*B.D.*, 2024 WL 4227544, at *16. Here, the claim is even narrower, alleging a systemic failure to provide services and placements needed to remove children from exceptionally restrictive settings—E.D. s, psychiatric hospitals, and hospital psychiatric wards. *B.D.*'s analysis applies.

Plaintiffs' 19 general issues also present classwide issues. For example:

> (6) whether local DSS offices have refused, and are refusing, to pick up the Plaintiff Children, who are medically ready for discharge, from the hospital.

> (7) whether Defendants and their predecessors have failed to develop an array of foster-care placements sufficient to allow all Plaintiff Children to be placed into appropriate, least restrictive settings without any hospital overstays.

> (8) whether Defendants and their predecessors have failed to provide necessary therapeutic services in the community, such as intensive wraparound interventions, that

would enable Plaintiffs to avoid hospital overstays or to reduce the length of time spent in hospital overstays.

As discussed below, substantial evidence and substantial caselaw support these and the other classwide issues listed in Appendix A.

Defendants' opposition argued that the claims are too individualized, varying by each class member, to warrant class treatment under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), *see* ECF No. 23-1 at 15-17, but this is clearly wrong. *Wal-Mart*'s commonality test merely "requires the plaintiff to demonstrate that the class members 'have suffered the same injury'" from a common cause, whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). As Plaintiffs explained previously, numerous post-*Wal-Mart* foster-care and *Olmstead* decisions rule that Rule 23(a)(2) is met by evidence of systemic deficiencies, be they an insufficient supply of services or a systemic failure to ensure compliance with policies. "Federal courts throughout the country have determined that plaintiffs in foster care seeking class certification can satisfy the commonality requirement with proof of systemic policies or practices in the provision of child welfare services that expose the plaintiffs to an unreasonable risk of harm." *Jonathan R. v. Justice*, 344 F.R.D. 294, 304 (S.D. W. Va. 2023) (citing cases).

### A.    Recourse to Hospital Overstays.

A key common fact is the overstay itself. Keeping a child in a hospital when hospitalization is not medically necessary and the hospital is ready to discharge the child to their legal custodian— the local DSS—but the DSS will not take the child because no appropriate placement is available, is a policy decision. And that decision results from the consequences of Defendants' other policy decisions and systemic practices that led to the overstay. DHS could, if it chose, simply prohibit the practice and remove the children when asked by the hospital. On October 22, 2025, DHS

issued such a broad policy prohibiting the use of hotels, motels, offices, and other unlicensed settings to house foster children and ordering their removal from such locations by November 24, *see* Ex. 12 (memo by DHS to local DSS directors), but it elected *not* to include hospital overstays. This is a systemic policy choice to stop housing foster children in *some* unlicensed settings but allowing Defendants' *Olmstead* violations here to persist, even though they are facets of the same problem for many of the same children. Indeed, class members often languish in hospitals *and* in hotels or DSS offices. Children were housed in hotels in 12 of the 31 overstay cases reviewed by Dr. Beyer; at least two went *to* a hotel from the hospital. *See* Beyer Apx. D; Apx. E; Apx. F; Apx. H; Apx. I; Apx. L; Apx. U; Apx. W; Apx. Y; Apx. DD; Apx. FF; Apx. GG.

The policy decision to prohibit placement in hotels and offices occurred under duress, when DHS was under intense legislative and journalistic scrutiny following the death of an unattended 16-year-old foster child in a hotel and an audit by the Department of Legislative Services raising significant concerns about safety of children in DHS' care.[6] After treating the use of hotels and offices as a case-by-case individualized practice issue, just as it treats the overstays, DHS made a deliberate decision to ban hotel and offices as locations to board children in apparent response to the foster youth's death. It also made a very deliberate decision to exclude hospitals from the policy, even though hospitals, like hotels, are not licensed to provide foster-care services.

Overstays have been treated as a systemic policy issue for years. The General Assembly requires DHS to submit annual reports on the number of occurrences and average duration. *See, e.g.*, 2024 Jt. Chairmen's Rep. 144-45. Last year, the General Assembly enacted HB 962, Public Health – Pediatric Hospital Overstay Patients and Workgroup on Children in Unlicensed Settings

---

[6] *See, e.g.*, Jean Marbella, *Maryland ending practice of housing foster children in hotels*, Baltimore Sun (Oct. 27, 2025); Lee O. Sanderlin, *Maryland to end controversial practice of housing foster children in hotels*, Baltimore Banner (Oct. 27, 2025).

and Pediatric Overstays, 2025 Md. Laws ch. 479, which establishes a workgroup to develop and report systemic solutions to the legislature. DHS and MDH have weekly meetings to review overstay cases and work on resolutions, and they have reported multiple initiatives to expand placement supply, demonstrating that local agencies and courts cannot solve the problem themselves, even in individual cases. *See* Ex. 3, Expert Rep. 28. Just one year ago, DHS told the General Assembly that "DHS is working with urgency and intention to reduce and eliminate hospital overstays." *Id*. at 27. Those efforts are systemic.

Until those efforts succeed, Defendants' policy of keeping children in overstays until a bed is available somewhere remains their practice. In case after case, when hospitals have asked local DSS agencies to pick up foster children who were ready for discharge, the hospitals were told that DSS will not pick up children from the hospital unless and until a placement is available:

- "[T]the Dept. does not intend to come and pick [**P3**] up until we have an appropriate placement." SSA-2315.
- "…[U]nfortunately, until we have a placement we will be unable to pick [**P4**] up from the hospital…" SSA-2738.
- "DSS is refusing to pick up the patient [**P5**]…." SSA-3232.
- "Today we received contact from [hospital] informing us that they plan to discharge [**P6**] today and request that we come to pick her up. We informed them that we have not located another placement for [**P6**] and would not be picking her up." SSA-3995.
- "[Local department] will not be picking [**P7**] up." SSA-4139.

Defendants' recourse to hospitals in lieu of development of a sufficient supply of placements and services to meet the children's needs in appropriate integrated settings lies at the core of Plaintiffs' claims, and it establishes commonality. *See Wal-Mart*, 564 U.S. at 359 (noting that "even a single common question" will satisfy commonality) (cleaned up); *Elisa W. v. City of New York*, 82 F.4th 115, 123 (2d Cir. 2023) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.") (citation omitted); *Jamie S. v. Milwaukee Pub. Sch.,* 668 F.3d 481, 498 (7th Cir. 2012) ("As the Supreme Court noted

in *Wal-Mart,* an illegal *policy* might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class."). Chapin Hall clearly found that the problem was systemic and not individualized. *See* Ex. 4, Chapin Hall Rep. 57 ("These overstays reflect difficulties in transitioning children from hospital settings to a suitable placement, particularly for those with significant behavioral or psychological health issues who were admitted for psychiatric reasons.").

Numerous cases have found commonality for claims addressing foster-care placement shortages, excessive use of congregate foster-care settings, etc. *See B.D.*, 2024 WL 4227544, at *12 ("B.D. contends that this overreliance on congregate care is the result of the defendants' deficient practices, which leave decisionmakers with virtually no choice but to place and retain adolescent foster children in congregate care. Specifically, B.D. contends that the defendants' failure to fund and maintain a sufficient array of community-based placements and services … systematically funnels adolescent foster children into congregate care"); *see also id*. at *16 ("B.D.'s claims are no exception and raise a host of common questions amenable to common answers. In order to succeed on their ADA claims, B.D. will need to demonstrate that the defendants' operation of its foster care program subjects class members to unnecessary institutionalization or risk thereof."); *Baby Neal v. Casey*, 43 F.3d 48, 62 (3d Cir. 1994) (finding commonality where a class of foster children challenged the defendants' failure to provide a sufficient number of appropriate placements); *Jonathan R.*, 344 F.R.D. at 305-06 (same); *Wyatt B. v. Brown*, No. 6:19-cv-005556-AA, 2022 WL 3445767, at *25-26 (D. Or. 2022) (same); *Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 34 (D. Mass. 2011) (same); *S.R. v. Pa. Dep't of Hum. Servs.*, 325 F.R.D. 103, 110 (M.D. Pa. 2018) (noting that "systemic deficiencies in the availability of placements" are "exactly the type of 'common mode' or practice predicating each alleged violation that was noticeably absent from [*Wal-Mart*]"); *cf. Elisa W.*, 82 F.4th at 124-25 (finding

commonality for claim challenging agency practice of making arbitrary placement decisions without matching children's needs to the location); *B.K. by Tinsley v. Snyder*, 922 F.3d 957, 973 (9th Cir. 2019) (finding commonality for challenge to "statewide practices" affecting foster children: (1) excessive use of emergency shelters and group homes; (2) unnecessary separation of siblings; and (3) placement of children far from home).

Moreover, these cases expressly reject Defendants' arguments that such claims are fundamentally individualized.  As the *B.D.* court explained:

> B.D. does not challenge any particular placement decision, nor do they seek the sort of individualized relief that would necessitate an inquiry into the propriety of any given class member's placement…. Rather, B.D.'s claims challenge specific acts and omissions in the defendants' operation of its foster care program that allegedly expose all class members to an ADA violation. Accordingly, the focus of B.D.'s claims will be on the <u>defendants'</u> actions, each of which are common to the class, rather than any individual plaintiff's placement.")

*B.D.*, 2024 WL 4227544, at *15 (underlining in original); *see also S.R.*, 325 F.R.D. at 109 (distinguishing between claims that "seek review and determination of each individual class member's placement" and those that seek "system wide change").  This analysis applies here.

Hospital overstays constitute a "uniformly applied, official policy …, or an unofficial yet well-defined practice, that drives the alleged violation."  *G.T. v. Bd. of Educ. of Kanawha Cnty.*, 117 F.4th 193, 203 (4th Cir. 2024) (citation omitted).  They are a discrete wrongful practice, not a broad wholesale attack against, for instance, allegedly improper disciplinary removals of children with disabilities from classrooms without any allegation of a "single or uniform policy or practice that bridges all their claims."  *Id.* at 205 (citation omitted).  Defendants' deliberate recourse to overstays in lieu of development of appropriate placements is a quintessential common issue.  As then-MDH Secretary Herrera Scott testified about why overstays occur, "We don't have enough beds.  Full stop." … "[I]t's also the bed type and having the clinicians to cover those beds."  Am. Compl. ¶ 192, ECF No. 37; Answer ¶ 192, ECF No. 79.

**B.      Plaintiffs' Experts Identify Multiple Common Practices and Problems.**

Dr. Epstein and Ms. White, eminent experts in foster care and children's mental-health, directed a 25-member case sampling of the 144 foster children and then analyzed Dr. Beyer's case summaries of the sample cases and the six named plaintiffs.  In addition to the overriding fact of the recourse to overstays, they determined several overriding practices that drive overstays.

**1.      Defendants Do Not Ensure Adequate Assessment of the Children.**

In reviewing the 25 sample cases and the named plaintiffs, the experts determined that:

> Defendants consistently fail to accurately and comprehensively assess the needs of these children and their families. The absence of needed assessments deprives Defendants of a basis for determining, planning for, and providing what the children, together with their families, other caregivers and providers[,] actually need upon discharge from the hospital. This failure directly contributes to overstays by making it more difficult, if not impossible, to identify and arrange suitable places for the children to live which can and will meet their needs at the time. This failure causes additional harm by depriving the children of the normative experiences and opportunities for growth and development they would have in appropriate living arrangements. It also denies them access to appropriate specialized services and supports in the least restrictive settings consistent with their needs.

Ex. 3, Expert Rep. 9-10.  Missing and/or inadequate assessments affected almost every child— only one of the 25 (**P8**) had a strong assessment; another (**P9**) had thorough assessment of his profound physical disabilities, but not his mental health.  *Id.* at 10.  For example:

- **P10**: "Dr. Beyer noted that 'it is shocking that neither the DSS nor the hospital records contain reports from his prior hospitalizations, treatment, or evaluations. Everything from before his family moved to Maryland (when he was almost 15) was unknown.'"

- **P11**: "Despite multiple hospitalizations, one residential placement and several group home placements, there was no evaluation in [P11's] record."

- **P12**: Dr. Beyer found "she had received '[a] lengthy but superficial school psychological report in 4th grade' [but it] 'did not clarify how [P12's] past sexual abuse and current abandonment by her mother and problems with her relatives with whom she was placed were causing her behavior.  If she had evaluations at [RTCs], these are not in the DSS record and would have been useful in designing services."

- **P13**: Despite seven months in an overstay, her record had no psychological evaluation. "Consequently, there is no intelligence testing, no assessment of any processing, expressive or other cognitive deficits and no trauma history in [P13's] record. Lacking

thorough assessment, it remained unclear what [P13's] needs were and the placement search was for any RTC that accepted her without knowing the specific services required to address what was driving her behavior."  Beyer Apx. J.

- **P14**: She "had been in care most of her life, including multiple placements" and in two separate hospital overstays in 2023 (the first lasting two months, the second lasting two weeks), yet "there is no prenatal, trauma or developmental history in [P14's] record" and she was not recognized as having "a neurodevelopmental disorder with a low IQ (55)" until a neuropsychological evaluation was conducted (and not completed until September 2023).  Even though Defendants knew that she needed to have coordinated care informed by her combination of intellectual disabilities and trauma, the records do not refer to DD (developmentally disabled) services other than that they "had been applied for" during her second overstay.

*Id.* at 10-11.  "Conducting thorough assessments and/or reviewing the results of prior assessments is standard practice" and "essential for developing an individualized plan of care."  *Id.* at 11.  Without these, the only way the children "can be described to potential community-based placements is by reporting their challenging behaviors," which contributes to, or even causes  the overstay[,] by decreasing, if not precluding, the likelihood that a community-based placement will accept them," and increasing the likelihood of a longer overstay and limiting the placement options to more restrictive settings like RTCs.  *Id.*  They conclude:

> Instead of insisting on adequate assessments upon admission to the hospital, leading to accurate and comprehensive case conceptualization and the provision of needed services and other supports, Defendants' pattern is to rely on the records that were available when the children came into the hospital and that, more often, emphasized descriptions of troubling and troublesome behaviors.  As a result, Defendants' focus first and foremost on managing 'problematic' behaviors such as aggression, self-harm, or running away and look first for placements and services that can and will attempt to control difficult behaviors.

*Id.* at 12.  Placements thus are harder to find and often quickly disrupt, leading to recurring hospitalizations and overstays.  *Id.*

Chapin Hall corroborates this.  Its discussions with SSA and hospital staff "revealed that a child's discharge recommendation (e.g. RTC, group home, etc.) may not always be informed by the child's *needs* at discharge but instead may reflect the types of placement settings currently

available" and "may not be consistently updated as new information becomes available."  Ex. 4, Chapin Hall Rep. 57.  Chapin Hall also found that case files lack "explicit needs data … including accurate documentation of special populations like [pregnant and parenting youth] and children with significant physical and mental health diagnoses and disabilities" and "structured assessments like the Child and Adolescent Needs and Strengths (CANS)," where "[t]here is a high percentage of children missing a CANS or with a CANS but with no needs documented."  *Id.* at 42.

Defendants' failure to ensure appropriate assessments to facilitate good placement decisions is an accepted common claim under Rule 23(a)(2).  *See, e.g.*, *Elisa W.*, 84 F.4th at 125 (reversing district court denial of certification because, *inter alia*, "Put simply, ACS either has a practice of ensuring that appropriate criteria inform placement decisions, or it does not."); *B.K.*, 922 F.3d at 969 (affirming commonality for claim of statewide failure to ensure, *inter alia*, adequate health assessments); *Jonathan R.*, 344 F.R.D. at 307 (certifying claim alleging, *inter alia*, that caseworkers "fail to 'complete quality comprehensive assessments of the needs of children and their parents'").  The lack of sound processes to ensure necessary planning for the children in many instances is a systemic deficiency warranting class treatment.  *See B.D.*, 2024 WL 4227544, at *10 (finding commonality met for claim that failure to ensure proper case plans helps to funnel foster children into inappropriate congregate-care placements).

### 2. Defendants Fail to Ensure that Children's Traumas Are Recognized and Addressed.

The failure to ensure proper assessments is compounded by Defendants' failure to account for class members' deep histories of complex traumas ranging "from neglect to physical and sexual abuse before coming into care[;] loss of caregivers due to death, incarceration, or abandonment[;] caregiver substance abuse[;] repeated rejections by family members[;] and/or negative experiences such as sex or other abuse in traditional foster and congregate care placements."  Ex. 3, Expert

Rep. 13.  As the experts concluded, "[t]ime and again, these children experience profound loss that is not addressed while in care, and that is compounded by their disabilities." *Id.*  Though "the impact of complex trauma on behavior was recognized for several of the children, … for most of the children, the Defendants failed to ensure that the children's adverse experiences and disabilities were recognized as underlying their behavior." *Id.* 13-14.  For example, named Plaintiff [**P15**], a child diagnosed with bipolar disorder, had "no trauma history or psychological evaluation in [her] records," and Defendants' reliance on psychiatric assessments resulted in a narrow understanding of her complex trauma." *Id.* at 14 (quoting Beyer Apx. E).

> This had direct consequences on the children's hospitalizations and subsequent overstays:
>
> Not recognizing and addressing complex trauma experiences contributes to hospital overstays by ensuring that the challenging behaviors, not the traumas that underly them, become the focus. The experiences that caused the traumas and underly the behaviors are less likely to be adequately explored and addressed. These behaviors are, therefore, increasingly likely to continue or worsen which, in turn, increases the likelihood of overstay hospitalizations. It further harms them by increasing the likelihood that, when hospital discharge does occur, it will be to an RTC or some other restrictive placement.

*Id.  See also id.* at 15 ("This misunderstanding also contributes to the overstay by resulting in descriptions of the children to potential community-based settings that misattribute the causes of their behaviors to them being angry and aggressive, not to them being traumatized on top of their disabilities.").  Conversely, "when the challenging behaviors of traumatized children are recognized as being secondary … to [their] traumas…, community-based placements are more likely to agree to work with them and provide the stable relationships and specialized treatments they need…." *Id.* at 14.  Thus, the failure to appreciate trauma results in fewer placement opportunities and, correspondingly, more or longer overstays. *Id.*[7]

---

[7] As Dr. Epstein and Ms. White explain, "The literature about children with significant psychiatric and behavior problems indicates that seeking the next placement that is available, regardless of

### 3.    Defendants Fail to Ensure Adequate Capacity and Quality of Community-Based Placements, Services, and Other Supports.

Even though Dr. Epstein and Ms. White explain that it "is well established that the most effective approach to serving traumatized children with disabilities must combine stable home-like settings with consistent and supportive relationships, appropriate educational experiences, and community-based services and other supports that have been individualized to meet their needs," they conclude "that there was not an adequate supply of community-based living arrangements, services, and other supports, both prior to their hospitalizations and during searches for discharge placements." *Id.* at 17. Instead, Defendants looked for a placement—any placement that would take them—irrespective of the children's needs. *Id.* And, because the focus is "a perfunctory and overly bureaucratic approach to *solving the overstay* by *finding a placement*," less appropriate solutions like RTCs are pursued even though RTC beds are in short supply with long wait lists and better solutions that meet needs are not developed. *Id.* at 16-17. In short: "Efforts to secure the 'next placement' do not reflect focused and organized efforts to construct comprehensive and individualized plans for appropriate services designed to address their complex traumas or their disabilities within the least restrictive environment consistent with their needs." *Id.* at 16.[8]

The children's cases are replete with evidence of Defendants seeking RTC or highly restrictive placements in lieu of recommended, clinically appropriate, community settings:

---

whether it can address the child's needs, often leads to over-reliance on residential and institutional care, and an underinvestment in less restrictive community-based services and other supports. Such inappropriate placements and services then result in disrupted placements and relationships, more confusion for the children about where and to whom they belong, and inconsistent treatment and educational experiences, … all of which inflict even more harm." *Id.* at 16 (citing studies).

[8] Experts in *Jonathan R.* made the same finding, which the court credited in finding commonality for a challenge to the state's placement array. *See Jonathan R.*, 344 F.R.D. at 306 ("They opined that rather than considering the children's individualized needs, DHHR simply assigned the Named Plaintiffs to 'the first available placement,'" raising "questions about "West Virginia's continuum of placement options available to meet the complex needs of these children.").

- One child, **P2**, who was stuck for months in an E.R. overstay, was found by her treatment team not to need an RTC, but the local DSS repeatedly pushed for a certificate of need so she could be placed in an RTC. The DSS notes say, "Hospital asked to complete CON with other options being explored. Hospital reports she requires outpatient care and therapy in the community, they do not see her needing an RTC. She does not need to be hospital [sic], she is not on med, she is open to other placements, no need for RTC…She has been able can [sic] hold it together with only a couple incidents over 21 days due to stress she is under being confined in hospital room then can be successful in less restrictive." SSA-2546. Four months later, DHS was again requesting a CON even though "her hospital team does not feel this child requires an RTC." SSA-2564. Several weeks after that, a treating hospital psychiatrist wrote, "I'm pretty concerned about working on []'s placements. I'm not sure what else we can be doing to help, but I emailed to check in with [DSS worker] about group home interviews, and he responded asking for paperwork for RICA [a state-run RTC]. We've been pretty explicit that we don't believe she needs this higher level of care until she's exhausted all other options. We also reiterated that we weren't willing to do a CON at this time." SSA-2570-71.

- **P16** had years of prior trauma that was never adequately assessed and eventually came to an E.R. after four years of RTCs and hospitalizations. Expert Rep. 17; Beyer Apx. I. The hospital pleaded, "He does not need an inpatient admission. He needs a place to board while he is awaiting a placement. The ED does not want him to remain in the ED as it is a small space with no windows or ability to walk around." SA-2862. When the hospital E.R. staff immediately deemed him ready for discharge and refused to approve a certificate of need for RTC placement, an outside provider was brought in to sign instead. *Id.*; *see also* SSA-2870.

- After **P13** had spent almost 200 days in an overstay, DHS's hospital youth liaison summarized a meeting at which the question was asked, "Would it be ethically possible to remove the community part from the [hospital's] recommendation" that "she could be in community with supports and if not available then residential [treatment] is resource." Beyer Apx. J; SSA-3088. She told her MDH counterpart that DHS wanted the hospital "to rewrite the recommendation and leave out the part that [P13] could be mainted [sic] in the community with supports which we do not have at this time. They are uncomfortable changing recommendation…" Indeed, an RTC was mentioned as an alternative only because [the community placement with supports option] does not exist." SSA-3090.

- **P12** and **P17** were recommended by their hospitals for "a community based placement similar to this youth's last placement" and "therapeutic foster home or any less restrictive setting with appropriate services and supports in the community…to help him reintegrate into school and community," respectively, yet DHS pursued RTC placements. *See* Bayer Apx. W, SSA-4224-32, 3701-02.

- **P18** was removed from an overstay and placed in a hotel despite documentation of a concern due to possible risk of sex trafficking. SSA-3279, 3282.

24

- **P19** is representative of the systemic breakdown resulting in overstays and inappropriate placements. She was hospitalized (in an E.D.) from a hotel because "she had one leg out of the hotel's second floor window and was threatening to jump. It is not safe having her stay in hotels with mentors anymore…" Despite DHS's insistence that it was unsafe for her to return to the hotel, the hospital gave notice that it would drop her off there, stating that her "continued stay in our pediatric ED is detrimental to [P19's] well-being and inappropriately limits our vital resources to treat other children within our community who have acute care needs. We can no longer be the backstop for DSS' responsibilities in caring for this child."). SSA-3250, 3271-73.

- In October 2024, late in 12-year-old **P20**'s fourth month of overstay in an E.D., the DHS overstay log "noted, 'there are no placement options for this youth and he remains in the ED.'" Expert Rep. at 21 (quoting Beyer Apx. S).

Defendants' records corroborate what experts have long said: necessary community-based placements and services are not sufficiently available. Chapin Hall, for instance, found "a shortage of placements for children with complex behavioral and emotional needs, contributing to longer stays," which was reflected by use of hotels. Ex. 4, Chapin Hall Rep. 111. And it emphasized "the importance of tailored interventions and comprehensive support services to address the complex needs of children experiencing prolonged hospital stays." *Id.* Before Chapin Hall, in 2022 the Institute for Innovation and Implementation at the University of Maryland School of Social Work issued a placement needs assessment for Baltimore City DSS and concluded that Defendants should *not* develop additional highly restrictive congregate care settings such as RTCs and high-intensity therapeutic group homes because "[t]here are children in these settings who instead should be in family settings" in their communities. Am Compl. ¶ 35 (citation omitted).[9]

Dr. Epstein and Ms. White explain that, even for traumatized foster children presenting significant challenges, models have existed for supportive services that can sustain community

---

[9] Defendants' Answer does not deny the accuracy of quoted materials cited in the Amended Complaint and instead questions relevance or argumentation. *See, e.g.*, Answer ¶ 35, ECF No. 79. Accordingly, those allegations should be deemed admitted for accuracy and authenticity. *See* Fed. R Civ. P. 8(b)(6); *Legal Aid Soc'y of Alameda Cnty. v. Brennan*, 608 F.2d 1319, 1334 (9th Cir. 1979) ("[A]llegations are to be treated as admitted [if] not denied.").

placements—services that were not available to class members—including a menu of services recommended by the federal government back in 2013, such as wraparound, crisis intervention, case coordination, etc.  *See* Expert Rep. 21, 24-25.  They point to a 2022 placement needs assessment for Baltimore City foster children conducted by the Institute for Innovations at the University of Maryland School of Social Work and relied upon by Chapin Hall, which, *inter alia*, questioned state and local child welfare leaders and organizations about children placed in residential care: "When [these leaders were] asked whether the youth's clinical or behavioral needs could have been met in a family setting, with few exceptions, the answer was "yes," *had the necessary home and community-based services been available*."  Expert Rep. 21 (quoting Chapin Hall Rep. 117) (citation omitted, brackets and emphasis added by Chapin Hall)).

Indeed, Defendants do not deny that the Governor's Office of Crime Prevention, Youth, and Victim Services, which is responsible for setting interagency policy on placements and assessing unmet needs, reported to the General Assembly that "Residential Treatment Centers and other high-level residential programs do not currently offer the types of services to adequately address the ongoing needs of the youth identified as at risk for a hospital overstay."  Am. Compl. ¶ 22 (quoting report); Answer ¶ 22 (asserting insufficient knowledge to admit or deny).

Defendants have known for years that these services were needed.  They do not deny (and thus admit) that Maryland's lack of a continuum of mental and behavioral health services for children compounds the placement shortage; that crisis intervention and comprehensive wraparound services are not widely available in sufficient quantity or quality to address crises and stabilize children; and that *17 years ago*, Maryland began a five-year pilot to establish these services for children such as Plaintiffs, but this pilot effort was abandoned in 2016.  *See* Am.

26

Compl. ¶ 161; Answer ¶ 161.[10]  Even their limited substitute, Medicaid's "1915(i)" program served

only 10 to 40 children per year in FY 2019-21, only 36 children in FY 2022, and only 16 children

near the end of reporting in FY 2023.  *Id.*; Ex. 13, Letter from then-MDH Sec. Herrera Scott to

legislative chairs (Sept. 12, 2024) at 2, 4.  One year ago, Secretary Herrera Scott wrote to the

Legislature, "There is recognition that 1915(i) services have continued to be inadequate and highly

underutilized" and acknowledged that "the adequate availability of wrap around support services

(under the 1915i waiver) should allow for more effective diversion from higher levels of care and

provide adequate community based support allowing for earlier and more stable step down from

these higher levels of care."  *Id.* at 2.  The 1915(i) services are "intended to support youth with the

highest mental health needs as a method to divert a youth from an inpatient or RTC admission or

to reduce the length of stay in a facility by providing a number of services not part of the basic

Maryland plan to support the youth in the community."  *Id.* at 3.  MDH acknowledged that

"adequate, accessible, high quality intensive in-home services [under 1915(i)] is a vital component

of a successful children's continuum of care" and "are essential to support our high needs youth

in the community and to reduce their utilization of the most restrictive institutional settings such

as inpatient, residential treatment centers, and other residential congregate care settings."  *Id.* at 1.

Though "vital" and "essential," they are not adequately available to class members.

　　　　Even if Defendants dispute the existence of a placement shortage and service deficiency,

such a dispute is common to the class and fully warrants certification.  Numerous cases have so

held or ruled regarding similar allegations.  *See, e.g.*, *B.D.*, 2024 WL 4227544, at *12 ("evidence

supports B.D.'s claim that the defendants are failing to take certain steps to increase the supply of

---

[10] Defendants' Answer asserts that no response was required due to dismissal of Plaintiffs' EPSDT claim.  Answer ¶ 161.  But the assertion relates to all claims, not EPSDT, and was pled in the section titled "Factual Allegations Common to All Claims."  Am. Compl. pp.156-58, ECF No. 37.

community-based placements"); *Jonathan R.*, 344 F.R.D. at 306-07 (inadequate array of placements resulting in use of hotels and agency offices to house foster children); *Tinsley*, 411 F. Supp. 3d at 476-77 (shortage of therapeutic foster homes, identified by Ms. White).

### 4. Defendants Lack an Effective Means to Facilitate Timely Discharge.

Finally, Dr. Epstein and Ms. White conclude that Defendants "do not have an effective way to guide and oversee efforts to facilitate children's timely discharge from the hospital when their medical professionals no longer believe they need to be there." Expert Rep. 27. Despite the assignment of a liaison to work with hospitals and local DSS agencies, despite the weekly meetings with DHS and MDH officials, despite years of public discussion of the problem and need for high-level intervention, the case summaries demonstrate systemic dysfunction and a singular focus on finding a placement, rather than serving the child:

- Almost five months of named Plaintiff **P21**'s yearlong overstay had elapsed before the DHS liaison learned of her case. The logs total 1,000 pages but show only efforts for RTC placements and no efforts to find alternatives, "as she simply languished" and "decompensated" without access to the community. Expert Rep. 27-28.

- **P22** spent a month in overstay before the hospital youth liaison learned of her case. Like **P21**, her file is filled with multiple denials of admission from RTCs but does not appear to include other discharge planning efforts. *Id*. at 28.

- **P23** spent 10 months in overstay pending "chaotic" efforts to find an RTC, including an out-of-state placement that DHS ultimately would not approve, and an in-state RTC placement at her former RTC that would not accept her back and then insisted on receiving evaluations that had not been done. Beyer Apx. FF.

- Multiple cases "show chaotic and/or conflictual interactions between the [DHS liaison] and hospital[s] … where DHS "push[ed] for help in getting the child into an RTC" while hospital staff "refused to cooperate in light of their opinion that the child could, and needed to be, served in a community-based setting." Expert Rep. 28. *See, e.g.*, **P12**, **P17**, and **P19** cases *supra*; *see also* **P24** (whose hospital was pressured into issuing a CON for an RTC placement because nothing was available). Beyer Apx. U.

- **P2**'s worker was at least partially responsible for the loss of a placement and for one of her overstays: Several months into her first hospital overstay, the hospital wrote a letter expressing "concerns with responses from the worker." Meetings with the DHS liaison did not go well. SSA-2577. The liaison asked for DHS review of a referral prepared by DSS before it was sent to the hospital, saying, "This is just so

embarrassing." SSA-2581. Three days later, the liaison wrote to the acting director of SSA to say that a bed would be available at a program in three days, but "[DSS] has not confirmed the admission with [the program] or submitted document to prepare for admission." SSA-2605. **P2** was placed but then discharged shortly thereafter and "and became an overstay due to communication issues with [worker] and left hospital confused, used resources did not need to us [sic], communication barriers, conflicting information between [program] and [worker]." SSA-2627.

- **P2** vividly demonstrates hospital-DSS deadlock. Her hospital treatment team insisted that she did not need an RTC, but DSS repeatedly pushed for a CON and residential treatment. For example: "Hospital asked to complete CON with other options being explored. Hospital reports she requires outpatient care and therapy in the community, they do not see her needing an RTC. She does not need to be hospital [sic]. She is not on med, she is open to other placements, no need for RTC…She has been able can [sic] hold it together with only a couple incidents over 21 days due to stress she is under being confined in hospital room then can be successful in less restrictive." Yet, four months later, the DHS liaison emailed a DHS official that DSS "has requested a CON although her hospital team does not feel this child requires an RTC." Several weeks later, one of the treating psychiatrists at the hospital wrote to the youth hospital liaison: "I'm pretty concerned about working on []'s placements. I'm not sure what else we can be doing to help, but I emailed to check in with [DSS worker] about group home interviews, and he responded asking for paperwork for RICA [RTC]. We've been pretty explicit that we don't believe she needs this higher level of care until she's exhausted all other options. We also reiterated that we weren't willing to do a CON at this time." SSA-2546, 2564, 2570-71.

- **P10**'s hospital also complained about difficulty contacting his caseworker—the same worker assigned to UBM--and reported that **P10** "has no clothing or personal items, including his glasses." SSA-2897, 2922.

- Communication problems caused significant risk of harm to **P25**, who did not enter substance abuse treatment or an RTC because DSS did not discuss the former option with **P25** or provide documents to the hospital for the latter option. SSA-3952, 3964. DSS decided to return **P25** to her mother but "no one was notified of the decision including [the hospital], child's attorney…" SSA-3969. The DHS liaison asked for a meeting with the substance abuse treatment program, but DSS acted too late, and **P25** left the hospital with her mother. The liaison then wrote DHS leadership about a "rapid response" or "action plan" to address **P25**'s need "for medication and intensive outpatient services to prevent a potential fatality." SSA-3970-71. Eventually, **P25** was placed in a hotel supervised by a 1:1 aide, yet she left and obtained fentanyl. SSA-3973. Two months after her discharge, **P25** returned to the hospital's E.D. with open wounds and needing detox. SSA-3971.

- For named Plaintiff **P21**, *supra*, the hospital youth liaison reported that the "hospital has expressed some concern regarding a sense of lack of priority towards locating a placement" and, two months later, "I need to have leadership on the call to help move this forward. It feels like we are spinning in circles and lack urgency on this case." SSA-3765, 3788. Two months after a facility finally accepted P21, the hospital asked:

29

"…[T]here is no discharge date in sight. Is there any way to find out why there is such a delay? My team is very concerned about this patient and her well-being. Each meeting we have no news and it has been very discouraging for everyone." SSA-3820.

- Almost two months after **P26** was accepted by an out-of-state RTC, the hospital wrote DHS: "The meeting with [DSS] was frustrating at best….They do not have an admission date or travel arrangements made. … I found [Acting Bureau Chief] to be extremely unprofessional…." SSA-3342.

- Internal communications confirm the dysfunction. After **P15** had been in overstay for three months, the DHS hospital youth liaison wrote to a DHS administrator, "I do not have any updates for BB because I have not been cc'd on anything to follow up on," and the administrator responded, "sometimes I wonder about their sense of urgency but I don't want to be judgey…" SSA-2520-21. *See also* **P27** ("diagnostic is reviewing, they were going to accept her but requested 1:1 and there was a delay in communication and they gave bed away"), SSA-3896; **P28 (**"scheduled for discharge tomorrow, but the hospital has not received any information from the department regarding her discharge plan"), SSA-2751; **P29** ("I just tried the CW supervisor [ ] and like always no response. I am drafting another email. They are in danger of losing the bed. [Program] has said they cant hold it."), SSA-2802; **P30** ("It is imperative we improve our communications with hospitals…"), SSA-2979; **P31** ("[Hospital] has been trying to coordinate a meeting with your team and has not been successful with getting your team to the table"), SSA-3011; meeting note: "Breakdown in communication and what is happening disconnect," SSA-3015; **P32** ("It's been very difficult getting timely updates from the worker…"), SSA-3357; **P33** ("Asked DSS if they can provide 1:1 support—no response"), SSA-3674; **P34** (after 44 days of E.D. overstay, "The [DSS] worker and supervisor were not prepared for the call [with the hospital]. Neither … read any of the emails…regarding acceptance to [ ]"), SSA-3872.

Dr. Epstein and Ms. White also conclude that Defendants have failed to take systemwide steps to address the crisis, such as "shift[ing] their focus to development of sufficient community-based placements and other resources for children like [Plaintiffs]," providing immediate state-level focus when a child is admitted to a hospital or is in an E.D. without an admission or somewhere to go; conducting a "state level review … to determine whether all the types of assessments needed to develop comprehensive, individualized plans are available and up to date" and address traumas and their impact on functioning; or using "the considerable carrots and sticks at their disposal to try to secure a placement in an appropriate community-based living arrangement that was … reluctant to serve a particular child," by offering "technical assistance or additional resources to address the barriers to admission[.]" Expert Rep. 30-31. Until recently,

30

they did not adjust provider contracts to limit discretion and, instead, allowed DSS "to sen[d] out broadcast applications for admission to many different types of placements in Maryland, and even across the country, without any evidence as to which, if any of them, might be appropriate for the overstay child in question." *Id*. at 31.

As the experts conclude, these are systemic, statewide issues. They write:

…[F]rom top to bottom, the state level Defendants and their agents perpetuated and even modeled the prehospitalization pattern of inadequate assessment, absence of trauma-informed service planning, and inappropriate placements and services by starting and sticking with one question, "What's available?" and not, "What do this child and family actually need to succeed when they leave the hospital and what must *we* do to make sure they receive it?"

*Id.* at 32. Such broad systemic policies and practices cannot be addressed in individual cases.

### C.     The Harm Caused by Overstays Is a Common Issue.

The case summaries above sometimes refer to harm occurring to the child while in overstay or to the deplorable conditions for children spending months in an E.D. or a psychiatric ward. Tragically, and outrageously, this is a common and seemingly accepted consequence:

- **P35**: "[H]as begun expressing increased hopelessness and frustration at her prolonged hospitalization. We are very concerned about her mental wellbeing especially in light of hearing that it could take months to find her placement." SSA-2318.

- **P15**: Slept "excessively" and explained "that it was because she is bored." SSA-2512. Months into her hospitalization, a few hours of home and hospital tutoring was just getting underway. SSA-2522. *See also* **P36** ("bored, becoming ancy [sic], not understanding why he is still in the hospital, he is still in a very restrictive area, not conducive for a young man w/mental capabilities," SSA-2768-69, and a month later "behaviors increasing due to boredom, extremely frustrated, had to give IM [intramuscular] yesterday," SSA-2773); and **P37** ("CASA [court-appointed special advocate expressed concern she is always sleeping when she calls…There is nothing to do in the day, nothing of interest, with people like themselves, part escape, part is medication, part is only peaceful time she has, not on age level, not able to communicate at age level, hearing may be impaired as well."), SSA-3170.

- Children frequently decompensated: **P38** ("He is decompensating very badly due to peers he views as having 'worse' behaviors getting accepted into RTCs."), SSA-2787; **P39** ("she is having a hard time finding hope" and "She is starting to decompensate on the unit", "only had access to same cycle of groups", and did not begin tutoring for almost a month), SSA-3032, 3034; **P40** ("DSS worker reported [J] decompensating"

and "She is becoming institutionalized…wants to move out of hospital"), SSA-3389, 3380; **P41** (Three months into overstay, "he ask[s] daily when he is leaving, he pick up behaviors from peers as a way to get out of the hospital, he stopped attending groups since repetitive, he considers himself jr staff…he is stuck in holding pattern" and "concern he will pick up more behaviors de-compensate longer he stays here"), SSA-3082; **P42** ("she has been on overstay for months and is getting worse by being here" and "realizing deteriorating the longer she is here. Need escalation, don't want to have to isolate her…Ideally would like her to go to [ ] or [ ] if denial then OOS [out of state] but not end goal for her and believe it will make it worse…Team feels strongly deserves to be in Maryland"), SSA-3424, 3427; **P27** ("Continued challenges due to extended length of stay in the acute care setting—attachment to staff, more anxious about leaving/discharge, competitive behaviors, attention seeking…" and "Due to [P27] Long Length of Stay in the Acute Care Setting her behaviors have escalated…clinically stable for discharge, however continues to have challenges with escalating behaviors due to long length of stay, and environment." SSA-3897-98.

- After 71 days of overstay, **P26**'s case staffing notes stated, "frustrat[ed] wants to go home, doesn't want to be here, keeps hurting self to feel something," SSA-3300; after almost three months: "had a rough week, instances to harm herself…She vocalizes that she is ready to go and she is bored," and "based on deterioration of behaviors from time she had been accepted, started behaviors she wasn't doing before," her recommendation changed to RTC. SSA-3298, 3306.

- **P10** was assaulted twice during his overstay and deteriorated emotionally: he "is not doing well, frustrated… school has not started…." SSA-2888-89, 2955.

- After 4 months of overstay, **P17**'s psychiatrist wrote, "I believe that [his] ingestion of non-food objects is a symptom of a larger issue which is institutionalization. I believe that this behavior will continue as long as he remains in an institutional setting, and the only hope of improvement will be getting out of that setting and into a home setting…So we have changed our recommendation to a therapeutic foster home … or any less restrictive setting with appropriate services and supports in the community … to help him reintegrate into school and community." SSA-3701-02.

- Institutionalization is common. After months in overstay, **P43**'s "mood has changed, very depressed—she reports waking up to the same day over and over again. she wants to be a normal kid… irritable seeing other youth leave, she is on edge—very tearful, hard to see her in this current state…" SSA-4050. *See also*: **P25** ("She is incredibly frustrated with being here and being unable to participate in normal activities. She expressed an interest in attending school and working." She "is becoming more agitated with being here and being limited to the floor…I would like to prevent any further restrictions to her while she is here." "We are very concerned that her agitation will increase, causing her not to be a candidate" for the substance abuse program), SSA-3960, 3962, 3966. **P44**, with an IQ of 53, had an IM because she **"**is struggling and feeling abandoned when seeing other youth have visitors and leave the hospital," SSA-3632-33. After six months of overstay, hospital case notes for named Plaintiff **P21** stated, " unfortunate we have become her residence"; two months later, she "is way too comfortable at hospital…she doesn't want to leave." SSA-3773, 3794.

32

- For children in emergency departments, the situation is especially dire. After 85 days of overstay, **P2**'s team wrote: "The team is however concerned about [her] mental state. She has now been in the hospital for almost 3 months and it has taken a great toll on her mental stability." *Four months* later, the E.D. director wrote to DSS: "[W]hile pt is currently being held in the Emergency Department it is important to understand that she is NOT receiving support services, such as therapy, while she waits. This is not the proper setting for support services, she is merely in holding…Are any efforts being made to provide pt with schooling material?...Please understand the situation is dire as pt is only having her minimal needs met (food, clothing, shelter) while she sits here each day." Yet one month later, an email stated, "The emergency department is not representative of [**P2**'s] current functioning in a community setting; she is not interacting with peers, she's not attending school or other required scheduled activities, she's not spending any time outside, and she is constantly monitored by a sitter and now additionally a 1:1, and she's not being provided any therapeutic or treatment services." SSA-2548, 2637, 2667. **P16**'s hospital wrote that it "is concerned, ethically, about being used to hold this child against his will. Please let us know when you will pick him up and take him to the other boarding location you have identified as the unlicensed home. Surely, he will do better there than he will in a locked room with no sunlight." "We do not want him to remain in the [E.D.], as it is a small space with no windows or ability to walk around." SSA-2860, 2862. *See also* **P30** ("[T]he ED is not an ideal place for children to remain for extended periods …He has expressed desire to go outside, and concern regarding falling behind in school."), SSA-2973).

- **P11** spent three weeks in a locked E.D. pod, even though he had been accepted to a therapeutic group home and could have been placed a week sooner, but his DSS caseworker scheduled a later placement date because of her leave schedule, causing him to spend Christmas in the E.D. The DHS hospital youth liaison tried to escalate to high-levels, urging that **P11** be "discharged from the hospital and placed in the group home as soon as possible," to no avail. SSA-3159-60. **P35** had to be restrained in the E.D. and given IM on Christmas Eve, her 79th day of four months in overstay. SSA-2380. As of her 28th day in an E.D. overstay, **P1**, 12 years old, *supra*, was "confined to a 5 bed secured area and only permitted to wear paper scrubs. She has not had any visitors. DSS reports speaking with her but they have not seen her." …[S]he is not receiving medication, therapy or case management." SSA-2482, 2491, 2495. **P19** spent more than a month boarding in an E.D. without decent clothing ("Hospital request clothing, [worker] brought undergarments on Friday…letting up on restrictions as she is a boarder, don't have scrubs that fit her, she wears a gown but not 2 and she is exposed." SSA-3266. After 400 hours in an E.D., notes for **P21** stated, "she is confined to small area and begin to fall apart, expected behaviors from being in confined area, she is clearly frustrated…" SSA-3746. **P34** was in a "locked 6 bed area in the ED" and "only allowed paper scrubs" "with no end in sight" after 41.5 days. "She is not getting any schooling (due to being in Emergency Room) and has essentially been stuck in a room. While our staff are doing their past [sic] to provide her with activities, clothes, etc…it is no substitute for a proper placement. She is not a mental health nor medical patient-simply boarding here, getting no services, until DSS finds a place." She also was "overdue on dental and vision." SSA-3857, 3871.

- Finally, as these case examples indicate, foster children in overstays receive minimal, if any, education services while hospitalized. **P13** had been placed in a series of residential programs and had not been in a public school for two years; meeting notes stated, "She has fallen through the cracks." SSA-3096. **P45,** a deaf teenager, received no education services while in overstay, as the local school liaison asserted they can not 'teach them.'" SSA-3126. For named Plaintiff **P46**, who spent months in overstay, the education director of the RTC identified for him stated that the "school team let me know today that we cannot educate him due to how far he is behind educationally." SSA-4072. DSS wrote that **P17** "has lost out on a large amount of in the classroom instruction, educational classroom information, and feel that he would benefit from much more educational instruction than he is receiving. For clarity, the question was posed, can he receive BOTH in-person instruction…AND virtual learning beyond the 6 hours per week." SSA-3715-16. **P21,** in E.D. overstay for more than 900 hours, received *no* education. SSA-3753.

These tragic examples reflect the great harm commonly caused by overstays.

## III.    The Proposed Class Continues to Satisfy Rules 23(a)(3), (a)(4), (b)(2), and (b)(3).

For all remaining requirements of Rule 23, Plaintiffs incorporate their prior arguments.

**A.    Typicality is met.**  Dr. Epstein and Ms. White compared the named Plaintiffs' cases to the 25 sample cases and determined that they are typical of the proposed class: "the named Plaintiffs are typical of other Maryland children with disabilities who experience hospital overstays while in Defendants' custody and that the named Plaintiffs and these other children are similarly situated." Expert Rep. 4. This evidence amply meets Plaintiffs' burden of proof.

Typicality merely requires the named plaintiffs to "be part of the class and 'possess the same interest and suffer the same injury' as the class members." *In re Under Armour Secs. Litig.*, 631 F. Supp. 3d 285, 302 (D. Md. 2022) (quoting *Broussard v. Meinecke Discount Muffler Shops, Inc.*, 155 F.4th 331, 338 (4th Cir. 1998)).  "The crux of the typicality requirement is whether the Named Plaintiffs' *claims* are representative of the absent class members' *claims*—not whether their factual circumstances are identical." *Jonathan R.*, 344 F.R.D. at 314 (emphasis in original). Here, both the same "legal theory" (*Olmstead*) and "the same course of conduct" are alleged. *Id.* The named Plaintiffs had long overstays of three months or more: P15 (3 mos.); P47 (6 mos.); P24

(3½ mos.); P21 (11 mos.); P48 (6 mos.), P46 (11 mos.), with overstay days ranging from 107 to 344 days, compared to three to 618 days for the class. making them strong representatives. (Expert Rep. 8, 35, 36-37, 45, 47, 48, 49). They had similar discharge outcomes. *Id.* at 9. Defendants have not identified any "major defense" unique to the named Plaintiffs. *See Under Armour*, 631 F. Supp. 3d at 302. In short, "[b]y pursuing their own interests, the Named Plaintiffs will necessarily advance the interests of all other [class] members." *Jonathan R.*, 344 F.R.D. at 314.

      **B.**    **Adequacy of representation is met** per Plaintiffs' prior arguments.

      **C.**    **Rule 23(b)(2) is met.** By "demonstrating that [Defendants] engage in certain common practices," Plaintiffs have established that [Defendants'] contested actions "apply generally" to the class. *B.D.*, 2024 WL 4227544, at *18 (citing cases).

      **D.**    **Rule 23(b)(3) is met** per Plaintiffs' prior arguments.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should reopen Plaintiffs' Motion for Class Certification, certify the proposed class, and appoint the undersigned as class counsel.

Dated: January 12, 2026                        Respectfully submitted,

/s/ Luciene M. Parsley                      /s/ Mitchell Y. Mirviss
Luciene M. Parsley (Fed. Bar No. 27089)        Mitchell Y. Mirviss (Fed. Bar No. 05535)
(signed by Mitchell Mirviss with permission)      750 East Pratt Street, 9th Fl.
of Luciene M. Parsley)                     Venable LLP
Leslie Seid Margolis (Fed. Bar No. 23422)       Baltimore, MD 21202
Megan R. Berger (Fed. Bar No. 21705)          mymirviss@venable.com
Disability Rights Maryland                 Ph: (410) 244-7412 / Fax: (410) 244-7742
1500 Union Avenue, Suite 2000
Baltimore, MD 21211
LucieneP@disabilityrightsmd.org
LeslieM@disabilityrightsmd.org
Megan.Berger@disabilityrightsmd.org
Ph: (410) 727-6352 / Fax: (410) 727-6389

Attorneys for Plaintiffs